IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

FILED

2017 MAR 16 P 12: 04

U.S. DISTRICT COURT
EASTERN DIST. TENN.

| | | |
|---|---|---|
| (UNDER SEAL), | ) | |
| | ) | |
|     Plaintiff/Relators, | ) | |
| | ) | Qui Tam No. _____ |
| v. | ) | 3:17-cv-96 |
| | ) | |
| (UNDER SEAL), | ) | |
| | ) | |
|     Defendants. | ) | |

---

## FALSE CLAIMS ACT COMPLAINT

---

### [FILED UNDER SEAL]

David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
**BURKHALTER, RAYSON & ASSOCIATES, P.C.**
Attorneys for Plaintiff/Relator
P.O. Box 2777
Knoxville, Tennessee 37901-2777
(865) 524-4974

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. LEANN MARSHALL, and | ) | |
| LEANN MARSHALL, INDIVIDUALLY, | ) | |
| | ) | |
| STATE OF TENNESSEE, | ) | |
| ex rel. LEANN MARSHALL, and | ) | |
| LEANN MARSHALL, INDIVIDUALLY, | ) | |
| | ) | QUI TAM NO.: _____ |
| Plaintiffs/Relators, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF TN MEDICAL CENTER HOME | ) | |
| CARE SERVICES, LLC, and LHC GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## FALSE CLAIMS ACT COMPLAINT

---

Relator, ex rel., LeAnn Marshall, by and through her attorneys, and on behalf of the

United States and the State of Tennessee, hereby sues the Defendants pursuant to 31 U.S.C. §

3729, *et seq.*, and in support thereof, would show unto this Honorable Court as follows, to-wit:

## I.     TABLE OF CONTENTS

I.     NATURE OF THE CASE ................................................................................... 2

II.    JURISDICTION AND VENUE ......................................................................... 3

III.   SUMMARY OF ALLEGATIONS ..................................................................... 3

IV.    THE PARTIES .................................................................................................. 5

       A.  The Relator: LeAnn Marshall ............................................................... 5

Page **1** of **68**

  B.  The Defendants: University of TN Medical Center Home Care Services, LLC/LHC Group, Inc ..................................................................................... 8

V.  SOURCE OF RELATOR'S ALLEGATIONS .............................................. 15

VI.  THE MEDICARE PROGRAM AND HOME HEALTH CARE AGENCIES ................ 16

VII.  SUBSTANTIVE ALLEGATIONS ......................................................... 24

  A.  Upcoding And Falsification Of OASIS Assessments: Scoring Patients At A More Dependent Functional Status; And Keeping Patients On Without Medical Necessity; And Keeping Patients On Without Being Homebound; And Not Having Physicians Approve or Sign Off On Plans Of Care ........................................................ 24

  B.  Fraudulent Recertifications .......................................................... 40

  C.  Decrease in Patient Care After Medicare Agrees to Pay In Order to Maximize Profits: Failure to Provide Services and Supplies; Negligent Care ......................... 47

  D.  Additional Examples of The Fraudulent Practices With Names of Specific Patients . 53

VIII.  SPECIFIC COUNTS AND RELIEF SOUGHT ............................................ 58

PRAYER FOR RELIEF ............................................................................ 66

CERTIFICATE OF SERVICE ..................................................................... 68

## I.   NATURE OF THE CASE

1.     This case is brought to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*., and Tenn. Code Ann. § 4-18-101, *et seq*.  This is also an action for unlawful retaliation under the Federal and Tennessee False Claims Act provisions.  *Id.*

2.     A private person, known as the "Relator", may bring a *qui tam* action in federal district court for herself and for the United States, and may share in any recovery under the United States False Claims Act, 31 U.S.C. § 3729, *et seq*., as well as under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*.

3.      In addition, under the False Claims Act, as well as the Tennessee False Claims Act, the Relator also brings an individual action against Defendants for the retaliation taken against her as a result of lawful acts done by Relator in furtherance of an FCA action and/or as a result of her other efforts to stop one or more FCA violations. 31 U.S.C. § 3730(h).

## II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to Federal Question, 28 U.S.C. § 1331, and § 1345, and 31 U.S.C. § 3729, *et seq*.

5.      In addition, to promote judicial efficiency, this Court may exercise supplemental jurisdiction over claims under Tennessee common law pursuant to 28 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a), in that all state created claims pleaded or that may be pleaded in this case arise out of a common nucleus of operative facts.

6.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because Defendants do business in the Eastern District of Tennessee, and the individual Defendants engaged in the conduct herein described in the Eastern District of Tennessee.

7.      Venue lies within the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732 because the acts and practices alleged in this Complaint occurred in this District.

## III.      SUMMARY OF ALLEGATIONS

8.      The Relator estimates that of the billings at University of TN Medical Center Home Care Services, LLC/LHC Group, Inc., (hereinafter "Defendants"), ninety percent (90%) would be Medicare, two percent (2%) would be TVA/governmental programs, three percent (3%) would be TennCare, and five percent (5%) would be private insurance and/or private pay.

9.      Defendants are treating beneficiaries and billing for home health services where

such services are not medically reasonable and necessary.

10. Defendants are upcoding by falsifying and manipulating the Outcome and Assessment Information Set ("OASIS") in order to score a higher Home Health Resource Group ("HHRG"), so Medicare pays at higher levels than would otherwise be justified.

11. Defendants are recertifying patients for additional home health services that do not meet requirements for medical necessity.

12. Defendants are providing home health services, and billing Medicare, when the treating physicians have not approved or certified the patient plans of care.

13. Defendants do not properly document the patients' medical records to justify billing Medicare, such as the failure to document verbal orders of physicians, and the medical records of the patients' certifying physician do not support the basis for certification and/or recertification of home health eligibility.

14. Once the OASIS assessment is submitted and Medicare payment is established, Defendants utilize a software tool, "Service Value Points", which is designed to minimize patient visits and services in order to maximize profits at the expense of patient care.

15. Once the OASIS assessment is submitted and Medicare payment is established, Defendants withhold supplies and/or provide cheap supplies in order to maximize profits at the expense of patient care. Further, in order to maximize profits, Defendants do not provide the type or amount of home health services as contemplated in the patient OASIS assessment and/or plan of care, such as sending LPNs to visit home health patients instead of RNs or Medical Social Workers.

16. As a result, after Medicare payment is established, the Defendants intentionally disregard and deviate from the patients' plans of care, as established by their treating and

Page **4** of **68**

certifying physicians.

17.     Defendants are recertifying patients for additional home health services, and billing Medicare, when the recertifying physicians have not indicated the need for continuing home health services, and have not estimated how much longer the services would be required, and have not provided a narrative justifying the patient recertification.

18.     Defendants are treating beneficiaries and billing for home health services where there is non-compliance or lack of documented certification of homebound status or medical necessity.

19.     The Relator alleges that these fraudulent practices are company-wide and involve systemic fraud, in light of the training Defendants provide to its employees, including training materials and training sessions, and further, in light of the close supervision of regional personnel and/or company-wide personnel on the local offices, including conference calls and software management tools, as alleged herein.

20.     During the last month of Relator's employment, she was retaliated against, and ultimately terminated on June 2, 2016, for her objections and for her refusal to go along with the fraud, as herein alleged, and Relator therefore also brings this action against Defendants for wrongful termination.

## IV.     THE PARTIES

**A.     The Relator: LeAnn Marshall**

21.     Leann Marshall was born on September 27, 1960 in Memphis, Tennessee. She currently resides at 201 Hicks Drive, Sevierville, TN 37862. Her Social Security Number is: 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. Her home telephone number is: (865) 640-2234. She has been married to Roy Marshall since December 4, 1993. She was previously married to Anthony Irvin Sills, and they

were divorced in January of 1993 in Memphis, Tennessee. She has never been arrested.

22. The Relator has a Bachelor of Science in Nursing from the University of Memphis where she graduated in August of 1993, and she received her Registered Nurse license in September of 1993. She has knowledge and over 15 years of experience in Home Health/Hospice/Hospital/School Nurse/Clinical Educator.

23. The Relator was originally hired by Defendants on or about June 10, 2010, as a Field RN at the Sevierville office location.

24. The Relator remained in the position of a Field RN at the Sevierville office until approximately February 22, 2011, when she was promoted to the position of Team Leader and transferred to the Maryville office. The Relator remained at Maryville until approximately July of 2013, when she was transferred to the Sevierville office as Team Leader. The Relator remained at Sevierville as a Team Leader until she was terminated on June 2, 2016.

25. During her employment, Relator's evaluations were always excellent.

26. During her employment, the Relator was written up on only one occasion when the Director of Nursing issued a blanket disciplinary action to all management staff.

27. As Team Leader, the Relator oversaw the plans of care for all 80 to 110 patients at the Sevierville location, and she supervised and oversaw the work of about fifteen (15) staff members: four (4) RN's, three (3) LPN's, one (1) physical therapist, one (1) occupational therapist, three (3) physical therapy assistants, one (1) medical social worker, and one (1) home health aide. Pursuant to her training and the instructions that she received, the Relator assisted in training these employees to focus on alleged patient "safety" issues in order to make sure the patients were scored at the highest possible acuity to ensure the highest Medicare payments. The Relator reviewed and made changes, relative to "safety", on the Medicare OASIS assessment

Page **6** of **68**

forms submitted by the RNs (even though Relator did not personally see the patients) to ensure that Medicare would assign the patients the highest payment possible. Based on instructions received from management, including the Performance Improvement Director and the Regional Director of Operations, Relator decreased the number of patient home health visits to maximize profitability. The Relator attended weekly case conferences on patients who were ready to either be discharged or recertified for additional home health services, and Relator initiated the paperwork with respect to recertifications and patient discharge. She also had several other duties, as stated in the attached job description from LHC Group's website.

28.  On June 2, 2016, the Relator was fired for a trumped up reason. At the time Relator was fired, her official job title according to her Separation Notice was Point of Care Team Leader. The Relator was allegedly terminated for: "Involuntary – Performance".

29.  Joe Huff, the Director of Nursing, informed the Relator of her termination, and the Branch Manager, Melanie Gibson, attended the termination meeting in person, while both the Corporate H.R. representative, Yolanda Brown, and the Regional Director of Operations, Melisa Rittenberry, attended the Relator's termination meeting via telephone. The termination telephone call lasted about five (5) minutes.

30.  During the termination meeting, Melanie Gibson and Joe Huff did not speak, and the Regional Director of Operations, Melisa Rittenberry, told Relator that she was terminated for not seeing that an LPN saw a patient in a timely manner. Yolanda Brown, in H.R., then told the Relator she was terminated, effective immediately, and to leave her keys, name badge, and to exit the premises. Ms. Brown also said they were not sharing details with staff and asked that Relator do the same. Relator told her that over the past 6 years, she had accumulated a lot of personal items in her office that she would like to have. Melisa Rittenberry directed Joe Huff,

Director of Nursing, to escort the Relator to her office while she retrieved her personal belongings, but the Relator was so rattled by the termination that she left about half of her things. Mr. Huff then escorted Relator to the door and said nothing.

31.     The real reason for Relator's termination was due to her refusal to go along with Medicare and Medicaid fraud. In early May of 2016, Relator began objecting and refusing to recertify patients who did not qualify for additional home health services and who needed to be discharged, and in late-May of 2016, the Relator began objecting and refusing to alter the OASIS assessments that were initially submitted by the Field Nurses. Within days of making the latter objections to Branch Manager, Melanie Gibson, the Relator was fired on June 2, 2016.

**B.      The Defendants:  University of TN Medical Center Home Care Services, LLC/LHC Group, Inc.**

32.     The Defendant, University of TN Medical Center Home Care Services, LLC's, current principal place of business is located at 420 W. Pinhook Road, Lafayette, Louisiana 70503-2131. Its Registered Agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

33.     The Defendant, LHC Group, Inc., is a publicly traded company and a Delaware corporation which was originally formed on January 20, 2005. However, according to the Tennessee Secretary of State, its initial filing is January 1, 2006. Its principal place of business is located at 901 Hugh Wallis Road South, Lafayette, Louisiana 70508-2511. Its Registered Agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312; (1-866-LHC-GROUP). Webpage address is: www.lhcgroup.com.

34.     Prior to Relator's hire, the Defendant, University of TN Medical Center Home Care Services, LLC, was acquired by LHC Group, Inc., and is currently a member of LHC

Group, Inc.

35. The Defendant, LHC Group, Inc., has numerous other home health care facilities in Tennessee and throughout the United States.

36. According to the webpage of Defendant, LHC Group, Inc., more than 60 leading hospitals and health systems around the country have "partnered" with LHC Group to deliver patient-centered care in the home; estimated to have 11,000+ employees in 26 states.

37. The Defendant, University of TN Medical Center Home Care Services, LLC, has three (3) branch locations: Knoxville, Maryville, and Sevierville.

38. The addresses of University of TN Medical Center Home Health Services/LHC Group branch offices are as follows:

MAIN OFFICE & BRANCH OFFICES

LHC GROUP/University of Tennessee Medical Center Home Care Services
2270 Sutherland Avenue, #101
Knoxville, TN 37919
865-544-6222

LHC GROUP/University of Tennessee Medical Center Home Care Services
1101 Fox Meadows Blvd, #104
Sevierville, TN 37862
865-908-4982

LHC GROUP/University of Tennessee Medical Center Home Care Services
629 Smithview Drive
Maryville, TN 37803
865-984-8484

39. The Sevierville office, located at 1101 Fox Meadows Boulevard, #104, Sevierville, TN 37862, has a patient census of approximately 80 to 110 home health patients.

40. The Maryville office, located at 629 Smithview Drive, Maryville, TN 37803, has a patient census of approximately 80 to 110 home health patients.

Page **9** of **68**

41.    The Knoxville office, located at 2270 Sutherland Avenue, #101, Knoxville, TN 37919, has a patient census of approximately 200 to 250 home health patients.

42.    As Relator understands, the University of TN Medical Center Home Care Services/LHC Group chain of command is as follows, by order of hierarchy:

- Don Stelly, CEO (Lafayette 1-866-LHC-GROUP)

- Susan Sylvester, Administrator (Knoxville, 865-544-6222). Susan Sylvester, Administrator (head manager over entire region). Relator only saw her 3 times in 6 years. She only got involved in crisis situations such as the recent audit.

- Sharon Coleman, RN, Performance Improvement Director, and is part of Performance Improvement Division. (Relator does not know who Ms. Coleman reports to at Corporate).

- Melisa Rittenberry, Regional Operations Director (Knoxville, 865-544-6222)

- Joe Huff, Director of Nursing (Knoxville, 865-544-6222)

- Melanie Gibson, Branch Manager (Sevierville, 865-908-4982); Former Branch Manager: Libby Davis, retired (Sevierville, 423-312-0054)

- Michelle Shelton, Former Branch Manager (Maryville, 865-984-8484), terminated on January 17, 2017.

- Relator, Team Leader

43.    The following employees at the Sevierville office would normally attend the weekly case conferences (shortly before the Relator was terminated):

- Relator

- Melanie Gibson, Branch Manager/ Libby Davis (retired)

- Bill Walker, RN

- Sarah Strike, PT

- Emily Stout, SLP

- Feather Reagan, RN

- Beverly Bryan, PTA

- Theresa Beauregard, PTA

- Ashley LaChance, LPN

- Kevin Utt, LPN

- Brandi Carpenter, Office Manager

- Bonita Dominque, Scheduler

Other employees in attendance have either resigned or were terminated.

44.     When Relator was initially hired by Defendants as a Field RN on July 10, 2010, she worked out of the Sevierville office.  During the time the Relator was a Field RN (from July 10, 2010, to February 22, 2011), she reported to the Team Leader, Kathleen Arnold, who was hired in 2010 and resigned in 2013.  The Team Leaders, in turn, reported to the Branch Manager. The Branch Manager during this time was Libby Davis.  Libby Davis was originally hired as Intake Coordinator by University of TN Medical Center Home Care Services before it was acquired by LHC Group, Inc., and Ms. Davis was thereafter promoted to Branch Manager in or about 2007 after the acquisition.  Libby Davis was Branch Manager for approximately seven (7) years before she retired in or about April of 2015.   When Libby Davis retired as Branch Manager, she was replaced by Melanie Gibson, who remains Branch Manager.  Melanie Gibson

was hired in as Branch Manager in or about May of 2015. Previously, Ms. Gibson had worked for Amedisys Hospice Services for about fifteen (15) years.

45.     The Branch Managers of Sevierville, Maryville, and Knoxville, report to the Director of Nursing who is based out of the Knoxville office. The Director of Nursing, Joe Huff, was promoted to the position of Director of Nursing in or about May of 2015. Prior to his promotion, Mr. Huff was originally hired as the Director of Home Health Community Based Services Department in or about 2014. The previous Director of Nursing was Melissa (Relator cannot recall her last name), who was hired sometime in 2014, and resigned in April of 2015. Prior to Melissa (last name unknown), Joe Davis was the Director of Nursing from approximately 2010 to 2014, until he was demoted to Team Leader for unsatisfactory work production and then he subsequently resigned.

46.     The Director of Nursing, Joe Huff, reports to the Regional Director of Operations, Melisa Rittenberry. Melisa Rittenberry has been the Regional Director of Operations for about four (4) years, and Relator is not familiar with her background. The Relator believes that Melisa Rittenberry's regions include Knoxville, Chattanooga, Maryville, Sevierville, and possibly Nashville and Athens, but she may be over other areas as well. To Relator's knowledge, there was no Regional Director of Operations before Ms. Rittenberry was hired.

47.     The Regional Director of Operations, Melisa Rittenberry, reports to the Administrator, Susan Sylvester. As Relator understands, Susan Sylvester is over all locations in the Southeast region of the country, including the State of Tennessee. Susan Sylvester has been Administrator since approximately 2007, though Relator is not positive. The Relator believes that Susan Sylvester reports to the CEO, Don Stelley, who is located in the home office in Lafayette, Louisiana.

48.     The general structure of the Sevierville Branch (as well as the Maryville and Knoxville Branches) during the Relator's employment was the Branch Manager was in charge. There was one (1) Team Leader; three (3) to four (4) Field RN's; three (3) LPN's; one (1) Physical Therapist; three (3) Physical Therapist Assistants; one (1) Occupational Therapist; one (1) Speech Therapist; one (1) Medical Social Worker; one (1) Home Health Aide; one (1) Office Manager; one (1) Administrative Assistant; and one (1) Branch Manager. Sometimes if there was a need, nurses would cover for sister offices. The Speech Therapist works for all three (3) offices. The Occupational Therapist works for Sevierville and Maryville. Since Knoxville is bigger, it has two (2) Team Leaders and more nurses, but the Relator is unsure of how many.

49.     The names of the Defendants' employees that Relator recalls working out of the Sevierville office were as follows:

- Greg Able, RN – hired 2011, and resigned in 2014
- Erin Cannon, RN – hired 2015, and resigned in 2016
- William Walker, RN – hired 2011, and still works on as needed basis
- Jennifer Knox, LPN – hired 2015, and resigned in 2016
- Rhonda Reams, LPN – hired 2007, and terminated in 2014
- Amber DeBoard, OT – hired 2010, and still works for both Sevierville and Maryville offices
- Kim Lemonade, Office Manager – hired 2012, and resigned in 2014
- Brandy Carpenter, Office Manager – hired 2015, and still works there
- Sarah Strike, PT – hired 2010, and transferred to Morristown, TN office (not within Knoxville provider) in 2016
- Laurie Daniels, Administrative Assistant – hired 2010, and terminated in 2014
- Bonita Dominque, Administrative Assistant – hired 2014, and resigned in 2016
- April Bryant, Aide – hired 2014, and terminated in 2016
- Melanie Gibson, Branch Manager – hired 2015, and still works there
- Libby Davis, Branch Manager – hired in 2003, and retired in 2015

50.     The names of the Defendants' employees that Relator recalls working out of the Maryville office were as follows:

- Sharon Braddy, RN – hired 2009, and resigned in 2013
- Jeff Winn, RN – hired 2015, and resigned in 2015
- Keyerra Steele, RN – hired 2015, and resigned in 2016
- Pamela McWhorter, RN – hired 2009, and resigned in 2013
- Anne Thompson, RN – hired 2015, and resigned in 2016
- Janet Swaney, LPN – hired 2010, and terminated in 2016
- Dustin Hall, PT – hired 2010, and still works there
- Pam Scarbrough, PTA – hired 2010, and still works there
- Kim Myers, Team Leader – hired 2013, and resigned in 2014
- Tina Williams, Office Manager – hired 2012, and resigned in 2014

51.     The duties of a Field RN are to assess patients and complete Medicare OASIS Start of Care based on patient condition that day and 24 hours prior, and also perform recertifications and official discharges of the patients at their home (after Relator approved the discharge) based on what was decided in the weekly case conferences.

52.     The duties of a Team Leader include managing census of approximately 100 patients and branch staff, approving OASIS assessments, attend and conduct the weekly case conferences, software, OASIS audits, onsite supervisory visits, perform duties of Branch Manager when Branch Manager is not in the office, and act as a liaison between patient/families and staff.

53.     The duties of the Office Manager include payroll, general office work, onboarding new staff members, and is also in charge of getting each patient's Plan of Care signed and returned by the physician.

54.     The duties of the Branch Manager include overseeing the branch, meeting expectations of the budget, numbers, etc., attending the weekly case conferences, and accepting patient referrals and entering them into the database.

55.     The Branch Managers, Office Managers, and Team Leaders are eligible to receive quarterly bonuses based on meeting budget. The Relator's last bonus was $500 in May of 2016. It is Relator's understanding that the bonuses are based on maintaining a high census at the facilities and showing profit for the quarter. Therefore, the bonus structure encourages such employees to participate in the fraudulent scheme, as alleged herein, because said bonuses would increase, for example, when the OASIS assessments are upcoded, and/or patients are kept on the census, thereby improving the overall numbers and bonus payments to management.

56.     Defendant, LHC Group, Inc., settled a False Claims Act case announced on September 30, 2011, making similar allegations as contained herein for $65,000,000.00, and signed a Settlement Agreement and Corporate Integrity Agreement on September 28, 2011. The CIA was effective for five (5) years from September 29, 2011. The DOJ press release stated the settlement:

> [R]esolved allegations that, between 2006 and 2008, LHC improperly billed for services, that were not medically necessary and for services rendered to patients who were not homebound.

As of the date of this filing, the webpage of the HHS Office of Inspector General identifies LHC Group, Inc., as a "Closed Case" since January 4, 2017.

57.     Relator has not alleged that the violation of the CIA is a basis by itself for a False Claims Act violation. Rather, the false claims that are the subject of this Complaint, as alleged herein, are separate and identifiable fraudulent acts that took place during Relator's employment.

## V.  SOURCE OF RELATOR'S ALLEGATIONS

Page **15** of **68**

58.     Relator states that all allegations in this Complaint are based on evidence obtained directly by Relator independently, and through her own labor and efforts. The information and evidence, as stated herein, is based on evidence she obtained, and is based on her personal knowledge.

## VI.  THE MEDICARE PROGRAM AND HOME HEALTH CARE AGENCIES

59.     In 1965, Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals. 42 U.S.C. § 1395, *et seq*.

60.     The Department of Health and Human Services ("HHS") is an instrumentality of the United States whose activities, operations, and contracts are paid from federal funds, and is responsible for the administration and supervision of the Medicare[1] program.

61.     "Medicare Part A" provides insurance benefits for aged and disabled persons who meet certain requirements. 42 U.S.C. § 1395f(a)(2)(C).   Medicare Part A "provides basic protection against the costs of … home health services" for qualified individuals. 42 U.S.C. § 1395c.

62.     "Medicare Part B" is a "voluntary insurance program to provide medical insurance benefits." 42 U.S.C. § 1395j.  Medicare Part B also provides coverage for certain "home health services".  42 U.S.C. § 1395k(a)(2)(A).

63.     The home health services covered by Medicare include:   Intermittent skilled nursing services, home health aide services, physical therapy, speech-language pathology, occupational therapy, and medical social services. Medicare Benefit Policy Manual, Chapter 7 –

---

[1] At all times stated herein, the term "Medicare" also includes other government healthcare programs, such as TRICARE/CHAMPUS, since said programs have similar requirements and have been similarly defrauded by Defendants, as alleged herein.

Home Health Services § 10.1 & § 40, *et seq.*

64.    Providers of home health care services are typically known as home health care agencies ("HHAs").  HHAs may furnish home health care using their own staff, or HHAs may contract with others to provide services.  In addition, many HHAs are chains that have a central "home office" that provides administrative and centralized management services to individual agencies within the chain.

65.    As a condition of payment, "Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies" the patient's eligibility and entitlement to home health services. 42 C.F.R. § 424.22.

66.    To qualify for the home health services, as a Medicare condition of payment, the physician must certify that the beneficiary meets the following requirements:

(1) Home-health services "are or were required because the individual is or was confined to his home ["homebound"] ... and needs or needed" covered home-health services;

(2) A "plan for furnishing such services to such individual has been established ["plan of care"] and is periodically reviewed by a physician";

(3) "[S]uch services are or were furnished while the individual is or was under the care of a physician"; and

(4) "[P]rior to making such certification the physician must document that the physician … has had a face-to-face encounter … with the individual during the 6-month period preceding such certification."

42 U.S.C. § 1395n(a)(2)(A); 42 U.S.C. § 1395f(a)(2)(C) (listing nearly identical requirements under Medicare Part A); *see also* 42 C.F.R. §§  424.10 & 424.22.

67.    To be eligible for home health care services, a Medicare beneficiary patient must

be considered "homebound". That is, the beneficiary must have a health condition that restricts his or her ability to leave the home except with the aid of supporting devices, or have a condition that makes leaving the home medically contraindicated. Further, there must exist a normal inability to leave the home, and leaving the home requires a considerable and taxing effort. Even if the beneficiary does leave the home, the beneficiary may still be considered homebound if the absences from the home are infrequent or for periods of relatively short duration, or are attributable to the need to receive health care treatment. *See* Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 30.1, Confined to the Home.

68.     To be eligible for home health care services, a patient must require intermittent skilled nursing services, physical therapy, or speech-language pathology services. Continuing occupational therapy services can also provide a basis for eligibility if the patient's initial eligibility was established by a prior need for one of the other qualifying services. In other words, at least one type of skilled service must be medically necessary in order for the patient to be eligible for home health care services. "Skilled services" are sophisticated and complex services that can only be safely and effectively performed by a registered nurse, qualified physical or occupational therapist, or speech-language pathologist. 42 C.F.R. § 409.44 & § 424.22; *see also* Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 10.1 & § 40, *et seq.*

69.     To be eligible for home health care services, the patient must be under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine. 42 C.F.R. § 424.22.

70.     To be eligible for home health care services, a physician must also certify the patient's need for home health services. 42 C.F.R. § 424.22. In order to be covered by Medicare, the services must be included in a plan of care established by a physician and reviewed and

signed by that physician at least once every sixty (60) days. 42 C.F.R. §§ 409.42, 409.43, 424.44. The plan of care must be completed on a HCFA or CMS Form 485 prior to its submission to Medicare. The plan of care is valid when it is signed and dated by a physician, except that services provided from the beginning of a certification period and before the physician signs the plan of care are considered to be provided under the subsequently signed plan of care where the services were provided pursuant to an adequately documented verbal order in the medical record, and the services are included in the subsequently signed plan of care. Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 30.2, *et seq.* A physician's verbal order must be documented in the plan of care, include "a description of the patient's condition and the services to be provided" by the HHA, and include "an attestation (relating to the physician's orders and the date received) signed and dated by the registered nurse or qualified therapist…responsible for furnishing or supervising the ordered service in the plan of care". 42 C.F.R. § 409.43; *see also* 42 C.F.R. § 484.18.

71.     The home health prospective payment system ("PPS") is the system by which HHAs are reimbursed for service costs by Medicare. 42 U.S.C. § 1395fff(a); Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 10, *et seq.* The PPS uses a 60-day "episode of care" as its standard measurement, and reimbursement for services provided during each episode of care is paid to the HHAs in two parts: An initial payment, referred to as a "request for anticipated payment" ("RAP"), which is a percentage of the anticipated episode payment, and a "residual final payment" that is paid after the end of the 60-day episode. *See* 42 C.F.R. § 484.205; Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 10.5.

72.     For the initial episodes of care, an HHA is paid on a 60/40 percentage split payment: "An initial percentage payment of 60 [%] of the episode will be paid at the beginning

of the episode and a final percentage payment of 40 [%] will be paid at the end of the episode, unless there is an applicable adjustment. For all subsequent episodes for beneficiaries who receive continuous home health care ["recertification"], the episodes will be paid at a 50/50 [%] payment split." Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 10.5.

73.     Medicare payments to HHAs, therefore, are not based on a fee-for-service model that would consider the precise treatments that were provided during the 60-day episode of care. Rather, the entire 60-day episode payment "represents payment in full for all costs associated with furnishing home health services previously paid on a reasonable cost basis." 42 C.F.R. § 484.205(b).

74.     Medicare will pay HHAs the full amount for the 60-day episode of care "unless the national 60-day episode payment is subject to a low-utilization payment adjustment set forth in [42 C.F.R.] §484.230, a partial episode payment adjustment set forth at [42 C.F.R.] §484.235, or an additional outlier payment set forth in [42 C.F.R.] §484.240. All payments under this system may be subject to a medical review adjustment reflecting beneficiary eligibility, medical necessity determinations, and HHRG assignment." 42 C.F.R. § 484.205(b).

75.     HHAs participating in Medicare are required to complete an Outcome and Assessment Information Set ("OASIS") form whenever a patient-specific comprehensive assessment is made for a patient in need of home health services. 42 C.F.R. § 484.55. This form is used to assess the condition and situation of potential patients, as well as to re-assess the condition and situation of existing patients at least every sixty (60) days. *Id.* In addition to other factors that must be included on the OASIS assessment, HHAs must verify patient eligibility for Medicare home health services by providing detailed and precise information about the patient, including homebound status and medical necessity, and to determine the immediate care and

support needs of the patient. 42 C.F.R. §§ 484.55, 484.205, 484.250.

76.     As stated in the OASIS-C2 Guidance Manual at Appendix F, the general background of the OASIS:

> The OASIS instrument was introduced nationally in 1999. Its initial purpose was to provide a standardized home health item set and standardized quality measures for use in quality improvement activities within individual home health agencies. The uses for OASIS data quickly expanded beyond quality measurement to also include determining reimbursement under Medicare Prospective Payment System (PPS). The uses for OASIS data have continued to evolve over the years with significant quality and payment implications tied to OASIS data. The current uses for OASIS-based measures include: 1) Home Health Agency Medicare-certification surveys, 2) the measures on the consumer-focused Home Health Compare website, 3) the measures used in the Home Health Quality of Patient Care Star Ratings,4) the measures used in the Centers for Medicare & Medicaid Services (CMS) Home Health ValueBased Purchasing (HHVBP) Model, and 5) the Quality Assessment Only (QAO) Metric used in home health pay-forreporting (P4R). The OASIS instrument is also expected to play a pivotal role in post-acute care quality improvement as advances are made related to the mandates of the IMPACT Act (Improving Medicare Post-Acute Care Transformation Act of 2014).

77.     The Health Insurance Prospective Payment System ("HIPPS") code reflects the intensity of the patient's condition and level of service that the patient is likely to require. HHAs determine the proper code to use for a patient by using a CMS software that generates the appropriate HIPPS code from a Home Health Resources Group ("HHRG") designation that the software assigns the patient. *See* 42 C.F.R. § 484.20(d).   The CMS software selects the appropriate HHRG based, in part, on the information that the HHAs include on the OASIS forms. *Id.* at § 484.210(e).

78.     Therefore, the encoded OASIS assessment data must accurately reflect the patient's status at the time of assessment, 42 C.F.R. § 484.20(b), and the submission of OASIS data is a condition of payment required by Medicare. 42 C.F.R. § 484.210(e).

79.     Home health services provided to Medicare beneficiaries must be reasonable and

Page **21** of **68**

necessary, which is determined by the Medicare contractor's review of the information set forth in the respective beneficiary's home health plan of care, the OASIS assessment as required by 42 C.F.R. § 484.55, or the medical records. Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 20.1.2.

80.     Medicare's PPS for home health care uses a case mix adjustment that recognizes that different types of patients require different levels of resources, and the data from the OASIS assessment is assigned point values based on clinical severity, functional severity, and service utilization: "The data elements of the case-mix adjustment methodology are organized into three dimensions to capture clinical severity factors, functional severity factors, and service utilization factors influencing case mix. In the clinical, functional, and service utilization dimensions, each data element is assigned a score value. The scores are summed to determine the patient's case-mix group." Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 10.2.

81.     HHAs, when performing the comprehensive assessment of the home health patient's condition, must also list on the OASIS assessment each diagnosis and corresponding ICD-9-CM code at the level of highest specificity for which the patient is receiving home care. Each diagnosis and corresponding ICD-9-CM code is sequenced according to the patient's primary diagnosis, other diagnoses, and additional diagnoses. The primary diagnosis of a patient should coincide with the focus of care of the home health services for that patient. Medicare reimbursement values are determined, in part, by the primary diagnosis and corresponding ICD-9-CM code existing for a particular patient – certain codes having a higher reimbursement value than others. 42 C.F.R. § 424.32.

82.     Based on the underlying diagnoses and the evaluation of the patient conducted by the HHA on the initial visit, the patient is assigned a HIPPS code that is used to reimburse the

HHA for the care they provide. The sicker the patient, generally, the greater the level of reimbursement, as these patients are deemed to require more attention, time, and clinical expertise. HHAs, therefore, have an incentive to upcode their patient's diagnoses and levels of clinical and functional severity, as well as their service utilization, in order to obtain maximum reimbursement.

83.    Medicare makes interim payments to HHAs throughout its fiscal year on the basis of the HHAs estimated costs in performing covered home health services. 42 C.F.R. § 413.64. This is known as the periodic interim payment ("PIP") or estimated cost method of payment.

84.    To receive the interim payments, HHAs are required, as they furnish services, to submit to the Medicare intermediary a HCFA ("UB-04") form. This form identifies the OASIS data collected in accordance with 42 C.F.R. § 484.55. 42 C.F.R. §§ 484.20, 484.205, 484.250.

85.    At the end of Medicare's fiscal year, HHAs submit detailed cost reports that reflect the total cost of providing Medicare services, including the HHAs' administrative expenses, less the total interim payments made to the HHAs. It is absolutely necessary that the information reflected on the year-end cost reports be accurate because that information forms the basis for the amount Medicare pays the HHAs for the period covered by the report.

86.    The Department of Health and Human Services, through its intermediaries, reviews cost reports, cost statements, and other financial representations made by HHAs and home offices, and makes retroactive adjustments to amounts paid to HHAs during the course of the fiscal year. 42 C.F.R. §§ 413.60, 413.64(f). If interim payments exceed actual, reimbursable costs, or the cost limits, pursuant to the cost report and cost statement reconciliation process, Medicare is entitled to a year-end adjustment. *Id.* If a HHA did not actually incur costs that it claimed in a cost report or cost statement and for which it received payment, the agency is in

Page **23** of **68**

receipt of money which it was not entitled and therefore is obliged to return the money to Medicare.

## VII.    SUBSTANTIVE ALLEGATIONS

**A.**    **Upcoding And Falsification Of OASIS Assessments:  Scoring Patients At A More Dependent Functional Status; And Keeping Patients On Without Medical Necessity; And Keeping Patients On Without Being Homebound; And Not Having Physicians Approve Or Sign Off On Plans Of Care.**

87.    During Relator's employment, she and other employees were trained and, at times, instructed by management-level employees to "upcode" the patient OASIS assessments in order to show a higher level of dependency, and to also justify homebound status and/or medical necessity for home health services.  Defendants train employees to score patients on the OASIS relative to the "safety" of the patient in order to justify scoring the patient at a higher level of dependency, and Defendants have training materials that focus on patient "safety".  The upcoding of the OASIS assessments was a standard practice throughout Relator's employment, and was done for primarily two reasons:

(i)    After the OASIS assessment was falsely upcoded, the respective patient received the highest (or much higher) HHRG score, as assigned by Medicare.  As a result, the patient was assigned to a much higher payment threshold and, in turn, Defendants received much higher payments from Medicare.  Since the patients were scored at a more dependent functional status, the Defendants received more money from Medicare for patient care and typically have a guarantee of at least one recertification for home health services.  When the patients are scored at a more dependent level, the Defendants could typically bill for additional services, such as Physical Therapists.  However, since the patient were more independent than what they were scored on the OASIS assessment, the Physical Therapist would determine that the patients did

not need physical therapy services and would therefore not schedule any therapy visits. But Defendants still received more money from Medicare due to the patients being scored at a more dependent level, and due to Defendants not having to pay for physical therapists visits.

(ii)     Since the patients were normally scored at higher dependency levels, by the time of official discharge, the patient could be scored on the discharge OASIS as being significantly improved in functional areas, thereby appearing to make positive outcomes for the patient. In turn, the Defendants report the positive functional outcome measures to Medicare, and this information is thereafter made publically available.

88.     The Relator's first experience with the alteration of OASIS assessments occurred approximately three (3) weeks after she was hired as a Field RN in July of 2010. Relator was assigned to initiate a start of care for a patient (cannot recall name) in Loudon County, Tennessee. The Relator completed the required OASIS paperwork, which indicated the patient's medical necessity and homebound status therein, and Relator submitted the paperwork to the Branch Manager (cannot recall name) at the Loudon office. Shortly after her submission, the Branch Manager called the Relator and informed her that the OASIS was scored incorrectly and not scored low enough in regard to the patient's level of dependence. The Branch Manager explained what items were wrong and that they had to be changed, and the Branch Manager thereafter faxed Relator a "corrected" OASIS for the Relator to sign and approve and resubmit to the Loudon office. Most of the Relator's previous answers were changed in the "corrected" OASIS and, as a result, the patient scored at a much lower level of dependency. The Relator approved the changes as she was instructed to do.

89.     After the Relator was promoted to the position of Team Leader, on February 22, 2011, and continuing up until her termination, if the Field RN did not score the patient at a more

dependent level, then the Relator was trained and instructed by Michelle Shelton, Branch Manager of Maryville; Libby Davis, Branch Manager of Sevierville; and Sharon Coleman, the Performance Improvement Director, to alter the OASIS answers to reflect that the patient needed more assistance even though Relator did not personally assess the patients. The Relator did as instructed, and she often changed every answer in the OASIS regarding the patients' dependence, despite never actually assessing, or even seeing the patients. The Relator believes that other Team Leaders working at other offices were trained and instructed in a similar fashion. As a result, the OASIS was not a true assessment of the patients' condition because Relator was not the nurse assessing the patient. The Relator was told by the Performance Improvement Director, Sharon Coleman, that "We must be able to show that the patient improved while under our care," and "We must score patient at a more dependent level especially if Physical Therapy is going to see patient". Michelle Shelton, Melanie Gibson, Libby Davis, and Sharon Coleman instructed Relator and other employees to score the OASIS to show that there is a need for Home Health Services. Many patients were initially scored by the RNs as being independent in most activities of daily living. Therefore, per management's instructions, Relator would change patients' OASIS assessments to show they were dependent in activities of daily living, therefore verifying home health services were necessary. The Relator was also instructed to teach the assessing RNs on how to score the patients' dependence low relative to "safety".

90.    Throughout Relator's employment, the Defendants provided its employees with training that focuses on patient "safety" in order to justify scoring patients at higher dependency levels. Relator attended many training sessions conducted by the Defendants that were designed and focused on training the employees to code and "score appropriately" the functional areas on the OASIS assessments by focusing on patient "safety". This training was typically in the form

Page **26** of **68**

of conference calls and webinars, and those in attendance included each location's Team Leaders and Branch Managers. At times, the training sessions were for only the Knoxville region and, at other times, the training sessions were conducted for the entire company. Many of the training sessions focused solely on teaching the Team Leaders to make sure OASIS was scored low relative to patient "safety". On one conference call, Relator recalls the trainers providing approximately ten (10) examples of a patient at home and his/her status. The trainer then asked the call participants for their opinion on how to rate the patient regarding the patient's "safety". Relator estimates at least seventy-five percent (75%) of responders rated the patients as higher (better) on independence than the trainer and, almost all of the time, the trainer would rate the patient one or two steps lower (worse) than the responders and the trainer would always cite that the patient is not "safe" as the justification.

91.     During her employment, Relator changed several OASIS assessments as compared to the OASIS assessments that were initially submitted by the Field RNs. The Relator never saw these patients, but she made these changes as she was trained and instructed to do, and these changes were subsequently approved by the assessing Field RNs. The Relator believes other Team Leaders participated in this same activity. The assessing Field RNs were so busy, or they just did not care, that they always accepted Relator's changes to the OASIS assessments. In fact, the Relator never had anyone disagree with her changes to the OASIS assessments. The Relator then forwarded the OASIS to the Coders. The Coder does their job and syncs the OASIS back to the Relator for final review. The Relator then locks the OASIS and forwards it to Medicare. Therefore, the false OASIS assessment was sent to Medicare showing a higher dependence level than the Field RNs original OASIS assessment. In turn, the respective patients were assigned to higher paying HHRG scores due to the higher upcoded dependency levels, and

Page **27** of **68**

Defendants were paid more by Medicare than they should have been.

92.     Further, Defendants made more money because in actuality, the patients did not need as many home health visits as their true acuity required and therefore, Defendants subsequently decreased the services provided to patients, such as not having to send nurses and therapists out as often as the OASIS scores and plans of care would lead Medicare to believe.  As a result, Defendants intentionally deviated from the plans of care that were established by the patients' certifying physicians.   After the patients were under Defendants' services, the Defendants rarely, if ever, submitted any documentation evidencing a change in the patients' condition.

93.     During her employment, Relator was told by management to always make sure that the patient had at least five (5) visits, so the Defendants would be paid by Medicare for an entire 60-day episode of care.  This was done to further manipulate the Medicare payment:  If an HHA provides four (4) visits or less in an episode, then they will be paid a standardized *per* visit payment, instead of an entire episode payment for a 60-day period. *See* Medicare Benefit Policy Manual, Chapter 7 – Home Health Services, § 10.7 – Low Utilization Payment Adjustment.

94.     The Defendants utilized a paper records system for monitoring and tracking its home health services, such as OASIS assessments, plans of care, and physician orders, from before the time Relator was hired, July of 2010, up until when Defendants switched to an electronic records system in March of 2015.  During the time Defendants utilized paper records, the Relator would occasionally be required to change the OASIS assessments, at the most once per day.  This was due to the fact that, throughout the time paper records were used, the Defendants employed a separate department of employees:  OASIS Coder and Coordinators. The Coder and Coordinators Department would identify the areas that needed to be changed in

Page **28** of **68**

the Field RNs' OASIS assessments, and they would contact the Field RN directly—always over the phone and never in writing—and instruct them to make changes and upcode their initial OASIS assessment relative to the "safety" of the patient. After the Field RNs made these changes as requested, they would resubmit the upcoded OASIS assessment to the Relator, which would be forwarded on to Medicare for payment.

95. During the time Defendants utilized paper records (prior to March of 2015), the OASIS assessments were upcoded in the following manner: The Branch Manager, Libby Davis, or Relator would enter referral information into ALLScripts software system (Demographics, Insurance, Diagnoses, Disciplines) in order to see the patient. The Field RN would be sent to the patient's home and do an on-site start of care using a paper OASIS assessment packet. The RNs were trained and instructed by management to downgrade the patients on the initial OASIS assessment, so they scored at a more dependent functional status as needing more assistance— otherwise known as "upcoding"—to downgrade relative to the "safety" of the patients. The Field RN would submit finished OASIS to the administrative personnel to be typed. The OASIS Coder and Coordinator Department, or occasionally, the Relator, would then review the OASIS and instruct the Field RN to score the patient at a more dependent level and/or this change would be made. The Field RN did not ever question why the OASIS was changed because, as part of the employees' training, scoring patients as needing more assistance was expected and the norm. After the changes to OASIS were made, it was sent back to administrative personnel to be re-typed. The Relator does not know whether the administrative personnel kept the original copy of the Field RN's OASIS assessment; it may have been shredded, or the original OASIS may be in the patient chart. Administrative personnel would then forward re-typed OASIS plans of care to the coder. After the coder was finished, the RN and Team Leader would receive and sign off on

the corrected OASIS. Administrative personnel would thereafter forward OASIS to Medicare.

96. Once the Defendants switched to the electronic records system in March of 2015, the OASIS Codes and Coordinators Department was phased out and eliminated by Defendants, and the Defendants thereafter required the Team Leaders, including Relator, to be responsible for contacting the Field RNs to change and upcode the initial OASIS assessments. After March of 2015, the Relator changed and rescored approximately five (5) OASIS assessments per day, and took about an hour to review each OASIS assessment.

97. It was more difficult to change the OASIS assessments when Defendants utilized the paper records because the changes would have to be approved by the RNs, and it was difficult to get the RNs to come into the office to sign off on the changes. It was much easier to change the OASIS assessment after Defendants switched to the electronic system because the OASIS was synched to the RNs' tablet, and the RNs could simply click on the "accept changes" box after the changes were made.

98. When Defendants changed to the electronic records system in March of 2015, Defendants began using a software called, "HomeCare HomeBase". The HomeCare HomeBase website represents that its software helps to "Build a solid case for payment". This software shows when and how the OASIS answers have been changed and the reason(s) given to the nurse for the change. It may also show the Field RN's original answers in the OASIS assessment when it was first synched and submitted to the Relator.

99. The submission of falsely upcoded OASIS assessments was done throughout Relator's employment, regardless of whether the Defendants were utilizing paper records (pre-March, 2015) or electronic records (post-March, 2015). The electronic records system offered more checks and balances as related to homebound status and medical necessity. However, a lot

of incomplete documentation still went through, especially on the nurse's notes, because nurses were supposed to document in a narrative why the patient was homebound and what necessitated need for skilled care. As a result, this was rarely, if ever, done on the LPN nursing notes, and most of the nurses did not even bother to write a narrative. Poor documentation is what Defendants were cited for in the recent audit by the State of Tennessee in late-April or early-May of 2016. Further, as stated above, the electronic records system allowed the OASIS assessments to be changed and altered much more easily since the nurses could simply click the "accept changes" box to accept any changes.

100. After switching to the electronic system in March of 2015, the OASIS assessments were upcoded in the following manner: Defendants would receive patient referrals from a hospital or physician. The former and current Branch Managers, Libby Davis and Melanie Gibson, or the Relator, prior to her termination, would enter the referral information into HomeCare HomeBase software, stating why the Defendants were to see the patient and what disciplines are to be provided to the patient. The RN would go to patient's home and perform the OASIS assessment. When completed, the nurse would sync the OASIS information from her tablet to Relator's computer. Relator knew the nurse's answers would most likely need to be changed to reflect a more dependent functional status (*i.e.*, upcoded), based on Relator's training and instructions from management, including the Performance Improvement Director, Sharon Coleman, and Ms. Coleman fully acknowledged that Relator was changing the OASIS assessments without assessing the patient. Relator would change the OASIS answers to a more dependent status and give reasons why it was changed. The Relator synced changes back to the nurse's tablet for her approval, and nurse would approve changes, usually immediately upon receipt, and Relator would then send OASIS to Coder. Coder would code and send OASIS back

Page **31** of **68**

to Relator, and Relator would then forward OASIS for submission to Medicare.

101.    All of this information should be stored in the HomeCare HomeBase software. Relator believes this software is accessible to anyone in a management position. Relator suggests reviewing Branch Manager, Melanie Gibson's, computer and the Team Leader's computer, and the former Branch Manager, Michelle Shelton's, computer. The Performance Improvement Director, Sharon Coleman, would also have access to this software for all of the offices (Knoxville, Sevierville, Maryville, and probably others). Also, Relator understands that state auditors are able to access all records because during Defendants' last audit, the auditor brought her tablet and was able to access all records to review.

102.    Immediately after switching to the electronic records system in March of 2015—as Defendants eliminated the OASIS Coder and Coordinators Department and required the Team Leaders to make the changes to the OASIS assessments—the Defendants also required all of the Team Leaders, including Relator, to send a "coordination note" to the assessing Field RN whenever the Team Leaders suggested that changes should be made to the initial OASIS assessment. This "coordination note" was to contain all of the Team Leaders' suggested changes to the initial OASIS assessment that was submitted by the Field RN. Upon receipt, the Field RN would review and send a "follow up coordination note" back to the Team Leader with their answers to the suggested changes (this practice was supposed to be done anytime there was a change to the OASIS). This paperwork trail evidenced the changes made to the OASIS assessment. However, after about two months of doing this practice, there was a corporate conference call in which all Branch Managers and all Team Leaders were informed that Defendants were eliminating the use of coordination notes, effective immediately. Instead, the employees were instructed that all Team Leaders, such as Relator, were to now make changes to

Page **32** of **68**

the OASIS electronically, without first contacting the Field RN, and then sync the changes to the Field RN for approval. Without the coordination notes, it would be impossible to contact the Field RN before making the changes.

103. In or about June of 2015—approximately one month after the corporate conference call instructing all employees to stop using the coordination notes to reflect changes to the OASIS assessments—the Defendants announced that they had contracted with "Strategic Healthcare Programs", a company located in Santa Barbara, California. This company's website advertises that its system is "A better way to manage your home health agency performance" and references its system maintains a tool for "OASIS scrubbing" that is used to "correct documentation inconsistencies before sending to CMS. Get reimbursed for all the work you do and don't leave any revenue on the table." On or about June of 2015, the Defendants informed its employees that the "OASIS scrubbing" tool would show the discrepancies between the Field nurse's initial OASIS assessment and the subsequent changes made by the Team Leaders, and that this tool allowed the Field Nurses' OASIS assessments to be "corrected". The Defendants instructed all Team Leaders throughout the company were to utilize this software when making changes to the OASIS. Since the "OASIS scrubbing" tool is designed to eliminate the manual viewing of the OASIS, this allowed the Defendants to further commit the fraudulent schemes, as alleged herein, in order to maximize profitability for the Defendants, as stated by the Strategic Healthcare Programs' website: "In our industry the saying goes, 'OASIS equals revenue.'"

104. During her employment, the Relator routinely complained about changing OASIS assessments to her Branch Managers, Libby Davis and Melanie Gibson, and to the Performance Improvement Director, Sharon Coleman. The biggest problem for Relator was the fact that she was not the nurse seeing or assessing the patient, and that the OASIS answers were subsequently

changed by Relator so Defendants would receive more money. The only response Relator received was that she should teach the RNs how to score OASIS so Defendants could show improvement outcomes at discharge. Management always said to consider the "safety" of the patients in order to justify the upcoded functional score, as it was the norm to take "safety" to the extreme. The Defendants were committing Medicare fraud because the Relator, and she believes, the other Team Leaders, were instructed and directed to change the OASIS assessments that were to be sent to Medicare, even though they were not the ones who saw the patients.

105.    At least once a week during the weekly case conference, and on many other occasions, the Relator approached the former and current Branch Managers, Libby Davis and Melanie Gibson, and voiced her concerns about changing OASIS assessments to reflect a more dependent level, and further, she expressed concerns about keeping patients on with no medical necessity or without being homebound. The Branch Managers agreed with Relator's concerns, but nothing was ever done about this because all of the employees were afraid of losing their jobs. Therefore, the standard response from the Branch Managers: "We have to score patient as needing more help at the start of care so we can show he/she improved at discharge", and "If we don't, Sharon Coleman will be all over us and we can't afford to lose our jobs". On several occasions, Melanie Gibson said to Relator, "We have to score low [on the OASIS] or we will lose our jobs." Sharon Coleman's tone of voice communicated she was not to be questioned, as she would say, "If we do not score the patients as needing more help, then Medicare will question why we are in there [providing home health services]." Sharon Coleman would also say, "If Physical Therapy is going to see patient, then we better score patient low enough to justify PT being there". Sharon Coleman was always concerned about the outcomes of patient care being positive since Medicare publishes this data. If Defendants' outcomes were poor, then

Page **34** of **68**

Ms. Coleman would call the Branch Manager, Melanie Gibson, concerning this, and Ms. Gibson, to save herself, would put the onus on Relator. Relator would then be contacted by Sharon Coleman, and told to "make sure patients showed improvement". The Relator felt Sharon Coleman had her job in her hands and Relator was afraid of her. Sharon Coleman played an instrumental part in firing people, and Relator believes Ms. Coleman was involved in her termination. The Relator was terrified about losing her job because she needed her income, so she did as instructed.

106. Near the end of May of 2016, the Relator informed her Branch Manager, Melanie Gibson, that she would no longer alter the Field RNs' initial OASIS assessments because Relator had not personally assessed the patients, and the Relator thereafter began accepting the RNs Medicare OASIS assessments "as is", and she stopped changing the OASIS assessments to maximize Medicare payments. Shortly after this time, Relator's supervisor, Branch Manager, Melanie Gibson, immediately became distant and standoffish, and she began to retaliate against the Relator. The Relator was fired on June 2, 2016, for a trumped up reason.

107. In late-2016 or early-2017, Bill Walker, RN, mentioned to Relator all of the changes that were made to the OASIS after he submitted it. Mr. Walker said he figured Relator knew more than him, so he just agreed to all of the changes without even reviewing them. The other RNs, if they were honest, would state the same.

108. The upcoding of the OASIS assessments often resulted in patients receiving home health services even though the patients were not homebound and/or the services were not medically necessary. For example, Physical Therapist, Sarah Strike, recently told Relator about the difficulty she was having trying to get in to see a patient because the patient was never home; one day this patient was at Walmart and the next day the patient was at Dollywood. The patient

clearly did not meet the Medicare criteria for home health services as being homebound. However, the Branch Manager, Melanie Gibson, insisted that Sarah Strike keep trying to see the patient so Defendants would not lose Medicare revenue.

109.    One nurse, Jeff Winn, RN, informed Relator that the Maryville office had patients on their census that were not homebound and others that were being seen with no cause. This bothered him to the point that he resigned in 2015 for health reasons related to stress on the job.

110.    Further, during the weekly case conferences, Relator heard nurses—such as, Bill Walker, Erin Cannon, and Jennifer Knox—joke about patients not being homebound.  One patient (Relator cannot recall name) told a nurse that she had to hurry up if she was going to see him because he was going shopping at Walmart.

111.    Defendants had several patients on service for B-12 injections during Relator's employment.  Although these injections are given once a month, Defendants would find other reasons to see patients for an entire episode of care.  Further, there were many patients who were not homebound, and therefore did not qualify for home health services, because the patients had a caregiver who could take the patient to a physician or clinic for their injections. (*See infra*, at Section VII.D., for examples of specific patients).

112.    The Defendants' Marketing Representative, Josh McDaniel, would often bring in the "bottom of the barrel" referrals from physician offices.  Relator believes that the doctors and nurse practitioners referred Mr. McDaniel anyone just to get him to leave.  For example, on more than one occasion, Defendants taught medication management to Alzheimer's patients.  When Relator would say something to Branch Manager, Libby Davis, about a referral such as this, Relator was told, "We never turn down a Medicare referral".  The Relator does not know how the Marketing Representative, Mr. McDaniel, was paid by Defendants, but Relator is fairly

Page **36** of **68**

certain that he had to meet a referral quota.

113.    At the end of the initial OASIS assessment, the RN is to call the treating physician and go over the plan of care that the RN has established for patient.  Calling the physician in order to get his approval for the plan of care serves as a verbal order from that physician, until a written order can be sent for the physician's certification, since Medicare requires the plan of care to be signed and dated by the physician.  Only a licensed nurse or qualified therapist can take a verbal order, which must then be documented into the patient's plan of care, along with an "attestation" that is signed and dated by the licensed nurse or qualified therapist responsible for furnishing or supervising the ordered service in the plan of care. 42 C.F.R. § 409.43; 42 C.F.R. § 484.18; *see also* Medicare Benefit Policy Manual, Chapter 7 – Home Health Services § 30.2.5.  However, throughout Relator's employment, the RNs rarely made the call to take the verbal order:  Relator estimates that an RN/qualified therapist made this call only about ten percent (10%) of the time, and that no one made the call the other ninety percent (90%) of the time.  However, despite not making this call ninety percent (90%) of the time, the RNs/qualified therapists would misrepresent in the plan of care that they did speak to the physician, when this was not true.  This occurred from 2010 to 2016.

114.    For example, on several occasions Dr. Eric Littleton would return fax the hard copy of his patients' plans of care, which was sent to him for his signature and certification, and Dr. Littleton wrote all over plan of care, stating "I never ordered Home Health for this patient".  It could have been another physician who ordered home health services (*e.g.*, cardiologist), but since the nurse did not call the physician and document that she spoke with him, the plan of care was sent to the patient's primary care physician for certification.  There must be documentation of the physicians' order, verbal or written, and certification for home health services.  As of the

Page **37** of **68**

date of this filing, the Relator understands that the Sevierville office is in such a state of confusion that the Office Manager and Scheduler have to take physician orders over the phone, which also violates Medicare regulations. 42 C.F.R. §§ 409.43 & 424.22.

115.     During the time Defendants utilized the paper records system (prior to March of 2015), there was a higher number of patients being treated when there was a lack of documented medical necessity and/or homebound status as approved by an RN.   The paperwork was more tedious than the electronic records and, as a result, the Relator observed that the nurses frequently failed to document in the nursing visit note why a patient was homebound or what skill was required for the visit to evidence medical necessity.   During her employment, the Relator rarely saw documentation addressing these two areas when Relator audited the nurses' visit notes.   The case conference notes and the nurses' notes, especially prior to the decision to recertify patients, do not indicate or document medical necessity or homebound status.   The charts and records from 2010 to 2015 are kept in storage in an off-site location (Relator does know location).   After March of 2015, the electronic records system contained boxes to check as to why the patient is homebound.   Explicit documentation is required by Medicare in these two areas.

116.     The Relator observed other glaring issues with the nursing documentation during the time Defendants utilized the paper records.   Due to the lack of checks and balances, it was easier for the nurse to omit or falsify information.   Relator recalls that the nurses would write orders for extra visits, less visits, change in wound care, and add other disciplines to plan of care without notifying physician.

117.     The nurses would also forge their times spent with patients during the time the Defendants utilized paper records.   Relator estimates that approximately two (2) times a month,

patients would call to complain that the nurse was there for only ten (10) minutes, and state something to the effect, "All she did was take my vital signs". The nurse timesheets also suspiciously evidenced exact 30-minute increments. Defendants would still receive payment even though the patient may have been seen for only 10 or 15 minutes. After March of 2015, it became more difficult to forge the time spent with patients because the software system automatically started time when the nurse entered the patient's home and ended when the patient signed off on the nurse's note.

118. The Maryville Branch Manager, Michelle Shelton, was terminated on January 17, 2017. Ms. Shelton was terminated for creating a hostile work environment and for certifying patients for care that was not justified. The decision-makers to Ms. Shelton's termination were not regional management, but were actually from Corporate's Human Resources office, due to a complaint of an RN, Ginny (last name unknown), in the Maryville office in late-December of 2016. Ginny complained to Corporate Human Resources about the Branch Manager, Michelle Shelton, operating a hostile work environment and falsifying patient records to justify medical necessity. Shortly thereafter, Human Resources contacted Melisa Rittenberry, Regional Director of Operations, and Joe Huff, Director of Nursing, regarding Ginny's complaint and, as a result, Ms. Rittenberry and Mr. Huff have since been trying to cover up records in the Maryville office. On January 17, 2017, Corporate Human Resources contacted individuals at the Maryville office, including Ginny, Dustin Hall, and Amber DeBoard, to investigate Ginny's complaint. Amber DeBoard, OT, reported to the Human Resources representative that the false record keeping (such as recertifying patients that were not homebound and/or lacked medical necessity) had been going on for a long time at the Maryville office. Later that same day, Ms. Rittenberry sent an email to all Maryville office employees stating that the Branch Manager, Michelle Shelton, no

Page **39** of **68**

longer worked there, and no reason was given.

119.   Since early-2017, the Sevierville office has engaged in other fraudulent practices, such as, the Branch Manager, Melanie Gibson, has been forging physicians' orders. Dr. Whiton, an orthopedic surgeon and a very good referral source for Defendants, is now refusing to use Defendants' services. The Marketing Representative, Josh McDaniel, knew which patients of Dr. Whiton were to receive surgery, and he gave the names to Branch Manager, Melanie Gibson. Ms. Gibson would then write false orders certifying that Dr. Whiton ordered physical therapy for these patients and scheduled the patients to be admitted to Defendants' services. A member of Dr. Whiton's staff told Defendants that physical therapy was not ordered on all patients and Dr. Whiton wanted to know how Defendants obtained access to his surgery schedule.

## B.   Fraudulent Recertifications.

120.   The Defendants instruct and pressure its employees to keep patients for additional home health services by recertifying patients for unnecessary services at the end of the patients' episodes of care, even when the patients should be discharged. Throughout Relator's employment, management strongly encouraged its employees to keep patients for more than one 60-day episode of care.

121.   The Branch Managers are pressured to recertify patients for unnecessary home health services by members of upper management including, the Regional Director of Operations, Melisa Rittenberry, and the Performance Improvement Director, Sharon Coleman, especially whenever the patient census dropped. The more patients on the census for home health services, the more Medicare pays the Defendants.

122.   Given the instruction and pressure on the regional offices to falsely recertify patients for additional home health services, as alleged herein, by members of corporate, the

Page **40** of **68**

false recertifications were part of a company-wide scheme to require the regional offices to maintain a high patient census in order to obtain more profits. For example, at the time of her termination, as a result of Relator discharging too many patients, as alleged herein, the Sevierville office was instructed that they could no longer discharge any patients without first getting the discharge specifically approved by the Regional Director of Operations, Melisa Rittenberry. However, Ms. Rittenberry is not a nurse, and she knew nothing about the patient, and she did not see the patient when making this determination.

123. As the justification for recertification, Defendants' employees are trained and instructed to review the patients' co-morbidities in order to recertify home health services for an additional 60-day episode of care. In determining whether to recertify or discharge a patient, Relator was often told by the former and current Branch Managers, Libby Davis and Melanie Gibson, "We are discharging way too many patients. We have got to find a reason to recertify these patients. Do they not have any co-morbidities that we can teach on?" The Relator and other employees have heard these exact words many times.

124. Patients are also fraudulently recertified and kept on Defendants' service, even when the patients request to be discharged. For example, several Maryville patients would request discharge, but Branch Manager, Michelle Shelton, continued to keep them on service, stating: "We can't be discharging all these people. We have to keep our census up. We can't let the Sevierville office get ahead of us." On information and belief, Relator believes that the Branch Managers may have received some kind of financial incentive (such as a bonus), when their office had more patients and/or profits than the other offices.

125. As part of Relator's duties as Team Leader, the Relator was responsible for conducting all of the weekly case conferences regarding the office discussions on whether to

Page **41** of **68**

discharge or recertify patients for additional home health services. Relator was charged with taking notes during these conferences, and her notes would ultimately become the basis for recertifying or discharging the patient. It was during the weekly case conferences when the Defendants would create reasons to recertify patients for additional unnecessary home health services. In order to discharge a patient, the Relator entered the patients' coordination note into the software, HomeCare HomeBase. Most of the time, however, as the Relator documented what was being discussed at the conferences, she included the justification for the patients' recertifications based on what she was instructed by the Branch Manager, Libby Davis. When the case conference was over, the Relator returned to her office and entered coordination notes on each patient discussed during the conference and the reason for the respective patients' recertification or discharge. The Relator then listed everyone who was in attendance at the weekly case conference, which typically included, prior to Relator's termination, the following employees at the Sevierville office: Relator, Melanie Gibson (Branch Manager), Bill Walker (RN), Sarah Strike (PT), Emily Stout (SLP), Feather Reagan (RN), Beverly Bryan (PTA), Theresa Beauregard (PTA).

126. The following is one example of the typical case conference, which led to an unnecessary and fraudulent recertification for additional home health services: Defendants received one order for services from a physician to admit a patient for patient's uncontrolled diabetes. The patient was admitted through the Sevierville office for a 60-day episode in order to follow Defendants' diabetic pathway, which includes teaching the patient how to monitor the patient's sugar and keep a log, how to control the patient's diabetes with medication and diet, and what signs and symptoms to look for if the patient is having an exacerbation of the disease. This was all included in the patient's plan of care. At the end of the patient's 60-day episode of

Page **42** of **68**

care, the staff discussed the patient's progress during the weekly case conference to determine if the patient is ready for discharge or if there is a reason to continue services for another 60-day episode. At that time, if the patient is compliant with all instructions and the patient's diabetes is controlled, and patient goals have been met, then the patient is ready for discharge. In this particular case, this patient's diabetic pathway goals were met and the patient was ready for discharge. However, since management did not like to discharge a patient if the patient had only one 60-day episode of care, the Relator and staff were repeatedly told by their Branch Managers: "Surely this patient has co-morbidities we can teach on, so we can keep them on service." This was the typical discussion at the case conference when finding a reason to justify a patient's recertification for additional home health services.

127. For example, another physician ordered his patient to be admitted to Defendants' services for the primary diagnosis of uncontrolled diabetes. The patient's co-morbidities included: COPD, Osteoarthritis, Congestive Heart Failure, Obesity, History of nicotine dependence, Long term history of oxygen use. It was decided to recertify the patient for another 60-day episode to teach on "Congestive Heart Failure", even though this may be a long-standing co-morbidity that the physician is not currently treating and the patient may not have had an exacerbation of the disease for years. Regardless, the Defendants kept the patient on home health services and billed Medicare for an additional 60-day episode that was not medically necessary.

128. Other common examples include several of Defendants' patients who were unnecessarily recertified for urinary tract infections ("UTIs"). UTIs are common among the geriatric population. Patients would be recertified without a physician's diagnosis, and there would be no antibiotic listed as a new medication. This practice was more prevalent during the

Page **43** of **68**

time Defendants utilized paper records (prior to March of 2015), because once Defendants went electronic, the Coding Department was able to obviate some of these issues. (*See infra*, at Section VII.D., for examples of specific patients).

129.　Of the patients who were unnecessarily recertified for additional home health services, as alleged herein, the recertifying physician frequently failed to indicate the need for continuing home health services and also failed to estimate how much longer the services would be required.　Further, the Relator never saw any narrative from a physician on a patient recertification.　The physicians never provided this information because the Defendants would find any reason to justify a recertification, and typically, the physician did not know why the patient was being recertified until the actual paperwork was submitted to the physician for their signature.　These practices are in clear violation of Medicare conditions of payment. *See* 42 C.F.R. § 424.22(b).

130.　These practices further violated the Medicare rules that require the certifying physician's medical records to be the basis for certification and/or recertification of home health eligibility.　*See* 42 C.F.R. § 424.22(c).　When the Defendants decided to recertify patients, especially for a medically unnecessary reason such as to teach on a co-morbidity that was not being taught by the patient's physician, this information was not contained in the physician's underlying medical records for the patient, and therefore, this documentation was not sufficient to demonstrate that the patient was eligible to receive home health services. *Id.*

131.　The nurses similarly failed to document in the nursing notes what service was being taught to the patients since they could not remember why a patient was on service or why the patient was recertified so, instead, the nurses would enter a generic response in the nursing notes.　In fact, regardless of the reason the patient was on Defendants' home health service, the

Relator would estimate that approximately ninety percent (90%) of the time the nursing note documented the reason as "med management" or "fall prevention". The failure to document in the patient's records was especially flagrant during the time Defendants utilized paper records (prior to March of 2015).

132.    One nurse, Leah MacWithey, LPN, often maintained poor record documentation, and her notes would reflect that nothing was wrong with a patient, however, she always wanted to recertify patients because it was an easy visit for her: Ms. MacWithey could get in and get out quickly, and be paid for a full visit. The patients that Ms. MacWithey liked and saw were usually recertified since Branch Manager, Libby Davis, did not like to discharge patients.

133.    During Relator's employment, the Relator and former and current Branch Managers, Libby Davis and Melanie Gibson, have been told on many occasions that the Sevierville office allows too many patients to be discharged and, as a result, the Relator has been told by these Branch Managers to find a reason to recertify patients for another sixty (60) days of service. On or about May 1, 2016, Relator informed Branch Manager, Melanie Gibson, that Relator would no longer unnecessarily recertify patients for home health services who were ready to be discharged, and instead, Relator would discharge the appropriate patients. In the following weekly case conference, it was clear to Relator that some of the patients did not need to be recertified for additional home health services, based on the input from the patients' assessing RN and based on the patients' relevant medical documentation, which evidenced that the patients had improved and met their goals. Therefore, the Relator discharged the appropriate patients, approximately fifteen to twenty (15 to 20) patients, who were scheduled to be recertified, but Relator had the patients discharged, because they were either not homebound or did not have a medical necessity to justify additional home health services. As soon as the

Page **45** of **68**

Relator began discharging patients as appropriate, the patient census dropped significantly.

134.     Soon thereafter, in mid to late May, 2016, the Relator was instructed by Branch Manager, Melanie Gibson, that the Sevierville office was no longer allowed to discharge any patients unless the discharge was approved by the Regional Director of Operations, Melisa Rittenberry, and that Ms. Rittenberry was to be sent the patients' case conference notes so she could make this determination.  From this point forward up to the date of her termination, the Relator was no longer allowed to discharge patients as she was previously.  Instead, the Branch Manager, Melanie Gibson, would enter the coordination notes in the software, HomeCare HomeBase, and Melissa Rittenberry made the final decision to discharge the patients, despite the fact that Ms. Rittenberry is not a nurse and she knew nothing about the patients, so she could not make an informed medical decision as to whether or not it was appropriate to recertify or discharge the patients.

135.     In or about March of 2016, Jennifer Knox, LPN, and another nurse from the Maryville office called the Corporate Integrity Line to report that the Maryville office was keeping patients on service when there was no medical necessity.  Corporate then called the Branch Manager at the Maryville office and, as Relator understands, Jennifer Knox was retaliated against, tormented, and this eventually caused her to resign.  Several other nurses, such as Sharon Braddy and Pam McWhorter, have also resigned due to similar situations, and because they were in fear that they would lose their nursing licenses.  Employees are afraid to call the Corporate Integrity Line for fear of being exposed and retaliated against.

136.     The Office Scheduler at the Sevierville office, Brenda (last name unknown), called the Corporate Human Resources office and complained that it was a hostile work environment and she requested to be transferred.  Brenda said that "things were not kosher and

management was doing things that were not right".

137.    In February of 2017, Relator received a text message from Amber DeBoard, OT, regarding the fraudulent and questionable practices taking place at the Maryville office while under the supervision of the former Branch Manager, Michelle Shelton:

> "Oh my God LeAnn, Michelle [Shelton] has left a huge holy mess…..orders changed, up codes for risk adjustment, changing OASIS,  recertifying patients for years….had one patient with nursing 3 times a week since 2014 for wound care."

The patient referenced in this text message was later identified as Patient 1.[2]  The Branch Manager of the Maryville office, Michelle Shelton, was recently terminated by the Defendants on January 17, 2017.

138.    As of early 2017, the Maryville office has patients on their census who are deceased.  One of the patients was picked up for services and died two (2) weeks into the episode.  Instead of doing a death discharge as required by Medicare, the Branch Manager, Michelle Shelton, kept the patient on the census in order to bill Medicare for the entire eight (8) week episode, rather than just the two (2) weeks.  Defendants get six (6) weeks of free pay because they do not have to make any home health visits.  This patient was actually kept on the census for two (2) months.  Relator's Branch Manager, Melanie Gibson, threatened to call Medicare regarding the above allegations, but she likely never did this for fear of losing her job.

**C.    Decrease in Patient Care After Medicare Agrees to Pay In Order to Maximize Profits:  Failure to Provide Services and Supplies; Negligent Care.**

139.    The Defendants utilize a software system, "Service Value Points", to track and monitor the number of home health visits that are provided to its patients.  This software tool is

---

[2] The Relator has not disclosed the names, or other identifiable information, with regard to the specific Medicare/Medicaid beneficiaries mentioned in this Complaint. This information is in the possession of Relator's counsel and will be disclosed upon request by this Court and/or the Government.

Page **47** of **68**

designed to prevent the Defendants from providing "too many" visits to its patients in order to ensure that Defendants retain a profit. In turn, this software tool has resulted in a substantial decrease in patient care because patient home health visits and supplies are intentionally reduced and/or are not provided to those patients in need as set forth in their plans of care and OASIS assessments. The Defendants do not want to provide patients with too many home health visits, as this would impact the profit margin, and therefore, this software tool ensures that the Defendants retain a profit at the detriment to its patients.

140. The Service Value Points software is designed to limit the number of home health visits a patient can receive from each discipline based on the patient's respective Home Health Resource Group ("HHRG") score. After the OASIS assessment is created, it generates a HHRG score based on how the Field RN scored in the OASIS assessment and as subsequently modified by the Team Leaders. Since Medicare payment is locked based on the HHRG score, the Service Value Points assigns the respective patient a certain amount of points in the system—a "ceiling" amount of points—that is not to be exceeded by the local office in treating the patient. The goal when utilizing this software tool is to avoid exceeding the threshold "ceiling" amount of points, or else the points will go into a negative balance and, in turn, negatively impact the Defendants' profit margins. Therefore, the Defendants instruct its employees to ensure that each respective patient's Service Value Points are either zero or positive at the end of the patients' episode of care. In order to determine the "ceiling" amount of points, the Service Value Points contains a model for the number of home health visits that patient should receive based on the National norm for patients scored at the same HHRG score. In other words, the visits provided to patients are not specific to the patients' individualized medical necessity. Each home health discipline is assigned so many points in the software tool (*e.g.*, 2 for RN; 1.50 for LPN; 2.25 for PT, etc.).

Page **48** of **68**

Once the points have been "spent" up to the "ceiling" amount, there are no extra home health visits provided to the patient without cutting into Defendant's profit margin. Therefore, the Defendants closely monitor the amount of spent points so that patients are not provided with more home health visits than indicated by the Service Value Points software system. This software tool maximizes Defendants' profitability in furtherance of its fraudulent schemes, in part, because the number of home health visits provided to its patients is not specific to the patients' individualized needs.

141. After the OASIS is completed, the RNs pull up a calendar on their tablets and plug in visits they feel the patient's condition requires. Meanwhile, the Team Leaders, including Relator, enter the patient's HHRG score into the Service Value Points software system, which then indicates how many visits the patient should receive based on the National norm for patients with the same HHRG score. Since the OASIS assessment is already submitted to Medicare for payment at this time, it could not be changed to decrease the patient's dependency and, in turn, increase the HHRG score and reimbursement to allow more home health visits. Therefore, depending on the amount of "ceiling" points assigned to the patient, the Team Leaders may have to decrease the amount of visits the RNs originally scheduled in the calendar, so that the Service Value Points equaled either a positive or zero balance. However, during Relator's employment, the Service Value Points were often a positive balance meaning Defendants were not providing the patients with enough home health visits based on their respective HHRG score. This resulted from the assessing Field RN not having to schedule as many visits since the patient's acuity was fraudulently upcoded in the OASIS assessments.

142. Further, despite utilizing the Service Value Points software tool to reduce home health visits and patient services, the Defendants did not notify the certifying physicians and

patients that certain home health services, as set forth in the OASIS assessment and plans of care, were being reduced or eliminated. The Defendants also did not document the reason for disregarding and/or deviating from the plans of care in the patients' medical records.

143. The Relator did not like utilizing the Service Value Points software during episodes of care, as the Relator felt the assessing nurse knew better than her as to what the patient's conditions required. Therefore, the Relator often added extra home health visits, as requested by the RNs, for various reasons, such as patients needing extra wound care. However, this would often put the Service Value Points in to a negative balance.

144. The Regional Director of Operations, Melisa Rittenberry, closely monitored each branch's Service Value Points software information, and she therefore regularly pressured the Relator, and likely other Team Leaders, to keep the Service Value Point software system in check and to not allow a negative balance. When the points were near a negative balance, Ms. Rittenberry would call the office and want to know why a particular patient was getting so many visits. Nothing irritated Ms. Rittenberry more than patients receiving more home health visits than the amount allowed on the Service Value Points. The Relator was often warned that she "better be watching your SVP points", so that this did not cut into profit margin. When Ms. Rittenberry called about the negative balance, the Relator was instructed to try in any way she could to decrease the home health visits, so the points would become a positive or zero balance. Visits were often reduced, and patients complained since they were not getting the home health care that the nurse thought they needed. This resulted in more profits for Defendants because (I) As a result of the falsely upcoded OASIS assessment, Medicare paid more due to the higher HHRG score, and (II) Defendants paid less money out of pocket due to the fewer home health visits that were provided to patients.

145.     The following is one example of how the Service Value Point software tool is utilized:  The patient's HHRG score: $C_2F_2S_1$ = 30 Service Value Points.  The "ceiling" amount (30 points) is based on the software's model for the number of visits a patient should receive based on the National norm for patients with the same HHRG score.  The Relator's goal for this patient:  Adjust the home health visits that were initially assigned by the nurse in order to balance, and not exceed, the total points to 30 using the following Model for this HHRG score:

| Type of Discipline & # of Points Assigned to Each Discipline | RN 2.0 | PT 3.25 | LPN 1.75 | MSW 3.45 | HHA 1.0 | PTA 2.75 | ST 3.45 | OT 3.25 |
|---|---|---|---|---|---|---|---|---|
| # of Visits Assigned to Patient (Based on National Norm for Patients with same HHRG Score) | 2 | 2 | 4 | 0 | 1 | 4 | 0 | 0 |
| Total Points = 30 (Goal:  Do not exceed a total of 30 points) | 4.0 | 6.5 | 7.0 | 0 | 1 | 11.0 | 0 | 0 |

This model represents the amount and type of home health visits that this patient, with this particular HHRG score, should receive based on the National norm.  In other words, since the home health visits are based on the National norm, the number of visits provided to each patient is not based the respective patient's individualized needs.   The Relator was expected to use this model in order to adjust the visits the nurse had originally scheduled; thereby, resulting in greater profitability for Defendants.

146.     Prior to her termination, Relator recalls the Director of Nursing, Joe Huff, make the comment to the Branch Manager, Melanie Gibson, about the Service Value Points software, "Can you believe your positive SVP's are 600 points?"  This was in direct reference to Melanie

Gibson's location making substantial profits based on the lack of visits her location was providing to its patients.

147.    In reducing the level of services provided to patients, it is Defendants' policy to never send an RN to do a visit when it can be done by an LPN.  LPNs are significantly cheaper. Defendants pay RNs $30 per regular visit, and it pays LPNs $15 per visit.  Many of the RNs complained that they could not do an effective discharge, including Erin Cannon, Sharon Braddy, and Bill Walker, because the only time an RN saw a patient was at admission, recertification, and discharge.  Since it was mostly LPNs who saw the patients, the assessing RN could not make an informed decision at discharge.  Nevertheless, if the patients could not be recertified to avoid a discharge, the RNs were instructed to show patients as being independently functional at discharge so outcomes would be positive when reported to Medicare and this showed Medicare, "we were doing our job".

148.    Additionally, in providing visits by LPNs instead of RNs, several of the LPNs would only take the patients' vital signs and leave after 10 minutes when it was supposed to be a 30 minute visit.  This was reported by Defendants' employees, including, Bill Walker, Greg Able, and Kevin Utt, as well as patients.  These complaints were made about nurses such as Kellie Lawhorn, Leah MacWithey, and Rhonda Weens.  There were several complaints from patients about the short visits and many threatened to call Medicare.  The Branch Manager was supposed to write down all complaints in a Medicare-required "Complaint Log", and the action that was taken as a result of the complaint, but very few complaints were actually written down (the Relator would estimate about 10% were taken down), or taken seriously.  On information and belief, the nurses were never reprimanded and this was still continuing at the time of Relator's termination.

149. In reducing services to patients, the Defendants also neglected to provide patients with the necessary Medical Social Worker ("MSW") visits because an MSW visit is one of the most expensive disciplines. For example, although the patient needed a MSW visit and/or an MSW visit was ordered by the referring physician, as stated in the plan of care, the Maryville office Branch Manager, Michelle Shelton, would send an LPN to do the visit, and Ms. Shelton would have the LPN give the patient a community resource book on a regular skilled nursing visit. Since an LPN visit is much cheaper than an MSW visit, the Maryville office could increase its profit margin.

150. In addition to reducing services, the Defendants also reduce medical supplies that are supposed to be provided to patients, thereby further increasing profit margins. For example, Patient 2 had colon cancer and had a new ostomy. (Approximate date: 2016). The skin around the ostomy was very macerated due to the fact Patient 2 could not care for it properly and needed to be shown how to do correct ostomy bag changes. Due to Patient 2's HHRG score, the nurse was given a limited number of visits to teach this patient how to care for the colostomy. This patient could not learn and needed more time and extra visits. However, Michelle Shelton, Branch Manager, would not approve any extra visits. As a result, the skin around the colostomy became macerated and infected. This negligent care also jeopardized the safety of the patient. Patient 2 needed services, but the Branch Manager, Michelle Shelton, actually decreased this patient's visits and also severely limited this patient's amount of ostomy supplies, because doing so would have negatively impacted her office's budget and profit margin. The treating nurses, Janet Swaney and Keyerra Steele, had to practically beg for supplies that their patients needed. This type of situation occurred on numerous occasions.

**D.    Additional Examples of the Fraudulent Practices with Names of Specific Patients.**

Page **53** of **68**

151.    On information and belief, the following identified patients are Medicare beneficiaries:

A.    Dr. Staci Stalcup had a patient named Patient 3 who had been on and off Defendants' services for years.  There was a referral from Dr. Stalcup to begin services for this patient because Patient 3 had frequent falls.  Physical Therapist Assistant, Beverly Bryan, and Sarah Strike, PT, worked with the patient for one or two 60-day episodes and felt the patient was ready for discharge because the patient had either reached the patient's goals and can ambulate safely, or the patient had reached the patient's maximum potential and there was nothing more Defendants could do for the patient.  Patient 3 was discharged at that time.  Two weeks later, Patient 3 called Dr. Stalcup and said the patient had fallen and wanted to be placed back on home health services.  Dr. Stalcup wrote another order for Defendants' home health services, and home health picked right back up knowing there was nothing more Defendants could do for this patient.  At the end of Patient 3's episode of care, in determining whether to recertify or discharge this patient, one of Defendants' employees suggested in the case conference, "Well, we might as well keep them because Dr. Stalcup will just send them back.  Let's send nursing in to teach on medication management".  However, Patient 3 was already independent in medication management at this time, but Defendants continued to keep the patient on service anyway, and billed Medicare for another unnecessary episode of care.  The Relator believes Patient 3 has had many episodes of care that are very questionable and/or unnecessary. (Approximate dates: 2014 to 2016).

B.    The Sevierville office received a physician's referral on Patient 4.  Patient 4 was to be started under Defendants' services because the patient was overweight and needed weight loss tips and recipes, which is not a billable skilled need, but Patient 4 was taken in for at least

Page **54** of **68**

one certification period and Medicare was billed. When Patient 4 was discharged, the caregiver called and wanted to know where Patient 4's recipes were, because Patient 4 never received any from Defendants. The nurse never provided any services during the patient's episode of care that was billed to and paid by Medicare. (Approximate date: 2016).

C. Patient 5 was recertified for several 60-day episodes of care, because the patient "refused" to be discharged. The Sevierville office kept Patient 5 on services and continued billing Medicare for additional episodes by re-certifying Patient 5 for "medication management" or to teach Patient 5 on a co-morbidity. (Approximate dates: 2015 to 2016).

D. Patient 6 was kept on service after the patient was supposed to be discharged because Patient 6 kept calling the Sevierville office wanting someone to come and check the patient's blood pressure. Instead of explaining to this patient why this reason did not make the patient eligible for home health services, Defendants kept Patient 6 on service for longer than Patient 6 needed to be. Medicare was billed for these blood pressure checks even though it is not considered a skilled need, and Patient 6's medical records did not reflect a skilled need when it was submitted to Relator. (Approximate date: 2016).

E. Patient 7 was not homebound nor did Patient 7 have medical necessity for home health care. The nurses were seeing Patient 7 just to fill the patient's pill planner, which Medicare does not consider a skilled need. Also, when nurses arrived at Patient 7's house, they were often told by a neighbor that Patient 7 just got into a taxi to go to town, and many days Patient 7 would just ride the trolley around Pigeon Forge. To be considered homebound by Medicare, it has to be a taxing effort on the patient to leave home, and Patient 7 had no trouble. The nurses would document that Patient 7 was not homebound, but Defendants continued to keep the patient on service. (Approximate dates: 2014 to 2016).

Page **55** of **68**

F.     <u>Patient 8</u> was kept on service just for PT/INR (blood clotting) checks. Medicare does not consider this to be a skilled need, and a skilled need was not documented in the patient's medical records. (Approximate dates: 2015 to 2016).

G.     <u>Patient 9</u> was being seen by Janet Swaney, LPN, for a below-knee amputation wound care. <u>Patient 9</u> had a wound on the patient's stump for which Defendants were treating. During one visit while <u>Patient 9</u> was in Defendants' care, Ms. Swaney noticed bone showing through the wound. Ms. Swaney filled out the required wound addendum stating bone was showing and she sent <u>Patient 9</u> to the hospital. <u>Patient 9</u> then had to have the leg amputated above the knee. <u>Patient 9</u> died shortly thereafter. Ms. Swaney subsequently checked <u>Patient 9's</u> file and found that the wound addendum was missing from the file. Ms. Swaney informed Relator that she believes the wound addendum was pulled by the Maryville Branch Manager, Michelle Shelton, so that it would not show up in a Medicare audit. (Approximate dates: 2013 to 2014).

H.     The former Branch Manager of the Maryville office, Michelle Shelton, had a habit of keeping the patients she liked on service. She became friends with <u>Patient 10</u> who had been a patient for approximately six (6) years. <u>Patient 10</u> was once discharged when the Relator was a Team Leader at Maryville, but Relator understands that <u>Patient 10</u> has been back on service for quite some time and, in fact, was still a patient when Relator was terminated. (Approximate dates: 2010 to 2016).

I.     The Maryville office was billing Medicare for a patient in Vonore, <u>Patient 11</u>, who was receiving daily wound care for five (5) months. Medicare's intention for home health care is to go to patient's home and teach patient or caregiver how to do wound care, and then home health is to back out and discharge the patient. <u>Patient 11's</u> wife was a registered nurse

Page **56** of **68**

and knew how to do the wound care but wanted the home health nurse to do it. The nurses for this patient, Jennifer Knox, LPN, and Keyerra Steele, RN, informed Relator that Patient 11's wife would sit beside them and tell them step-by-step what to do. The nurses went there daily and Medicare was billed by Defendants. At one point, Patient 11's wound was no bigger than a pencil head, yet the nurses were still going out to Patient 11's home daily to dress the wound. The nurses were told by Branch Manager, Michelle Shelton, that if the caregiver was not willing to do wound care, then Medicare would pay. Therefore, Patient 11 was kept on service for daily wound care for over five (5) months. Jennifer Knox, LPN, called the Defendants' Corporate Integrity Line to report this fraud. However, Corporate called and informed the Branch Manager of Ms. Knox's reporting and, in turn, the Branch Manager retaliated against Ms. Knox until Ms. Knox eventually resigned. (Approximate date: 2016).

J.      The Maryville office had a patient, Patient 12, who was admitted to home health services by Jeff Winn, RN, due to a surgical procedure on a pressure ulcer which required a wound vac. Patient 12 was also being seen for incision care due to an ostomy reversal. Several weeks after Patient 12's admission to home health services, Janet Swaney, LPN, ran into Patient 12 at the hospital and Patient 12 informed her that no one ever came to see Patient 12 after his initial visit. (Approximate date: 2016)

K.      One VA patient, Patient 13, had chronic wounds to the patient's bilateral lower extremities. The wound continued to deteriorate while Patient 13 was under Defendants' care, and Lindsey Crowder, LPN, never documented that she notified the physician at the VA of the deterioration. Medicare requires that the physician be notified if there is a significant change in the patient's condition or the plan of care. *See* 42 C.F.R. § 409.43. Ms. Crowder would also change wound care as she saw fit. Patient 13 was seen for daily wound care for approximately

four (4) to five (5) months, and the patient died while under Defendants' care. (Approximate dates: 2015 to 2016).

This occurred with a large majority of Defendants' patients with wounds: Nurses would not contact the physician for orders for wound care. Instead, nurses would go to the Defendants' supply closet and choose wound care supplies they thought would work. Physicians were not notified of the change in wound care or the plan of care, which violates Medicare laws and regulations.

L. One patient in Sevierville, Patient 14, missed an entire week of occupational therapy because orders were not approved until the next week after the order was set, and this is documented in Patient 14's medical chart. There are several other physical therapy patients with this same issue. (Approximate date: 2017).

M. Nurse, Kellie Lawhorn, LPN, maintained very poor documentation and she was caught falsifying two visit notes while Patient 15 was in the hospital. Ms. Lawhorn documented that she had seen Patient 15 twice during that time and Ms. Lawhorn forged Patient 15's signature on the nurse's note. Ms. Lawhorn was given the option to resign by Branch Manager, Libby Davis, and Human Resource representative, Renee Delahooso. The Relator believes this type of situation also occurred more often than not.

## VIII. SPECIFIC COUNTS AND RELIEF SOUGHT

152. The United States was damaged as a result of the conduct of Defendants in submitting or causing to be submitted false or fraudulent claims, statements, and records and claims for payment as described in Relator's Complaint. Defendants profited unlawfully from the payment and retention of reimbursements and overpayments to which it was not legally entitled. Relator's Complaint consists of Thirteen Counts.

## COUNT I

153.   Relator incorporates by reference the allegations set forth in paragraphs 1 through 152, as though fully set forth herein.

154.   As set forth above, Defendants knowingly, or acting with reckless disregard or deliberate ignorance of their truth or falsity, have presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government, or that represented reimbursements that should have been refunded as overpayments to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

155.   By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, as to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## COUNT II

156.   Relator incorporates by reference the allegations set forth in paragraphs 1 through 155, as though fully set forth herein.

157.   As set forth above, Defendants knowingly, or acting with reckless disregard or deliberate ignorance of their truth or falsity, have made, used, or caused to be made or used false records or statements, including false certifications, to get false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(B).

158.   By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, as to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## COUNT III

159.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 158, as though fully set forth herein.

160.    As set forth above, Defendants knowingly, or acting with reckless disregard or deliberate ignorance of their truth or falsity, have made, used, or caused to be made or used false records or statements, including false certifications, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

161.    By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, as to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## COUNT IV

162.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 161, as though fully set forth herein.

163.    This is a claim for the recovery of monies paid by the United States and the State of Tennessee to Defendants as a result of mistaken understandings of fact.

164.    The false claims that Defendants submitted to the United States' and State of Tennessee's agents were paid by the United States and the State of Tennessee based upon mistaken or erroneous understandings of material facts.

165.    The United States and the State of Tennessee, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants certain sums of money to which Defendants were not legally entitled and

Page **60** of **68**

Defendants are thus liable to account and pay such amounts, as determined at trial, to the United States and the State of Tennessee.

## COUNT V

166. Relator incorporates by reference the allegations set forth in paragraphs 1 through 165, as though fully set forth herein.

167. This is a claim for recovery of monies by which Defendants have been unjustly enriched.

168. By directly or indirectly obtaining Federal and State funds to which Defendants were not legally entitled, Defendants were unjustly enriched and are liable to account and pay such amounts, as determined at trial, to the United States and the State of Tennessee.

## COUNT VI

169. Relator incorporates by reference the allegations set forth in paragraphs 1 through 168, as though fully set forth herein.

170. This is a claim for disgorgement of illegal profits earned by Defendants as a result of statutory violations in the manner in which Defendants maintained its records and accounts and in failing to make refunds of overpayments due to the United States and the State of Tennessee.

171. Defendants concealed their illegal activities through false statements, false claims, false records, and its failure to abide by its statutory and regulatory duties to disclose the existence of such overpayments.

172. The United States and the State of Tennessee therefore did not detect Defendants' illegal conduct.

173. On behalf of the United States and the State of Tennessee, the Relator is

requesting that the Court exercise equitable and statutory powers to require Defendants to disgorge all illegal profits earned as a result of Defendants' statutory violations, and for the Court to impress a resulting trust on all assets acquired by said Defendants with monies that should have been refunded and paid to the United States and/or State of Tennessee.

174.    On behalf of the United States and the State of Tennessee, the Relator is also requesting a full accounting of all revenues, as well as interest, received by Defendants during all relevant times.

## COUNT VII

175.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 174, as though fully set forth herein.

176.    This is a claim for recoupment of monies unlawfully paid by the United States and the State of Tennessee to Defendants contrary to statute or regulation.

177.    The United States and the State of Tennessee paid Defendants certain sums of money to which Defendants were not entitled and Defendants are thus liable under the law of recoupment to account and return such sums, as determined at trial, to the United States and the State of Tennessee.

## COUNT VIII

178.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 177, as though fully set forth herein.

179.    Defendants made material and false representations in the submission of claims for reimbursement from Federal and State funded health benefit programs and in the concealment of overpayments with the intention that the United States and the State of Tennessee be deprived of refunds or be caused to pay funds to Defendants to which it was not

Page **62** of **68**

legally entitled.

180. Had the true state of facts been known to the United States and the State of Tennessee, the United States and the State of Tennessee would not have made reimbursements to Defendants or would have sought recovery of overpayments as provided by law.

181. As a result of the conduct of Defendants, on behalf of the United States and the State of Tennessee, the Relator seeks to recover compensatory and punitive damages in an amount to be determined at trial.

## COUNT IX

182. Relator incorporates by reference the allegations set forth in paragraphs 1 through 181, as though fully set forth herein.

183. This is a claim for common law conversion on behalf of the United States and the State of Tennessee.

184. As a result of the conduct of Defendants in making false claims and in failing to make refunds of overpayments, Defendants have exercised an unauthorized right of ownership over funds belonging to the United States and the State of Tennessee and has deprived the United States and the State of Tennessee of these sums permanently and for an indefinite time inconsistent with the rights of the United States and the State of Tennessee for which Defendants owe compensatory and punitive damages.

## COUNT X

185. Relator incorporates by reference the allegations set forth in paragraphs 1 through 184, as though fully set forth herein.

186. In a violation of T.C.A. § 71-5-182(a)(1)(A), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity presented or caused to be

presented false or fraudulent claims for payment or approval to the State of Tennessee and the United States, including claims for medical services that were not performed, that were not medically necessary, that were improperly coded, or that represented reimbursements that should have been refunded as overpayments to the State of Tennessee and the United States.

187.    By virtue of these false or fraudulent claims on the part of Defendants, the State of Tennessee and the United States suffered damages and therefore is entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XI

188.    Relator incorporates by reference the allegations set forth in paragraphs 1 through 187, as though fully set forth herein.

189.    In violation of T.C.A. § 71-5-182(a)(1)(B), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used, false records or statements, including false certifications and representations by Defendants upon submission or resubmission of false claims for reimbursements under Medicaid and TennCare, for the purpose of obtaining payment or approval of false or fraudulent claims from the State of Tennessee and the United States.

190.    By virtue of using or making false records or false statements, Defendants caused the State of Tennessee and the United States to suffer damages and the State of Tennessee and the United States are therefore entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XII

191.    Relator incorporates by reference the allegations set forth in paragraphs 1 through

Page **64** of **68**

190, as though fully set forth herein.

192.     In a violation of T.C.A. § 71-5-182(a)(1)(D), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used false records or false statements, including false certifications by Defendants in submitting claims, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Tennessee and the United States.

193.     By virtue of using or making false records or false statements, Defendants caused the State of Tennessee and the United States to suffer damages and the State of Tennessee and the United States are therefore entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XIII
## RETALIATORY DISCHARGE

194.     Relator incorporates by reference the allegations set forth in paragraphs 1 through 193, as though fully set forth herein.

195.     As set forth above, Defendants harassed and discriminated against Relator in the terms and conditions of her employment because of lawful acts done by her as an employee and as an agent in furtherance of a False Claims Act action, or other efforts to stop one (1) or more violations of the Federal False Claims Act and Tennessee Medicaid Act, and/or due to Relator's refusals to participate in the fraudulent conduct, and therefore, Relator also sues for wrongful discharge.

196.     Defendants' actions damaged Relator in violation of 31 U.S.C. § 3730(h), Tenn. Code Ann. § 50-1-304, the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(g), and in violation of the public policy of the State of Tennessee and/or Tennessee Common

Case 3:17-cv-00096-CLC-DCP   Document 2   Filed 03/16/17   Page 66 of 69   PageID #: 68

Law, as Relator has sustained and will continue to sustain loss of income and benefits, humiliation and embarrassment, and emotional distress, in such an amount to be determined at trial.

197.    Defendants' actions were intentional and with willful disregard of her rights such as to justify substantial punitive damages.

198.    Pursuant to 31 U.S.C. § 3730(h), Tenn. Code Ann. § 50-1-304 and Tenn. Code Ann. § 71-5-183(g), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the pursuit of this retaliation claim.

## PRAYER FOR RELIEF

Wherefore, Relator demands on behalf of the United States and the State of Tennessee judgment in their favor against Defendants as follows:

1.    For the United States and the State of Tennessee to be awarded full and complete compensatory damages, and for damages to be trebled as required by law, and for the United States and State of Tennessee to be awarded such civil penalties and punitive damages as are permitted by law, together with such further relief as may be just and appropriate.

2.    For the United States and the State of Tennessee to be awarded damages and recovery of such amounts by which Defendants were unjustly enriched or which Defendants retained illegally, together with interest, costs, expenses, and all other relief that may be just and proper, including for the Court to declare a resulting trust and/or constructive trust on all assets acquired by Defendants with money that should have been refunded to the United States and the State of Tennessee, and be awarded punitive damages.

3.    For an accounting of all revenues unlawfully obtained or retained by Defendants and for the disgorgement of such funds, together with further equitable relief as may be just and

proper, including that the Court declare a resulting trust and/or constructive trust on all assets acquired by Defendants with money that should have been returned to the United States and the State of Tennessee.

4.      For common law fraud and conversion, the United States and the State of Tennessee seek compensatory and punitive damages in an amount to be determined at trial, together with costs and interest, and all other relief as may be just and proper.

5.      The United States and the State of Tennessee request that Defendants be ordered to cease and desist from submitting false claims and to comply fully with the statutes and regulations of the United States and the State of Tennessee.

6.      For Defendants to be barred from participating in Federal and State funded programs.

7.      Relator further requests that she be awarded the maximum amount permitted pursuant to 31 U.S.C. § 3729, *et seq.*, and T.C.A. § 71-5-101, *et seq.*

8.      Relator requests all costs, including court costs, expert fees, investigative expenses, and attorney's fees incurred by Relator in the prosecution of this suit.

9.      Relator requests that she and the United States and the State of Tennessee be granted all other relief that the Court deems appropriate and proper.

**JURY TRIAL DEMANDED**

RESPECTFULLY SUBMITTED this the _____ day of March, 2017.

By: _____

David A. Burkhalter, II
D. Alexander Burkhalter, III
***Burkhalter, Rayson & Associates, P.C.***
P.O. Box 2777
Knoxville, TN 37901
(865) 524-4974 Phone

Page **67** of **68**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was served upon counsel of record by placing same in the United States mail this the __16__ day of March, 2017 with proper postage affixed thereto, addressed to the following:


Jeff Sessions
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
**Attn: United States False Claims Act filing**

Nancy Stallard Harr
Acting United States Attorney for the Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902
**Attn: United States False Claims Act filing**
and

Herbert H. Slatery, III
State Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
**Attn: Tennessee Medicaid/Tenncare False Claims Act**

David A. Burkhalter, II

Page **68** of **68**