# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

UNITED STATES OF AMERICA *ex rel.*  
LEANN MARSHALL and  
VIB PARTNERS,

     Plaintiffs and Relators,

          vs.

LHC GROUP, INC. and  
UNIVERSITY OF TENNESSEE  
MEDICAL CENTER HOME CARE  
SERVICES, LLC,

     Defendants.

:  Civil Action No. 3:17-cv-96  
:  Judge Collier

## CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT

Jennifer M. Verkamp (admitted *pro hac vice*)  
Frederick M. Morgan, Jr. (admitted *pro hac vice*)  
Sonya A. Rao (*pro hac vice* being submitted)  
Ian M. Doig (*pro hac vice* being submitted)  
MORGAN VERKAMP LLC  
35 East 7th Street, Suite 600  
Cincinnati, OH 45202  
Telephone: (513) 651-4400  
Fax: (513) 651-4405  
Email: jverkamp@morganverkamp.com  
      rmorgan@morganverkamp.com

David A. Burkhalter, II, TN BPR #004771  
D. Alexander Burkhalter, III, TN BPR #033642  
Zachary J. Burkhalter, TN BPR #035956  
The Burkhalter Law Firm, P.C.  
111 S. Central Street  
Knoxville, TN 37902  
Telephone: (865) 524-4974  
Fax: (865) 524-0172  
Email: david@burkhalterlaw.com  
      alex@burkhalterlaw.com  
      zach@burkhalterlaw.com

# TABLE OF CONTENTS

*Page(s)*

I.     **INTRODUCTION** ................................................................ 1

II.    **JURISDICTION AND VENUE** ....................................... 2

III.   **PARTIES** ...................................................................... 3

IV.   **RULE 9(b), FED. R. CIV. P., ALLEGATIONS** .................. 5

V.    **RELEVANT LEGAL AND REGULATORY INFORMATION** ........................... 6

     A.  THE FALSE CLAIMS ACT ............................................... 6

     B.  THE MEDICARE PROGRAM ............................................ 7

VI.   **MATERIAL REQUIREMENTS APPLICABLE TO GOVERNMENT PAYMENT FOR HOME HEALTH SERVICES** ............................... 8

     A.  OASIS ASSESSMENTS DETERMINE THE AMOUNT CMS PAYS FOR HOME HEALTH SERVICES ............................... 9

         1.  Medicare Home Health PPS Billing & Payment Methodology ...................... 11
         2.  Case Mix Determines Adjustment of the National Standardized Episodic Rate and is Based on the OASIS Instrument .................................. 14

     B.  MEDICARE PAYS ONLY FOR MEDICALLY NECESSARY SERVICES ...... 18

     C.  MEDICARE HOME HEALTH STAR RATING SYSTEM ................. 19

VII.   **FACTS** ............................................................................ 21

     A.  OVERVIEW OF LHC AND ITS CORPORATE PROCESS ............ 21

     B.  LHC FALSIFIES OASIS ASSESSMENTS TO INCREASE REIMBURSEMENT AND IMPROVE RATINGS ................. 24

         1.  LHC Managers Directed Clinicians to Change OASIS answers ................ 24
         2.  LHC Installed Software to Make the Fraud Easier to Employ ................ 25
         3.  Clinicians Had No Discretion to Reject the Changes ........................ 27
         4.  When Clinicians Did Not Accept the Changes, LHC Managers Simply Overrode Those Decisions ................................................ 29
         5.  LHC Used Overrides to Falsely Inflate Quality Metrics ..................... 30

Case 3:17-cv-00096-CLC-DCP   Document 40   Filed 08/17/20   Page 2 of 73   PageID #: 184

6. LHC Knew that the Overrides Were Being Inappropriately Used ..................36

C. LHC MANIPULATES THE NUMBER OF THERAPY AND NURSING VISITS PER EPISODE IN ORDER TO INCREASE PROFITS.........................38

1. LHC Used the SVP Software and Clinical Programs to Manipulate Visits and Increase its Profits.............................................................40
   a. SVP's "Episodic Tool" Specifically Targeted Medicare Beneficiaries ..........................................................................42
   b. LHC Directed its Personnel to Modify Plans of Care to Adhere to "Ceiling" and "Available" Points Limitations ...................43
2. LHC Manipulated Therapy Visits/Plans of Care to Avoid LUPAs................46
3. LHC's Additional Manipulation of Therapy Buckets, Including Numbers of Visits ...............................................................................47

D. LHC KNOWINGLY CAUSES FALSE CLAIMS TO BE SUBMITTED...........51

1. LHC's Knowing Conduct ..............................................................51
2. LHC's Conduct Caused Claims to Federal Healthcare Programs ..................54

E. LHC RETALIATED AGAINST MARSHALL FOR LAWFULLY RAISING CONCERNS ABOUT FRAUDULENT CONDUCT ..........................62

VIII. CLAIMS FOR RELIEF ..........................................................................65

COUNT I: Violations of the Federal False Claims Act Against Defendant LHC 31 U.S.C. § 3729(a)(1)(A)-(B), (G) .............................................66

COUNT II: Violations of the Federal False Claims Act's Anti-Retaliation Provision by Defendants LHC and UTMC HCS 31 U.S.C. § 3730(H)................68

PRAYER FOR RELIEF ..................................................................................69

iii

# I.    INTRODUCTION

1.      Relators LeAnn Marshall and VIB Partners (collectively, the "Relators") bring this action alleging that Defendant LHC Group, Inc. ("LHC") violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.      Relators allege that, since at least 2011 to present, Defendant LHC has submitted false claims to the United States for the provision of therapy and nursing services provided by its facilities to home health patients insured by federal healthcare programs, including the Medicare program.

3.      More specifically, in order to inflate payments that it receives from federal healthcare programs, LHC implements a corporate-wide scheme in which it directs its facilities to systematically falsify the coding and assessment of patients' health conditions, and the number of therapy and nursing visits provided to patients.

4.      To carry out the aforementioned scheme, LHC directs its clinicians and managers to falsify Outcome and Assessment Information Set ("OASIS") assessments to claim greater reimbursement than the patients' conditions warrant, without regard to the reasonableness and necessity of care. This scheme to falsify records occurs both through direction to clinicians to accept corporately-directed changes to their clinical assessments, and through after-the-fact computer overrides by LHC management.

5.      LHC also uses a proprietary software called Service Value Points ("SVP") to falsely skew the number of therapy and nursing visits, by prioritizing profitability over clinical decision-making.  As a result of these schemes, LHC routinely falsifies records to support the eligibility of patients for the billed home health services.

6.     LHC also directs its clinicians and managers to make patients appear worse on admission and better on discharge, without regard to the patient's actual condition, in order to falsify quality improvement data used by Medicare to assign star-quality ratings to LHC's agencies.  By manipulating is star-quality rating scores, LHC fraudulently inflated revenue in states where Medicare's Home Health Value Based Purchasing pilot program operates.

7.     Because the OASIS assessment and the star-quality ratings directly tie to the amount of payment that LHC and its facilities receive, as further described herein, LHC's conduct is material to the Government's decision to pay claims for services submitted to public healthcare programs, including Medicare.

8.     LHC's knowing, and ongoing, conduct has caused the submission of false claims to federal healthcare programs by its facilities nationwide.

9.     LHC and Defendant University of Tennessee Medical Center Home Care Services, LLC ("UTMC HCS") also retaliated against, and ultimately terminated, Marshall on June 2, 2016, after she objected to and tried to stop LHC's fraudulent conduct in violation of the False Claims Act. Defendants' conduct violated the FCA's anti-retaliation provisions, 31 U.S.C. § 3730(h).

## II.     <u>JURISDICTION AND VENUE</u>

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and has personal jurisdiction over Defendants because both LHC and UTMC HCS transact business in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendant operates and transacts business within this district.

-2-

12.     Prior to the filing of Marshall's and Relator VIB's initial complaints, the facts and circumstances alleged in this complaint were not publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in any congressional, administrative, or Government Accountability Office, or other Federal report, hearing, audit, or investigation, or to the news media.  However, should there have been a public disclosure of these allegations prior to the filing of Relators' respective initial complaints, Relators have personal knowledge that is independent of and materials adds to the publicly disclosed allegations or transactions.

13.     Relators are original sources of the information upon which this complaint is based, as that phrase is used in the False Claims Act. 31 U.S.C. § 3730(e)(4)(B).

14.     Prior to filing this action, Relator Marshall and Relator VIB each voluntarily disclosed to the United States the information on which the allegations herein are based.

## III.     PARTIES

15.     The real party in interest to the claims in this action is the United States of America.

16.     Relator LeAnn Marshall is a resident of Knoxville, Tennessee.  She received a Bachelor of Science degree in Nursing from the University of Memphis in August 1993, and received her Registered Nurse ("RN") license in September 1993.  She currently has over 15 years of combined experience working in the home health, hospice, and hospital settings.

17.     Marshall worked for Defendants from approximately June 10, 2010, through June 2, 2016.  She was initially hired as a Field RN, but was promoted to Team Leader in approximately February 22, 2011.  She continued as a Team Leader until she was terminated on June 2, 2016.

18.     Relator VIB Partners is a Delaware partnership with two partners.[1]  At all times relevant to this complaint, one or both partners of VIB were employed in managerial positions at LHC and have personal knowledge of the allegations set forth herein.  The knowledge of each partner is imputed to VIB Partners.

19.     Defendant LHC Group, Inc., is a provider of home health and hospice services that primarily services elderly patients, the majority of whom are beneficiaries of Government health insurance programs.  In 1994, LHC was founded as St. Landry Home Health, Inc. in Palmetto, Louisiana, and, in June 2000, it became Louisiana Healthcare Group, Inc.  After several reorganizations and acquisitions, LHC emerged in February 2005 as a consolidated Delaware corporation.  LHC's principal executive offices are located at 901 Hugh Wallis Road South, Lafayette, Louisiana, 70508.

20.     As of December 2019, LHC operates 513 home health service locations, including 350 wholly-owned subsidiaries, throughout the United States.  These locations are divided among four geographic divisions, but are centrally controlled. All allegations herein relate to corporate-wide schemes directed and controlled by LHC and implemented systematically at all its facilities nationwide.

21.     Defendant UTMC HCS is one such subsidiary.  UTMC HCS's current principal place of business is located at 420 W. Pinhook Road, Lafayette, Louisiana, 70503-2131.  UTMC HCS operates three branches throughout Tennessee:  one in Knoxville, one in Sevierville, and one in Maryville. At all times relevant to her allegations, LHC and UTMC HCS were Marshall's employer.

---

[1] This case was filed under seal in the name of a partnership to protect VIB's partners from retaliation by LHC. The identity of VIB's partners has at all times been known to the real party in interest, the United States of America.

-4-

## IV.   **RULE 9(b), FED. R. CIV. P., ALLEGATIONS**

22.     Some of the evidence necessary to prove the allegations in this complaint, such as the documents related to claims submitted to the Government healthcare programs, is in the possession of LHC or the United States.

23.     With respect to each allegation made upon information and belief, Relators have—based upon knowledge, data, and experience—a reasoned factual basis to make the allegation but lacks complete details of it.

24.     Marshall bases her allegations in this complaint on personal experience, including without limitation personal observations of Medicare patients treated by LHC; assisting in training Defendant's employees; participating in corporate level meetings and communications as a team leader; following LHC directions to review and make change requests on the Medicare OASIS assessments to cause higher Medicare payment adjustments; attending weekly case conferences concerning specific Medicare patients; and initiating the paperwork with respect to re-certifications and patient discharge.

25.     Relator VIB bases its allegations in this complaint on the personal experiences of its two partners, who both held corporate-level positions and managed multiple locations for LHC over time and in different geographies. As such, they have personal knowledge concerning LHC's knowledge of the fraudulent conduct, and the nationwide scope of LHC's fraudulent practices, including LHC's pervasive practice of overriding its clinicians' OASIS assessments. Relator VIB's partners have also personally reviewed OASIS scoring for treatment of Medicare patients in LHC facilities, as well as discharges of Medicare patients.  Relator VIB's partners' job positions included regular review of financial and audit data. This includes audits of outstanding claims over time, as well as projected revenue from claims. Reports regularly

-5-

reviewed by VIB partners reflected whether claims submitted on behalf of Medicare patients are paid over time. The personal knowledge of each partner in VIB is imputed to the partnership VIB.

## V.   RELEVANT LEGAL AND REGULATORY BACKGROUND

### A.   THE FALSE CLAIMS ACT

26.     The federal False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

27.     The FCA defines "knowingly" as "hav[ing] actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the information."  31 U.S.C. § 3729(b)(1).  It requires "no proof of specific intent to defraud." *Id.*  Relators use forms of "knowingly" herein as that term is defined in the FCA.

28.     The FCA provides that a person is liable to the United States for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of between $10,957 and $21,916 per violation.  31 U.S.C. § 3729(a)(l); 28 U.S.C. §2461 note.

29.     Under the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), no one may discriminate against a person in the terms and conditions of employment because of that person's

efforts in furtherance of an action under the statute or efforts to stop one or more violations of the FCA. A person retaliated against in violation of this section is entitled to reinstatement, double the amount of lost back pay, interest on the back pay, and special damages, including attorney fees and litigation costs. *Id.*

### B. THE MEDICARE PROGRAM

30. The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

31. Three parts of the Medicare program are relevant to this action: Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care, including home health care. 42 U.S.C. § 1395c-1395i-2. Medicare Part B authorizes the payment of federal funds for medical and other health services, including home health care and medical supplies. 42 U.S.C. § 1395(k), (i), (s). Medicare Part C authorizes the payment of federal funds to private "Medicare Advantage" organizations, to manage the care of Medicare beneficiaries, including home health services. 42 U.S.C. § 1395w-21 *et seq.*

32. For beneficiaries enrolled in both Medicare Parts A and B, Part A finances post-institutional home health services furnished during a spell of illness for up to 100 visits, provided the beneficiary previously spent three consecutive days in a hospital and home health care was initiated within 14 days following discharge from the hospital, or was discharged from a skilled nursing facility in which the beneficiary was provided post-hospital extended care services.[2]

---

[2] The CARES Act, P.L. 116-136 § 3708 (April 29, 2020), recently waived the post-institutional requirement for coverage of home health services under Medicare Part A.

Medicare Benefit Policy Manual, ch. 7, § 60.1.  Part B finances the balance of the home health spell of illness in excess of the 100 visits covered by Part A.

33.     If a beneficiary is enrolled in Parts A and B, but does not meet the three-consecutive-day requirement or the 14-day requirement noted above, Part B finances all home health services for the beneficiary.  *Id.* § 60.2.  If a beneficiary is enrolled only in Part A or only in Part B, the part in which he or she is enrolled covers all of the home health services rendered. *Id.* § 60.3.  Assuming all other requirements are met, there is no limit on the number of visits Medicare Part B will reimburse.  *Id.* § 70.1.

34.     If a beneficiary is enrolled in Medicare Part C, the Medicare Advantage plan in which the beneficiary is enrolled pays for home health services required by the beneficiary, under terms negotiated between the home health agency ("HHA") and the Medicare Advantage insurer.  CMS pays the Medicare Advantage insurer an amount of money that the insurer uses to reimburse the HHA for its services to the beneficiary.

## VI.     MATERIAL REQUIREMENTS APPLICABLE TO GOVERNMENT PAYMENT FOR HOME HEALTH SERVICES

35.     The below requirements are material to the Government's payment of home health services, and are directly tied the amount of payment of the claims described.

36.     As detailed below, based on the relevant manuals, statutes, regulations, guidance, and the actions of the United States to prosecute similar frauds, Defendants knew or had reason to know the Government attached importance to adherence to these requirements in determining whether or not to reimburse a claim for home health services.

37.     The requirements at issue go to the core or basic conditions for payment of the federal healthcare claims for home health services, and are essential to the ability of LHC's facilities to get claims paid by federal healthcare programs.

-8-

**A. OASIS ASSESSMENTS DETERMINE THE AMOUNT CMS PAYS FOR HOME HEALTH SERVICES.**

38. Since October 1, 2000, CMS has paid for home health care through the Home Health Prospective Payment System ("PPS"), pursuant to § 4603 of the Balanced Budget Act of 1997, P.L. 105-33, as amended by § 5101 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, P.L. 105-277.

39. HHAs are required by statute and regulation to collect data regarding Medicare patients using the OASIS instrument. 42 U.S.C. §1395fff(b)(3)(B)(v)(II); 42 C.F.R. § 484.250; 484.55(b)(1). Data gathered through OASIS determines the amount which Medicare pays for home health care.

40. The OASIS assessment is used to determine a patient's Home Health Resource Group ("HHRG"), which in turn establishes amount of payment received.

41. OASIS data is material to the Government's payment of home health care claims. CMS requires that "[t]he encoded OASIS data must accurately reflect the patient's status at the time of assessment." 42 C.F.R. § 484.20(b). The OASIS Manual further explains that OASIS data are used to determine payment, and that it is thus "imperative that the OASIS data that HHAs collect and submit be accurate and complete." OASIS-C2 Guidance Manual, ch. 1 at 5 (Jan. 1, 2017), *available at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/ HomeHealthQualityInits/Downloads/OASIS-C2-Guidance-Manual-6-17-16.pdf. It further provides:

> OASIS data must accurately reflect the patient's status at the time the information is collected. Before transmission, the HHA must ensure that data items on its own clinical record match the encoded data that are sent to CMS. Once the qualified skilled professional (specifically, RN, PT, SLP/ST, or OT) completes the assessment, the HHA should develop means to ensure that the OASIS data input into the computer and transmitted to the CMS exactly reflect the data collected by

-9-

the skilled professional. In addition, the State survey process for HHAs may include review of OASIS data collected versus data encoded and transmitted to the CMS.

*Id.*, Appx. B.

42. Falsification of OASIS data has, in fact, resulted in criminal prosecution. For example, in 2014, a physician in Michigan pled guilty to, among other things, "sometimes adding diagnoses to make it appear that the beneficiaries qualified for and required home care when they did not, and other times, 'upcoding' physician home visits to higher levels of complexity than actually performed." Press release, "Michigan Physician Pleads Guilty for Role in $19 Million Medicare Fraud Scheme" (Nov. 14, 2104), *available at* https://www.justice.gov/opa/pr/michigan-physician-pleads-guilty-role-19-million-medicare-fraud-scheme. *See also*, *United States v. Orillo*, 733 F.3d 241, 242-243 (7th Cir. 2013) (affirming basis of sentencing a nurse who falsified OASIS data to increase reimbursement).

43. The Department of Justice ("DOJ") has also repeatedly pursued allegations of upcoding OASIS data under the FCA. For example, in 2014, the DOJ settled a case against CareAll Management LLC for "overstat[ing] the severity of patients' conditions to increase billings and bill[ing] for services that were not medically necessary." Press Release, "CareAll Companies Agree to Pay $25 Million to Settle False Claims Act Allegations" (Nov. 12, 2014), *available at* https://www.justice.gov/opa/pr/careall-companies-agree-pay-25-million-settle-false-claims-act-allegations. *See also*, Press Release, "Amedisys Home Health Companies Agree to Pay $150 Million to Resolve False Claims Act Allegations" (Apr. 23, 2014), *available at* https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations.

-10-

### 1. Medicare Home Health PPS Billing & Payment Methodology

44.     Prior to January 1, 2020, under the Home Health PPS, Medicare pays for home health services in increments called "episodes" of care, each of which lasts up to 60 days. 42 C.F.R. § 484.205(a). Each "spell of illness" consists of an initial 60-day episode of care and subsequent 60-day episodes, until the spell of illness ends. Medicare Benefit Policy Manual, ch. 7 § 60.1. Medicare pays for an unlimited number of episodes in each spell of illness, so long as all other requirements (discussed below) are met. *Id.*

45.     For each beneficiary qualified to receive the home health benefit, Medicare pays a HHA the National Standardized Episode Rate (the "Rate") per episode. The payment is intended to cover the care needs of patients who are homebound during the sixty-day episode.[3] 42 C.F.R. § 484.205(b). The Rate is revised annually by CMS in a final rule published in the Federal Register; it is adjusted for "case mix" (described further *infra*) to account for the health condition

---

[3] Medicare covers home health benefits for beneficiaries who are homebound. 42 U.S.C. § 1395f(a)(2)(C). If a patient is not homebound, Medicare will not cover services provided by a HHA. To be qualified as homebound or "confined to the home," a beneficiary must:

   (a)    because of illness or injury, need (i) the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; (ii)the use of special transportation; or (iii) the assistance of another person   in order to leave their place of residence; OR
   (b)    have a condition such that leaving his or her home is medically contraindicated.

Medicare Benefit Policy Manual, ch. 7. § 30.1.1. If one of the criteria set forth in the above paragraph is met, the beneficiary must also meet both of the following criteria:

   (a)    there must exist a normal inability to leave home; AND
   (b)    leaving home must require a considerable and taxing effort.

*Id.* Mere inconvenience or difficulty leaving the home is insufficient to justify a determination that the patient is homebound.

and resource use of each beneficiary.[4]  Thus, home health services provided to sicker

beneficiaries are reimbursed at higher rates because those individuals require more care.

46.     Specifically, Medicare pays a flat base rate per episode of care, described further

below, which is adjusted upward or downward based upon differences in the expected resource

needs of individual patients as indicated by clinical severity, functional severity and service

utilization, as determined by each patient's categorization into one of 153 HHRG payment

groups during OASIS assessment.  Payment is further adjusted for differences in local labor

costs using the hospital wage index. The base payment rate for Medicare home nursing was

$3,039.64 per 60-day episode for the year ended December 31, 2019.

47.     Claims for payment for these services are reimbursed in two stages: an initial

request for advance payment when the episode commences and a final claim when the episode is

completed.

48.     Prior to January 1, 2020, the first claim for payment is submitted shortly after the

start of the initial episode of care, in a Request for Anticipated Payment ("RAP") to CMS.  Upon

receipt of a qualifying RAP, CMS remits 60% of the initial episodic payment.  After completion

of the episode of care and submission of a qualifying claim, CMS remits the remaining 40% of

the episodic payment, subject to any applicable adjustments.  For subsequent episodes within the

same spell of illness, CMS remits 50% at the beginning of the episode (upon submission of a

RAP) and the remainder at the end of the episode (upon submission of a qualifying claim).  42

C.F.R. § 484.205(b).

49.     Effective January 1, 2020, CMS implemented the Patient Driven Groupings

Model ("PDGM") prospective payment system. Under PDGM, the initial certification of

---

[4] The Rate is also adjusted for local differences in labor costs, which are not at issue here.

Medicare patient eligibility, plan of care, and comprehensive assessment remains valid for 60-day episodes of care, but payments for Medicare home health services are made based upon 30-day payment periods. The national, standardized 30-day Medicare payment amount will be $1,864.03, resulting in a 1.3% increase in payments. The rule implements the 1.5% Medicare home health payment update mandated by the Bipartisan Budget Act of 2018, offset by a 0.2% decrease due to the rural add-on. The final rule also adjusts PDGM case-mix weights, which implements the removal of therapy thresholds for payments.

50.     Under PDGM, CMS will also reduce a request for anticipated RAP payments to 20% for existing home health providers. CMS finalized its proposal to eliminate RAP payments for calendar year 2021, and will require home health providers to submit "no pay" RAPs during that year. Beginning January 1, 2021, home health providers will be required to submit a Notice of Admission ("NOA") within five calendar days of the first 30-day period and within five calendar days of the day 31 for the second, subsequent 30-day period. CMS also finalized a policy allowing therapy assistants to provide maintenance therapy services in the home and modified certain requirements relating to the home health plan of care.

51.     In short, by 2021, CMS is phasing out the split pay system, to require submission of a one-time NOA at the start of the first 30-day episode, and to reimburse providers upon the final claim.

52.     Prior to January 1, 2020, payment for an episode was also subject to adjustment where a patient's care is so minimal (four visits or less per episode) that it qualifies for a low-utilization payment adjustment ("LUPA").  42 C.F.R. §§ 484.205(a)(1); 484.230.  LUPAs were introduced to prevent HHAs from claiming episodic reimbursement while stinting on care.  65 F.R. 41128, 41142 (July 3, 2000) (LUPAs were implemented "to moderate provision of minimal

or negligible care, that is, to discourage HHAs from providing a minimal number of visits in an episode").  In a LUPA, instead of payment being based on the Rate, it is instead made for individual services provided.  Payment subject to a LUPA is thus a fraction of the normal episodic payment.

53.     After January 1, 2020, for Medicare payments associated with LUPAs under PDGM, the threshold varies for a 30- day period depending on the PDGM payment group. The 30-day payment amounts are for 30-day periods of care beginning on and after January 1, 2020. There will be a transition period for home health episodes that span the implementation date of January 1, 2020, whereby payments for those services rendered during those episodes will be made under the national, standardized 60-day episode payments.

54.     Adjustments to the Rate also occur in other circumstances, including when the episode is interrupted by a patient's transfer or early discharge or where a patient's care is so expensive that s/he is considered an "outlier."  42 C.F.R. §§ 484.235, 484.240.

## 2.     Case Mix Determines Adjustment of the National Standardized Episodic Rate and is Based on the OASIS Instrument.

55.     As previously noted, payment for an episode of care is subject to the Rate and is adjusted for "case mix."  Case mix refers to the combination of clinical, functional, and service utilization factors that identify a beneficiary as more or less ill than the average beneficiary. Case mix, therefore, can result in an episodic payment that is higher or lower than the Rate.

56.     At or around the start of care, or upon recertification, an HHA clinician evaluates a beneficiary using the OASIS instrument.  The instrument consists of a series of questions scoring various health characteristics in three "dimensions": the clinical dimension (*e.g.*, primary diagnosis, secondary diagnoses, shortness of breath); the functional dimension (*e.g.*, dressing,

bathing, ambulation); and the service utilization dimension (*i.e.*, the number of skilled therapy visits provided). Clinicians enter the answers to these questions as "M-codes."

57. The M-codes are used to assign beneficiaries to an HHRG. Each HHRG includes a clinical severity level (C1, C2, or C3), a functional severity level (F1, F2, or F3), and a service utilization severity level (S1, S2, S3, S4, or S5). These codes combine to form 153 HHRGs (from C1F1S1 up to C3F3S5) and are further categorized to reflect whether the patient is in her first or second (or later) episode and whether the patient is receiving between 0 and 13 (or 14 or more) therapy visits. *See, e.g.*, CY 2017 Home Heath Prospective Payment System Rule Update, 81 Fed. Reg. 76702, 76707-708 (Nov. 3, 2016).

58. Each HHRG correlates with a Health Insurance Prospective Payment System ("HIPPS") code, which HHAs use to bill CMS for beneficiary care. The HIPPS code represents to CMS the factor by which the Rate is to be multiplied in order to determine the dollar amount of reimbursement for a given beneficiary.

59. The M-codes in the OASIS dataset are thus material to payment because they determine the HIPPS code that the HHA uses to bill CMS for the beneficiary's care.

60. As previously noted, CMS annually publishes a Home Health Final Rule in the Federal Register. The Rule sets forth the Rate, as well as the parameters for determining case-mix adjustment for the following calendar year. *E.g.*, 81 F.R. 76702 (Nov. 3, 2016) (establishing rates and parameters for 2017).

61. In the Rule, CMS identifies M-codes that can increase a beneficiary's HHRG, which in turn establishes the reimbursement value of the HIPPS code used for billing. For example, in 2019, a primary diagnosis of diabetes (M1021) results in an increase of three severity-score points in the Clinical dimension, if the beneficiary is in the first or second episode

-15-

in a spell of illness and receives 14 or more therapy visits. 83 F.R. 56406, 56416. By way of further example, a score of "1," "2," or "3" on M1860—indicating low-to-moderate difficulty walking—results in an increase of seven severity points in the Functional dimension, if the beneficiary is in the first or second episode and receives between zero and 13 therapy visits. *Id.* Or, a score of 2 or more on M1830—indicating at least an inability to bathe without intermittent assistance—increases the Function score by six severity points, if the beneficiary is in the first or second episode and receives between zero and 13 therapy visits. *Id.* As is evidenced by these examples, the severity points are tallied for each patient and establish the severity level of the Clinical and Functional dimensions of the HHRG. *Id.* at 76709.

62.     The following example illustrates how the case mix and M-Codes affect reimbursement: In 2017, a beneficiary with a HHRG of C1F1S1, who is in the first or second episode and is receiving between zero and five therapy visits, has a case-mix weight of .5857, which, multiplied by the Rate (i.e., $2,989.97), results in payment of $1,751.26. By contrast, in 2017, a beneficiary in any episode with an HHRG of C3F3S1, who is receiving 20 or more therapy visits, has a case-mix weight of 2.2112, which, multiplied by the Rate (again, $2,989.97), results in payment of $6,611.42. *See* 81 F.R. 76702, 76710-12, 76716 (Nov. 2, 2016).

63.     The HIPPS code generated by the OASIS tool (based on the M-codes the clinician entered) is submitted in both the initial and the final claims as a representation of the patient's acuity and, therefore, how much reimbursement the HHA is entitled to receive from the Government for that patient's care. *See generally* CMS, Definition and Uses of Health Insurance Prospective Payment System Codes (HIPPS Codes) (Jan. 3, 2010), *available at* https://www.cms.gov/ medicare/medicare-fee-for-service-payment/ prospmedicarefeesvcpmtgen/downloads /hippsusesv4.pdf.

-16-

64.     Because HHAs use OASIS to determine the payment code for each episode of care, CMS requires HHAs to ensure that the OASIS data accurately reflects the condition of each patient at the time of assessment.  42 C.F.R. § 484.20(b).  The OASIS assessment must be completed "in a timely manner, consistent with the patient's immediate needs, but no later than 5 calendar days after the start of care."  42 C.F.R. § 484.55(b).

65.     Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patients' condition and the health services performed.

66.     After completing OASIS comprehensive assessments, a clinician must attest that everything contained in the assessment is truthful and accurate, based on the evaluating clinician's assessment.

67.     Only one clinician may complete an assessment.  Although the clinician may consult the treating physician or coding staff to ensure correct documentation of the patient's condition, completing the assessment is not a collaborative effort between clinicians or between clinicians, managers, and other staff.

68.     The assessing clinician must perform the assessment and follow up on any observations of patient status reported by any other agency personnel.  Only the assessing clinician, based upon the patient assessment, can determine the patient's primary and secondary diagnoses and how well the patient's symptoms are controlled.  *See* OASIS C-2 Guidance Manual, ch. 1, at 4, *available at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HomeHealthQualityInits/Downloads/OASIS-C2-Guidance-Manual-6-17-16.pdf.

69.     Falsified OASIS data that exaggerate a beneficiary's condition result in falsely-inflated reimbursement to the HHA.  As a result, truthful and accurate OASIS assessments are a

-17-

condition material to the Government's decision to reimburse for the submitted claim for services.

### B. MEDICARE PAYS ONLY FOR MEDICALLY NECESSARY SERVICES.

70.     Under the Medicare program, "no payment may be made…for any expenses incurred for items or services…not reasonable and necessary for the diagnosis or treatment of an illness or injury." 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 C.F.R. § 410.50. Medical providers are not permitted to bill the Government for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.* Treatment decisions must be based on patient medical needs, not provider profits.

71.     Medicare reimburses for home health services only if the beneficiary: (1) requires skilled nursing services (other than solely venipuncture) on an intermittent basis, and/or physical, occupational, or speech therapy, as determined by a physician; and (2) is under a plan of care established, certified, and periodically reviewed by a physician and administered by a qualified HHA. 42 U.S.C. § 1395f(a)(2)(C).

72.     Services are covered only when consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs. Services also must be consistent with accepted standards of medical practice and reasonable in terms of duration and quantity. Medicare Benefit Policy Manual, ch. 7, § 40.1.1.

73.     Medicare requires proper and complete documentation of the services rendered to beneficiaries. A purpose of this requirement is to allow Medicare to assess the necessity and reasonableness of those services. 42 U.S.C. § 1395l(e) mandates that

> [n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

*Accord*, Medicare Benefits Policy Manual, ch. 7, § 20.1.2.

74.     No HHA may bill for services that are not medically necessary or unsupported by sufficient documentation of medical necessity.  CMS is required to, and does, refuse payment for claims that are unsupported by documentation.

75.     Obviously, falsification of documentation to support medical necessity results in false claims to federal health care programs.

### C.     MEDICARE HOME HEALTH STAR RATING SYSTEM

76.     CMS publishes quality ratings for HHAs, which are called "Star Ratings."  Since July 2015, these ratings have been available on CMS's Home Health Compare website (at https://www.medicare.gov/homehealthcompare/search.html).  The "Quality of Patient Care Rating" is derived from OASIS dataset submissions and claims data.  Higher star ratings generally result in more referrals because providers who refer patients to HHAs tend to recommend only or primarily to highly-rated agencies.  Patients similarly gravitate toward highly-rated HHAs.

77.     The "patient care quality" ratings (as opposed to "patient-satisfaction" ratings) are derived from nine measures contained in OASIS data: three process measures (i.e., timely initiation of care; education on patient drugs; flu vaccination) and six outcome measures (i.e., improvement in ambulation; improvement in bed transferring; improvement in bathing; improvement in pain interfering with activity; improvement in shortness of breath; and acute care hospitalization).  *See generally,* CMS, Quality Measures, *available at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-

-19-

nstruments/HomeHealthQualityInits/HHQIQualityMeasures.html.  Each measure is determined from M-codes in OASIS datasets submitted by each HHA to state agencies.  CMS, Home Health Quality Measures – Outcomes, *available at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HomeHealthQualityInits/Downloads/Home_Health_Outcomes_Measures_Table_OASIS_C2_02_03_17_Final.pdf.

78.     The six outcome measures are determined based on the proportion of patients, discharged during the reporting period, who have improved on the measure since start of care or recertification.  For example, the proportion of patients who have improved ambulation scores based on answers to OASIS item M1860—which rates patients from 0 to 6, with 0 indicating an ability to walk independently and 6 being "bedfast"—determines the score for that measure.

79.     The outcome measures are risk adjusted and combined with the process measures to produce an overall rating, as described in CMS, Home Health Compare (HCC) Star Ratings Methodology (March 4, 2015), *available at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HomeHealthQualityInits/Downloads/Home-Health-Star-Ratings-Methodology-updated-3-16-15.pdf.

80.     When more patients are scored as having improved, a higher star rating is likely.

81.     HHAs market themselves using star ratings.  Prospective patients choose higher-rated facilities, believing that the quality of care is higher at these facilities.

82.     As described further in Section VII.B.6, *infra*, scoring on many of the measures that affect star ratings also impacts federal healthcare payments in specific states, including Arizona, Florida, Maryland, North Carolina, Tennessee, and Washington.

-20-

## VII.  FACTS

83.  The majority of LHC's net service revenue arises from the treatment of Medicare beneficiaries.

84.  LHC directs decisions regarding therapy for Medicare home health beneficiaries on profits, rather than medical necessity or beneficiary need. When a clinician's clinical judgment deviates from LHC's financially motivated parameters, LHC uses software and management techniques to corporately and systemically override those judgments. This results in falsified OASIS data, nursing and therapy visits artificially conformed to profitable thresholds, and manipulated star ratings.

85.  LHC's conduct has been ongoing since at least 2011 and has caused the submission of claims for inflated payments from federal healthcare programs.

### A.  OVERVIEW OF LHC AND ITS CORPORATE PROCESS

86.  LHC's policies for increasing and maintaining census at all its facilities, and maximizing the reimbursement relating to those patients, are centrally and corporately directed, nationwide.

87.  LHC operates 513 home health service locations, including 350 wholly-owned subsidiaries, throughout the United States (hereinafter referred to as LHC facilities).

88.  Prior to April 2018, LHC facilities were divided among four geographic divisions: (1) the Beltway Division, which includes West Virginia, Tennessee, Virginia, Maryland, the District of Columbia, and part of Ohio; (2) the Coastal Division, which includes Alabama, Georgia, Kentucky, and Missouri; (3) the Acadia Division, which includes Arkansas, Illinois, Missouri, Oklahoma, Texas, Wisconsin, and most of Louisiana; and (4) the Gateway Division, which includes Arizona, California, Colorado, Idaho, Nevada, Oregon, and Washington.

-21-

89.     LHC acquired Almost Family in April 2018 and thereafter created four additional geographic divisions:  (5) the Cornerstone Division, which includes Indiana, Michigan, Pennsylvania, North Carolina, and South Carolina; (6) the Northeast Division, which includes Connecticut, Massachusetts, New Hampshire, New Jersey, New York, and Rhode Island; (7) the Florida Division, which includes Florida; and (8) the Capitol Division, which includes a small area in Louisiana.[5]

90.     The nationwide policies are controlled by LHC's corporate officers, who set the direction for all the facilities.  Prior to 2020, LHC's home health policies were under the direction and supervision of LHC's former President/Chief Operating Officer ("COO") Don Stelly. The divisional presidents and vice presidents report directly to the COO.[6]  These individuals in turn direct regional directors and their direct reports, the area managers, administrators, directors of nursing ("DONs"), assistant DONs, and team leaders at LHC facilities (including, *inter alia*, UTMC HCS) to ensure implementation of LHC's corporate strategies.

91.     From the top down, LHC closely monitors each of its facilities' financials, including census numbers (i.e., the number of beneficiaries receiving home health care), and maintains target numbers for each location. The target numbers included specific growth targets

---

[5] It is anticipated that these geographic divisions will be reorganized and consolidated in the near future, with potential new name designations. This re-organization may include:  (a) merging the Beltway Division with the Northeast Division; (b) merging the Acadia Division with the Gateway Division; (c) merging the Coastal Division with the Cornerstone Division.

[6] During an interim period after the departure of Mr. Stelly, his direct reports reported to Chief Executive Officer Keith Myers. Former Chief Financial Officer, Josh Proffit, was recently promoted into the President and COO position.

for Medicare beneficiaries (referred to as "Medicare admit goals") based on prior year admissions.

92.     LHC ensures that its managers implemented its corporate strategies not just through job security, but through commissions, bonuses, and raises heavily incentivized by meeting these goals.  If goals were consistently not met, LHC responded by implementing performance improvement plans that could lead to job loss.

93.     For example, LHC expects each of its facilities to meet admission targets and financial goals. The goals were referred to as "minimum budget" numbers and were tracked on a weekly, monthly, quarterly, and annual basis.  Managers and sales personnel at each location were responsible for ensuring that the minimum budget numbers were met.[7]

94.     LHC also uses a labor-management strategy it calls "flexing" to force time off and less pay (or use of PTO) to personnel at locations that are trending toward a decreased census. As then-Divisional Vice President of the Beltway Division, Susan Sylvester described to her management team in an August 2, 2016 email, "managing flex on a daily basis" works to increase census because staff who cannot afford things due to flexing will work toward a surge in admits.

---

[7] For example, through quarterly Short Term Incentive ("STI") plans, LHC incentivized managers to skew OASIS data and admit unqualified patients in order to meet aggressive revenue-based and quality targets.  Each of these STI plans also provided for additional bonuses (i.e., "kickers") if the employees met or exceeded LHC's STAR quality rating expectations; the bonuses were reduced when those employees failed to meet LHC's STAR quality ratings.  For upper management, "Quality Kickers" were available if star ratings met/exceeded targets, even if revenue-based targets were not satisfied.  Sales representatives were also incentivized: Most representatives only earn commission on Medicare admissions, depending on the market and the salesperson's base salary.  If representatives do not meet the goal, they do not earn a commission; if they consistently fail to meet the goal, they are put on a performance improvement plan, the goal is lowered, and their salary is correspondingly lowered.

95.     Through the use of these closely-monitored carrots and sticks, LHC made sure all employees fell in line with its corporate strategy.

96.     LHC's top down approach ensured strict control over the implementation of its fraudulent schemes at all facilities.

## B.     LHC FALSIFIES OASIS ASSESSMENTS TO INCREASE REIMBURSEMENT AND IMPROVE RATINGS.

### 1.     LHC Managers Directed Clinicians to Change OASIS Answers.

97.     Pursuant to corporate directives, LHC's managers directed clinicians to falsify OASIS items to make patients appear less healthy at admission or recertification, after the clinicians had already completed the comprehensive assessments of patients and submitted them for managerial review, and more healthy at discharge.

98.     The purpose of the changes directed by LHC supervisors was to (a) ensure that patients qualified for LHC's home health services and that the patients landed in a higher HHRG (so that LHC could receive a higher reimbursement for the patient); and (b) make it appear as if the patients' abilities had improved through discharge more than they actually had under LHC's care. In other words, by making a patient seem more dependent at the outset and less dependent in the end, LHC both increased its Medicare reimbursement and received additional financial benefits by falsifying its quality of care.

99.     Because the managers and coders directing the changes had never evaluated the patient, the directed changes were not based on clinical judgment relating to what is reasonable and necessary for that specific Medicare patient.

100.    These changes were part of a top-down strategy at LHC to manipulate Medicare revenue, and they were carefully monitored to ensure that they comport with LHC's financial

goals. For example, LHC directed it managers to run "OAIS Answer Change Trending Reports" on a regular basis to monitor the changes they implemented in the OASIS data.

101.    The managerial direction to change OASIS answers was communicated in various ways, including through email and during in-person and weekly case conferences.

102.    For example, in late 2016, Joe Huff, a Director of Nursing in Knoxville, emailed a clinician to sit down with him to change her OASIS assessment for a patient assessed as relatively independent.  Based on the clinician's actual assessment, the patient did not need LHC's services and, even if the patient qualified, there was no room to demonstrate patient improvement. The clinician told Huff that the changes he was directing seemed false and inaccurate.

103.    In March 2017, another clinician, Shanda Miller, reported to her supervisor that frequent changes were made by management to her OASIS assessments such that the assessments did not seem like her own. Miller's immediate supervisor agreed and recalled that, when he was a Field RN, LHC managers would call clinicians several times each day to tell them to accept changes to their OASIS assessments.

104.    Consistent with this corporate strategy, Relator Marshall reported to Performance Improvement Coordinator Coleman that she was being asked to change practically every Oasis question submitted.

## 2.    LHC Installed Software that Made the Fraud Easier to Employ.

105.    When LHC initially began engaging in the above-described scheme, its patient records were in paper form.  At that time, LHC trained and instructed its clinicians to submit initial patient assessments to its coding department for review.  The coders would then instruct the clinicians to score patients at an even more dependent level than was assessed.

-25-

106.    Because, however, clinicians were busy with patients in the field, it was sometimes hard to get them to physically come into the office to sign the paper records and approve the directed changes.

107.    LHC phased out paper records in 2011 and 2012 when the company adopted a new software platform called Homecare Homebase ("HCHB").  Using tablet computers, clinicians could access HCHB remotely and upload patient assessments directly to LHC's managers.

108.    In approximately June 2015, LHC also announced that it had contracted with "Strategic Healthcare Programs" ("SHP"), a company located in Santa Barbara, California. SHP's website advertises that its system offers "[a] better way to manage your home health agency performance."  The website also claims that SHP's system maintains a tool for "OASIS scrubbing" that can be used to "[c]orrect documentation inconsistencies before sending to CMS." The company acknowledges that changing OASIS scores can increase a HHA's Medicare reimbursement because "OASIS equals revenue." SHP thus claims that its software allows HHAs to not "leave any revenue on the table."

109.    LHC informed its employees that SHP's "OASIS scrubbing" tool would identify changes that could be made to OASIS items in order to increase reimbursement to LHC.  The software identified these potential changes by scanning the OASIS data of every Medicare patient being treated by LHC and, using algorithms, sending in-program "alerts" (identifying the potential revenue-increasing changes) to LHC managers.

110.    These alerts informed managers what changes to make in order to maximize reimbursement and improve quality data. While the alerts may at times have also identified

changes that did not affect reimbursement, upon information and belief, the alerts never identified changes that would decrease reimbursement or quality scores.

111.    LHC instructed its managers throughout the company to utilize the SHP software and change answers to OASIS items based on the SHP alerts, even when the managers did not personally see the patient.  This allowed LHC to maximize its profitability.

112.    After LHC switched to the SHP software, manager-directed OASIS changes were more easily made because the OASIS was synched to clinicians' work tablets, so they could simply click on the "accept changes" box after LHC managers manipulated the scores. Clinicians no longer had to physically come into the office, which made the fraud easier to execute.

### 3.    Clinicians Had No Discretion to Reject the Changes.

113.    While clinicians are able to technically accept or decline any changes to the OASIS assessment, in reality the clinicians at LHC are not given discretion to do so.

114.    For example, in 2017, Jeri Via, one of LHC's Directors of Nursing, emailed JoAnne Little (in LHC's Corporate Compliance Department) to report a Team Leader who was refusing to follow LHC's directives concerning changing an RN's OASIS assessments.  Via stated that the Team Leader had not had any issues with the OASIS answer changing process prior to the installation of the OASIS software (discussed *infra*), but was now concerned because the software would "tag" the Team Leader to those changes.  The Team Leader was specifically concerned about changing OASIS answers because she said she was "not the one who did the assessment," adding that she was not willing to "commit[] Medicare fraud." Via asked Little to send materials that would help her convince the Team Leader that following LHC's directives to change OASIS answers was part of the Leader's job requirement and responsibility.

115.    Later that month, DVP Sylvester initiated a Division-wide conference call to discuss declining quality metrics with LHC's managers.  During the call, one of LHC's Program Integrity Coordinators reported that some clinicians were refusing to accept their managers' changes to their OASIS assessments because they thought it was wrong to do so.  A supervisor in the same department also reported that there are clinicians who "think when they're asked to change OASIS answers that it's wrong or even illegal."  The supervisor stated that LHC should tell those clinicians that the changes were just a matter of "collecting data."

116.    Sometimes, however, clinicians did push back against the changes being directed by LHC managers.  For example, in May 2019, a clinician named Terra Tompkins emailed her Senior Regional Therapy Director to complain about the recommendations being made to her OASIS assessment. Tompkins asserted that her OASIS assessment was "based on me assessing the patient IN person which is what MEDICARE REQUIRES."  She added that it did not seem appropriate for her manager to "change 17 items based on what a computer is advising her."  Ms. Tompkins also reported this to LHC's compliance department, and she recounted that the compliance department assured her that they were just suggestions and that Medicare would not approve of scoring a patient lower in the beginning just to show an improvement in the end. However, this temporary assurance did not translate into any long term corrective action: Tompkins's manager maintained that she needed to change her OASIS answers, and Ms. Tompkins needed to go to the senior regional director to get a reprieve on this particular patient.

117.    If clinicians did decline to accept the instructed changes, they were deemed a "problem" by LHC managers.  To avoid being singled out as problem employees, many clinicians accepted the changes without comment without regard to whether the answers accurately described a patient's condition.

-28-

118.    Indeed, an LHC report detailing "Accepted Change Requests" between January 1, 2017 and March 23, 2017 reflects there were roughly 87,750 accepted change requests in a region in the Beltway Division. In contrast LHC's report for "Declined Change Requests" during that same region and time period lists only 245 declined changes.

### 4. When Clinicians Did Not Accept the Changes, LHC Managers Simply Overrode Those Decisions.

119.    Even when clinicians did not accept the instruction to alter OASIS data, LHC managers were empowered to nevertheless bypass the clinicians' assessments and make the changes by using an "override" function in one of LHC's digital platforms.

120.    Overrides were a way for LHC's leaders to simply substitute a clinician's OASIS answers with the SHP recommendations without waiting for any input or agreement from the clinician.

121.    A large number of overrides were executed without the clinician being told about the OASIS change or being offered the opportunity to review the change. Also, it was common for the overrides to be done so quickly that the clinician whose assessment was being changed would not have had a chance to respond before the override was executed.

122.    Upon information and belief, in nearly every case of a manager making an override, s/he neither met the patient nor consulted with the clinician about the override.

123.    Clinicians who did have time to respond (and did not accept the changes as described *supra*), often also took no action concerning the manager-directed OASIS changes because they knew that managers could accept the changed answers via the override function.  In this way, a clinician could avoid being viewed as a "problem" employee if s/he declined to accept a change.  And, that way, the clinician could also refrain from actively participating in falsifying OASIS answers.

124.     Managers at many levels, including Directors of Nursing, Performance Improvement Coordinators, and Branch managers, regularly executed numerous overrides to their clinicians' OASIS assessments.  Overrides were such an essential part of LHC's scheme that some of LHC's divisional and regional managers taught team leaders how to override OASIS data during site visits (and then shared this progress with LHC's highest-level executives).

125.     Because the assessing clinician is solely responsible for completing the OASIS assessment based on personal observation and is supposed to enter a patient's diagnoses "in the order that best reflects the seriousness of each condition and supports the disciplines or services provided,"[8] the use of overrides in this manner alters and falsifies the OASIS record.

126.     The fraud concerning the overrides resulted in changing the OASIS answers to functional M-items, which affected reimbursement, and to codes affected the case-mix group. After the clinician identified a patient's primary and secondary diagnoses and selected the corresponding codes, for example, LHC's coding department also selected different codes and/or rearranged the order of the codes to manipulate CMS's case-mix methodology.  The department's code choices and order frequently had nothing to do with the patient's need for home health services or the patient's active/complicating comorbidities.  Instead, the coding department manipulated the codes in order to land in a case-mix group that would increase Medicare reimbursement.

## 5.     LHC Knew that the Overrides Were Being Inappropriately Used.

127.     LHC knew that the override feature was only supposed to be used in limited, exigent circumstances, such as correcting clerical errors, or when the assessing clinician had left

---

[8] OASIS Guidance at ch. 2, 2-7; ch. 3, C-10.

the company. LHC knew that it was inappropriate to use the override feature simply because clinicians were pushing back on accepting their managers' OASIS changes. LHC also knew that the override feature was being used inappropriately, for these very reasons.

128. Starting in 2011, LHC's internal audits of its facilities were reflecting that improper payments were made due to OASIS M-codes not being supported by the medical record. In that time frame, LHC had entered into a Corporate Integrity Agreement ("CIA) with the United States related to a settled *qui tam* suit, *United States ex rel. Master v. LHC Group, Inc.*, W.D. La. Civil Action No. 07-0117.[9] That CIA required that LHC engage in ongoing review of claims submitted to Medicare to ensure that patients meet homebound status and that claims are for medically necessary services rendered to the patient.

129. Neither the CIA nor LHC's internal audit results led it to curb its OASIS manipulation and override practices. LHC knew that its managers were performing overrides,

---

[9] In two settlement agreements relating to that matter, the Government released LHC from Covered Conduct dating between 2006 and 2008. In a 2011 settlement agreement, the Government released:

> certain civil claims against LHC for submitting or causing to be submitted claims for payment to Medicare, TRICARE and FEHBP during the period January 1, 2006 through December 31, 2008 for home health services by the facilities [identified in an attachment to the agreement] that were not reimbursable because: (1) the services were not medically necessary, and/or (2) the patients were not homebound.

In a 2012 settlement agreement, the Government released:

> certain civil claims against LHC for submitting or causing to be submitted claims for payment to Medicare, TRICARE and FEHBP for home health services during the period January 1, 2006 through December 31, 2008 by the facilities [identified in an attachment to the agreement] that were not reimbursable because: (1) LHC billed for the services without a valid plan of care, (2) LHC resequenced and thereby upcoded the ICD-9-CM diagnosis codes, (3) LHC billed for services without the documentation required to support their medical necessity, and (4) LHC billed for services without physician orders, or for more services than ordered by the physician.

-31-

including through manipulation of M-codes, to accomplish these results. LHC also knew that these practices resulted from revenue-generating policies set by its highest-level executives, and specifically who specifically targeted the Medicare market in an effort to increase the company's profitability.

130.    In March 2017, however, LHC came to the stark realization that the sheer number of OASIS overrides being performed looked suspicious. By this time, LHC's data reflected over 72,000 overrides in a region in the Beltway Division alone. After reviewing the data at that time Sylvester told her reports to be careful about talking about it because it "looks like fraud."

131.    In this time frame, the Government had also began investigating the instant consolidated matters.

132.    Due to the company's fear that the sheer amount of overrides would be a red flag, DVPs like Sylvester subsequently commenced "verbal reviews" with their regional leaders to discuss the limited circumstances where overrides were permissible.  But the practice continued uninterrupted across all of LHC's facilities.

133.    In October 2018, Sylvester wrote to her team about the override policy:  "It's recently come to my attention that some of our [Executive Director's and Clinical Director's] need additional education on when they should use the OASIS override function per our policy…Closing current month pending assessments is our goal with each month end close but please ensure that no one uses this override function or any other function available to them in an inappropriate manner that's outside of our policies to meet the goal."

134.    One week later, LHC's President/COO Stelly issued a company-wide email concerning compliance efforts.  The statement read, in part, "Our desire to create 6 Pillar excellence is something that has set us apart… That desire should be and must be fulfilled by

always doing what is right, by following our policies and procedures, and never wavering to real or perceived pressure to cross any line… Period!"  A compliance newsletter issued that same month stated that "the use of an override to either accept or decline the recommendations made by either the coder or the Team Leader would violate the OASIS One Clinician Rule."

135.    On a conference call later that morning, however, Stelly said he wanted to discuss things he could not put in email "for obvious reasons."  He went on to say that changing a clinician's OASIS answers because SHP or a supervisor directed the change was inappropriate and that the company was aware that some managers were doing hundreds of such overrides. Stelly asserted that such use of overrides was wrong, unethical, and cause for termination.

136.    Approximately one week after the Stelly conference call, LHC implemented new training modules that discussed OASIS change and override policies.  The modules made clear that the OASIS report is a "legal document signed by the assessing clinician" and that overrides are only appropriate for either (a) demographic items or (b) when documentation "clearly indicates that the answer is in error."  The module instructed LHC employees to never override diagnosis codes or any clinical answer that is simply a "conflict or discrepancy."

137.    However, LHC's training was mere lipspeak.  LHC exerted the same pressure on its personnel to upcode and maintain financial targets. As would be expected, many of the company's managers did not cease performing improper overrides.  In March 2019, LHC's Director of Clinical Compliance sent a report detailing the number of overrides still being performed to LHC's DVPs, including Sylvester.  The Compliance Director noted that the report was "LENGTHY" and encouraged the DVPs to "drill down into these locations where the local leaders are performing overrides on Oasis and the clinicians are still employed."

138. Following the circulation of the March 2019 override report, Sylvester's team reported to her by email that "there were many overrides done that were not within policy."

139. Thus, LHC continued to perform enormous amounts of improper overrides to its clinicians' OASIS assessments. In June 2019, LHC circulated an email to its DVPs that demonstrated over 63,000 improper overrides were performed in the month of May 2019. LHC recognized that overrides should not be performed unless the clinician has left the company or is unavailable for consult due to being out more than two weeks. The email also acknowledged that it knew the overrides could not be due to a clinician's leave of absence, because "only two clinicians were on [leave] and only 1 was separated." The company also admitted that there was no way to tell which person was actually making the overrides. Therefore, DVPs were instructed to investigate who had privileges to override OASIS answers and work with the IT department so that LHC could see who had made those changes. The email also noted that LHC would be pulling override reports each month, and that the DVPs (like Susan Sylvester) would each need to submit action plans concerning the overrides.

140. There was a concerted and widespread effort by LHC to manipulate OASIS data in a manner that would increase the company's revenues. According to LHC's own data, from 2014 through early 2018, in the Beltway Division alone, LHC performed over 77,000 total overrides on the "first request." In other words, on over 77,000 occasions, LHC's managers overrode a clinician's OASIS answer without waiting for any feedback from the clinician. Nearly 7,000 of these overrides were related to functional ability codes that impacted reimbursement. Over 12,500 additional overrides were performed in subsequent requests (i.e., after a clinician had the opportunity to weigh in on the first request), and more than 500 of these subsequent requests related to functional ability codes. In sum, there were nearly 90,000

-34-

overrides performed in just LHC's Beltway Division; nearly 7,500 of these overrides related to functional ability codes that impact reimbursement. Moreover, functional ability overrides affected approximately 2,750 unique Medicare patients at either their start-of-care, resumption-of-care, or discharge.

141. In the same timeframe, LHC code overrides (to change M-codes) were overwhelmingly done in a manner that increased the company's reimbursement. For example:

    (a)    overrides to the code M1860 (Ambulation) made patients look less functional at the start of care approximately 98% of the time, but made patients look more functional approximately 96% of the time at discharge;

    (b)    overrides to the code M1830 (Bathing) made patients look less functional at the start of care approximately 94% of the time, but made patients look more functional approximately 98% of the time at discharge;

    (c)    overrides to the code M1810 (Upper Body Dressing) made patients look less functional at the start of care approximately 97% of the time, but made patients look more functional approximately 97% of the time at discharge;

    (d)    these trends held true for overrides made to every other functional ability M-code in LHC's OASIS data; and

    (e)    these trends also held true (to an even larger degree) for managers' change requests to M-codes that were simply accepted by clinicians.

142. LHC has clearly demonstrated that it intends to continue manipulating its coding to inflate its federal reimbursements.

-35-

**6. LHC Also Used Overrides to Falsely Inflate Quality Metrics.**

143. LHC participates in the Home Health Value Based Purchasing ("HHVBP") program in six states (*i.e.*, Arizona, Florida, Maryland, North Carolina, Tennessee, and Washington). The program increases or decreases the total annual payment to a HHA that would otherwise be due in a payment year when compared to a baseline year (i.e., 2015). The payment adjustment is based in on quality data derived from OASIS submissions during the performance year. If quality ratings are high, the payment is increased; if quality ratings decline, payment is decreased.

144. LHC's falsification of the underlying OASIS data inflated its performance on these quality measures and caused inflated payments and/or reduced losses to LHC in the relevant payment year.

145. For example, for many years, LHC directed its clinicians to falsify the M1860 code by directing them to score patients as more infirm on admission (or recertification) and more improved at discharge. If the clinicians did not comply, LHC supervisors would override the clinicians' answers.

146. Upon information and belief, LHC engaged in the same conduct with regard to codes M1850 (bed transferring), M1830 (bathing), and M1400 (shortness of breath), and other quality measures.

147. LHC's overrides not only maximized the company's Medicare reimbursement, but, because the conduct was systematic and widespread, the overrides affected LHC's quality ratings across entire states. In fact, LHC branches had (and has) some of the highest (if not the highest) quality ratings in the nation amongst HHAs.

-36-

148.     Again, as alleged herein, the high ratings were not based on superior care to beneficiaries, but on overrides that increased reimbursement and skewed quality measures.

149.     LHC management was always concerned with the company's quality metrics because of the impact on LHC's profits.  For example, on an April 2017 conference call, it was revealed that LHC managers had been instructing employees in its Pulaski, Virginia location to change a patient's functional M-codes in order to make the patient appear more disabled.  The reason for the change was to show greater improvement at discharge.

150.     In a call on September 15, 2017 between DVP Sylvester, the Divisional Performance Improvement Team Manager Julie Jarnagin, and all the Regional Operations Directors and Performance Improvement Coordinators (PIs) for the Division, Ms. Sylvester asked a PI why a location's star rating had dropped from 4.5 to 4.0 stars.  The PI explained, "some RNs…refuse to make changes to OASIS data because they think it's wrong to do so." Ms. Jarnagin, the PI's supervisor, stated that it was a more widespread issue, saying, "we have these clinicians and nurses that think when they're asked to change OASIS answers that its wrong or even illegal." Her direction: "We need to make them understand that when doing OASIS, we have to look at it as collecting data, not as assessment." No one, including Ms. Sylvester, responded to or clarified this instruction.

151.     After the training push described *infra* in 2018, LHC began to see a downturn in quality metrics. Even a small drop in the sheer number of overrides would affect quality metrics because reduced inflation of OASIS assessments means less room for inflated improvement upon discharge and then lower star ratings.

152.     In March 2019, LHC's Executive Vice President and Chief Clinical Officer, Angie Begnaud, sent a company-wide email (including to former President/COO Stelly) about a

-37-

"very concerning" decrease in quality metrics. To address this, she told LHC's Executive Directors and Clinical Directors to dig into their SHP reports and figure out what was driving the decrease."

153. In May 2019, DVP Sylvester forwarded an email to her team that detailed a precipitous decline in quality metric ratings. According to the email, only 63% of the locations in Sylvester's division were meeting LHC's target rating. Four days later, in an email to high-level management, LHC highlighted its focus on the declining ratings when it noted that the company was continuing to see a decline in the percentage of providers who were able to meet the company's benchmarks in quality ratings.

154. That same month, Program Integrity Coordinator Margaret Lee emailed a number of other managers about the need to create and implement methods of increasing the quality metrics/ratings. Lee specifically instructed the team to be on the lookout for "non-compliance with the clinician"—by which she meant clinicians who refused change requests that would help boost quality metrics—and to think about "what you will be doing to mitigate it with them."

155. LHC knew that benign factors were not the sole cause of LHC's declining quality metrics.

## C. LHC MANIPULATES THE NUMBER OF THERAPY AND NURSING VISITS PER EPISODE IN ORDER TO INCREASE PROFITS.

156. Under CMS's home health payment methodology, the number of therapy visits a beneficiary receives determines, to a great degree, which HHRG will be assigned and, therefore, how much reimbursement a HHA (like LHC) will receive for a beneficiary's episode. It also determines whether and how many clinical or functional severity points are accumulated. The four major "therapy buckets" that determine thresholds for reimbursement levels are: 0-5 visits, 6-13 visits, 14-19 visits, and 20 or more visits, per episode.

-38-

157.     Instead of basing the number of therapy visits on a patient's medical needs, LHC manipulated the number of visits to maximize its profit.

158.     LHC exerted pervasive corporate control over its patients' plans of care:  The company instructed its managers to use its proprietary SVP software to manage the care of every patient. It tracked adherence to SVP plans of care nationwide, down to the location level, and tied manager pay to that adherence.

159.     Managers then directed clinicians (during weekly case conferences and one-on-one interactions) to increase or exceed the aforementioned therapy thresholds without regard for medical necessity. At the instruction of their managers, many LHC clinicians inflated plans of care beyond what was medically necessary in order to meet the highest-possible therapy bucket.

160.     Ultimately, LHC presented a plan of care to a patient's treating physician that did not accurately reflect the patient's needs, and the doctor's approval was often cursorily given and rarely withheld.[10]

161.     Once the OASIS assessment was submitted and Medicare payment established, LHC intentionally disregarded and deviated from its patients' plans of care, as established by their treating and certifying physicians.  When it reduced or eliminated certain home health services in the plan of care, the company failed to notify the certifying physicians and/or the patients themselves of the change.

_____

[10] Relators estimate that LHC's clinicians made this call to a treating physician only about ten percent (10%) of the time, and that no one made the call the other ninety percent (90%) of the time. For that 90%, the clinicians would misrepresent in the plan of care that they spoke to the treating doctor, even when they had not done so.   For example, on several occasions Dr. Eric Littleton would often return paper copies of his patients' plans of care that had been sent to him for signature and certification.  When he returned the documents, he often wrote that he "never ordered Home Health for this patient."  While another treating doctor (e.g., a cardiologist) could have arguably ordered home health services for one of Dr. Littleton's patients, LHC clinicians routinely failed to maintain documentation that tracked the doctor ordering the services.

162.     Often, the company did not provide the type or amount of home health services contemplated in the OASIS assessment and/or plan of care, or it withheld supplies (or provided cheap supplies) and services to the patient.  For example, LHC sent Licensed Practical Nurses ("LPNs") to visit home health patients instead of RNs or Medical Social Workers.

163.     The scheme to manipulate the services and therapy visits increased LHC's profits, but did so at the expense of patient care.

### 1.     LHC Used the SVP Software and Clinical Programs to Manipulate Visits and Increase its Profits.

164.     LHC employs the SVP software across the company.  The software is used to map individual patient plans of care (combinations of therapy, nursing, and other visits) onto reimbursement methodologies by payor—both public and private—to evaluate the profitability of each patient's plan of care against the reimbursement methodology of the payor.

165.     The SVP software was used by LHC to limit the number of home health visits a patient can receive from each discipline based on the patient's respective HHRG score.  After the OASIS assessment was created, SVP generated a HHRG score based on the clinician's OASIS assessment and any modifications by managers.

166.     Since Medicare payment is locked based on the HHRG score, SVP assigned each patient an amount of points in the system that was not to be exceeded by LHC clinicians when treating the patient.  This point allotment was referred to as the "ceiling" amount of points. Instead of relying on a clinician's judgment concerning the needs of a particular patient, SVP determined the number of visits (translated into "ceiling" points) a patient should receive based on the national norm for patients with the same HHRG score.

167.     At the time the "ceiling" points are assigned to a patient, the OASIS assessment would have been submitted to Medicare and the reimbursement amount would have been

established. Thus, no changes to decrease the patient's dependency (and, in turn, increase the HHRG score and reimbursement) could be made in order to allow for more reimbursed home health visits.

168. LHC's ultimate goal was to avoid exceeding the "ceiling" amount of points, which would create a negative points balance for the patient. That negative points balance would affect LHC's profit margins because, as noted above, the reimbursement amount was essentially static.

169. LHC thus instructed its employees to make sure that the "ceiling" points were not exceeded for any patients. Managers monitored SVP and modified the number of therapy visits to ensure that clinicians did not exceed those "ceiling" points. That meant that managers would decrease the amount of visits the clinicians originally scheduled, creating an SVP points balance that was either positive (meaning that LHC was providing care at a less-than-average frequency) or neutral (meaning that LHC was providing care at no-more-than-average frequency).

170. A positive balance meant that LHC retained even more profit from the already-inflated reimbursement payment that resulted from the fraudulently upcoded OASIS assessment (discussed *supra*).

171. Because SVP is used to prevent LHC clinicians from providing "too many" visits to its patients, it ensures that LHC makes a profit on each patient. This, in turn, results in a substantial decrease in the quality of patient care because home health visits and supplies are intentionally reduced and/or are not provided based on plans of care and OASIS assessments.

### a. SVP's "Episodic Tool" Specifically Targeted Medicare Beneficiaries.

172. When using SVP for Medicare beneficiaries, LHC uses SVP's "episodic tool." For these patients, SVP interfaces with patients' OASIS records through the HCHB platform.[11] SVP's episodic tool feature and the HCHB platform worked in tandem to show how profitable each Medicare patient was—and how profitable a patient could be—by comparing the patients' current plans of care with a model plan of care that LHC knew was profitable under the Home Health PPS.

173. This model plan of care was based on a patient's HHRG. Upon information and belief, the model plan was not based on the patient's diagnoses or any patient-specific information. Instead, revenue was the primary determining factor for what the comparator model plan would look like.

174. The model plan is combined with cost information for different types of visits (e.g., physical therapist and registered nurse visits) to determine the "SVP points" budgeted for a patient's episode. Specifically, the visits in the model plan of care are multiplied by the costs allocated to each visit type and the result is expressed as "SVP points." These points are used to determine the "available" number of SVP points for an episode.[12]

---

[11] The "managed care" tool is used for beneficiaries who have Medicare Advantage plans, employer-based plans, or other types of commercial insurance. The managed care tool does not interface with HCHB, but is programmed with revenue and cost information, per visit, for every insurance plan accepted at each location.

[12] For example, a RN visit may be allocated 2.33 SVP points, while a physical therapist's ("PT") visit is allocated 4.28 SVP points (because the PT visit is more expensive for LHC to provide). A plan of care consisting of four RN visits and four PT visits would thus have a points budget of 78 SVP points. (This would be calculated as follows: (2.33 points/RN x 4 RN visits) + (2.33 points/PT + 4 PT visits) = 77.8. SVP would round up this number to 78 points.)

-42-

175. "Ceiling" points and "available" points were related. "Ceiling" points referred to the number of points that were not to be exceeded, and "available" points represented the number of points that remained before you hit the "ceiling" allotment.

176. Both the "ceiling" and "available" points acted as a budget for the number and types of visits that were allocated in a patient's plan of care.

### b. LHC Directed its Personnel to Modify Plans of Care to Adhere to "Ceiling" and "Available" Points Limitations.

177. As previously noted, LHC corporate instructed managers at all levels to "adhere to" and "manage to" the model plan of care provided by the SVP tool. The managers were charged with identifying plans of care with the largest deviance from the SVP-determined model plan. The managers would then tell the clinicians to conform their services to the SVP plan, with the goal of achieving a positive or neutral points balance.[13]

178. The instruction to change plans of care to maximize profits was communicated in various ways, including *inter alia*:

    (a)    consistent messaging from LHC corporate, combined with training providing the same missive, that directed managers to run every patient through SVP;

    (b)    direction provided at one-on-one meetings between clinicians and Branch Managers, Team Leads, Directors of Nursing, and other trainers about individual patients' plans of care;

---

[13] Upon information and belief, as with modifications to OASIS answers, there were instances when LHC managers altered plans of care to conform to SVP models without informing clinicians or securing their consent.

(c)     instruction at weekly clinical case review meetings attended by local managers and (at locations facing profitability issues) more senior management; and

(d)     provision of one-on-one "counseling" and "training" to clinicians who consistently created unprofitable plans of care.

179.    LHC tracked visits per episode nationally and locally.  In fact, local managers were instructed to bring reports tracking such information, filtered by therapy discipline, to meetings with regional managers.  The local managers were expected to be "prepared to discuss patients with a negative balance," i.e., the patients who exceeded their "ceiling" or "available" SVP points (or, put another way, patients who were least profitable to LHC).

180.    For example, in advance of a meeting between DVP Sylvester and the Director of Nursing at LHC's Pulaski, Virginia location in September 2016, Sylvester emailed that "EVERY patient needs to be run through whichever tool..[.]either Mcare or managed care, according to their payor source.  No exceptions, please."  In a follow-up email, Sylvester stated that the "focus this week [of my visit] will include the use of the SVP tool for both Mcare and managed care patients, to determine appropriate frequencies and manage the episode."

181.    In a September 2016 telephone call between Sylvester and a Director of Nursing, Sylvester communicated a threat involving President/COO Stelly. During that call, Sylvester discussed avoiding negative adjustments because of missed visits in Virginia locations, increasing therapy visits to increase revenue, and decreasing therapy visits once the twenty-episode threshold had been reached to avoid a decrease in profits.  She warned, "If we don't get changes made, Don Stelly will come and fix it himself!"

-44-

182.    The next day, Sylvester sent a follow-up email to the Director of Nursing in which she stated that Stelly "is pushing me hard and I'm talking to him weekly (at least) about V[irginia]. I had a long conversation yesterday with him. He's not satisfied with the financial performance. If we don't improve performance, he'll make changes there himself." A major emphasis of the email was adherence to the SVP points and models.

183.    When Huff (the assigned Director of Nursing) commented on Melanie Gibson's (a Branch Manager) HHA location making substantial profits based on a lack of visits provided to patients. Huff, in an approving tone, said, "Can you believe your positive SVP's are 600 points?"

184.    LHC managers closely monitored the SVP points balances. For example, in September 2016, DVP Sylvester emailed the following to LHC's Regional Operations Directors: "Team…please review…SVP balances (some greater than negative 500?), even in those locations with a good [operational margin]. We can improve these [operational margins] even more by operational management of these metrics." (President/COO Stelly and his son, Derek Stelly, who was also a LHC Financial Operations Analyst, were copied on the email.) Because a "negative 500" points balance affects profitability, LHC corporate was expressing concern.

185.    Marshall received censure if she did not control visits using the SVP tool instead of relying on the clinician's judgment as to the reasonable and necessary services their patients needed. If clinicians asked for additional home health visits be added to a plan of care (e.g., if a patient needed additional wound care), and Marshall added visits, this would put those patients into a negative SVP points balance. When a patient neared a negative SVP points balance, Marshall's supervisors, including Melissa Rittenberry (Regional Director of Operations), would call her to inquire about why the patient was getting so many therapy visits. Rittenberry often

-45-

warned that Marshall "better be watching your SVP points," so as not to cut into LHC's profit margin. Marshall was instructed to try in any way she could to decrease the number of home health visits, so the points would become a positive or neutral balance.

186.    LHC's practice of putting profits over patient needs inevitably led to patient complaints.  Patients often objected that they were not receiving adequate home health care that their assigned clinician believed they needed.

### 2.    LHC Manipulated Therapy Visits/Plans of Care to Avoid LUPAs.

187.    When an HHA provides four or fewer home health visits, there may be a (potentially significant) downward adjustment (i.e., a LUPA or low utilization payment adjustment) to the HHA's reimbursement amount.

188.    To avoid this decrease, LHC mangers—following corporate directives— instructed clinicians to create plans of care that exceeded LUPA's four-visit threshold without regard for whether the additional visits were medically necessary.

189.    Episodes of care for patients whose only services consist of intravenous ("IV") needle insertion are particularly subject to this kind of manipulation, because such episodes typically consist of four or fewer nursing visits for the periodic administration of IV medications over the course of 60 days.

190.    For example, during an April 13, 2016, company-wide call, Jason Brock, the National Special Projects Manager, told managers to look for and schedule extra visits for IV-only patients to prevent those patients from becoming LUPAs.  He further stated that, now that he had warned about the "pitfall," he was confident that the managers would avoid those IV patients from becoming LUPAs.

-46-

191.    In order to avoid a LUPA for an IV-only patient is to insert medically unnecessary visits into that patient's plan of care.  Thus, Brock's message conveyed that managers should insert medically unnecessary visits into plans of care for IV patients.

192.    In that same vein, Marshall was told by management to always make sure that the patient had at least five visits, so that LHC would be paid by Medicare for an entire 60-day episode of care.  This was done to further manipulate the Medicare payment:  If an HHA provided four (4) visits or less in an episode, then they were paid a standardized *per* visit payment, instead of for an entire episode payment for a 60-day period.

193.    For patients for whom there is no danger of a LUPA, LHC provides the converse direction:  It instructs local managers and clinicians to stint on medically necessary care by reducing nursing visits.

194.    For example, in August 2016, DVP Sylvester instructed a Regional Manager to review all patients in a particular state who had plans of care involving more than ten nursing visits per episode.  For those patients, the manager was told to reduce excess visits in order to improve operational margins.

### 3.    LHC's Additional Manipulation of Therapy Buckets, Including Numbers of Visits.

195.    In the last few years, the home health industry has experienced a series of rate cuts mandated by the Affordable Care Act.  As a result, during an annual evaluation of a Regional Operations Director in December 2016, DVP Sylvester instructed the Director to increase revenue by scrutinizing LUPAs and scheduled-but-missed therapy visits, as well as trying to push patients into higher therapy buckets.  Sylvester said she had to be careful about what she put in email, but acknowledged that the company was focusing on a lot of new metrics to increase revenue.  She further stated, "You know and I know it's all about case mix"—*i.e.*, the

-47-

HHRG as determined by OASIS data. She said that LHC needed to "make up revenue cuts" on the order of 2% "somehow" and that "there's no other way except therapy."

196. LHC thus recognizes that the therapy bucket into which a patient falls is the primary determiner of a patient's profitability to the company and that it has to increase therapy visits to increase profitability. During a conference call in early 2016, National Therapy Director John DiCapo told Operations Managers, Regional Therapy Directors, and the Divisional Vice President for the Beltway Division, among others, that "therapy visits are the driver of revenue."

197. In an accompanying power point, DiCapo compared reimbursement for three hypothetical patients of increasing acuity, represented by three HHRG scores: C2F1S1, C2F3S3, and C2F3S3. He explained that the gross profit margin for the lowest-acuity patient was 38%, while it was 51% for the middle-acuity patient and 50% for the highest-acuity patient. The gross margin differed so much because higher-acuity patients do not "require much more overhead[,] just more field staff visits, thus the higher the gross [revenue] the higher the margin." He concluded: "The difference between profit on the 1st case and 3rd case is $3,700 or 300%."

198. The purpose of the meeting was to instruct mid-level managers that a patient's therapy bucket has an outsized effect on reimbursement and that LHC expected those managers to get patients into the most profitable therapy bucket. DiCapo cautioned, however, that "care should always be provided to the lowest cost of care that is appropriate for the patient."

199. LHC reinforces the import it places on getting patients into the highest therapy buckets by tracking patients' current buckets. LHC provides this information for each location to all of its regional managers.

-48-

200.     LHC locations with the highest operating margins are those with the greatest proportion of episodes in the highest-reimbursing buckets.  LHC holds these locations out as models for other locations to emulate.[14]

201.     Conversely, those with a lower share of episodes in these high-reimbursing buckets are chastised and criticized and put on improvement plans, with the worst performing locations being labeled as "drags."  These facilities receive increased managerial oversight and are closely monitored to increase revenue and reduce costs.

202.     LHC's focus on the therapy bucket is further illustrated by a very successful effort in the Beltway Division in late 2016 to reduce missed therapy visits.  Both nursing and therapy visits were being missed, resulting in negative adjustments at final claim submission.  To fix the issue, LHC focused only on ensuring that therapy visits were not missed.  Missed nursing visits were ignored, because, so long as there were at least five visits of any type (as is typical with therapy patients) to avoid a LUPA, missed nursing visits actually helped LHC's bottom line by reducing costs.

203.     LHC tracked these missed visits:  Raj Shaete, the head of LHC's Information Technology department, sent weekly reports to regional therapy directors detailing "negative adjustments" (hereinafter, the "negative adjustment reports"). Negative adjustments to LHC's reimbursement amounts can occur when fewer therapy visits are provided than had been predicted in a patient's plan of care.  The "negative adjustment" report highlights how many visits would be necessary "to hit low end of therapy bucket."

---

[14] LHC's aggressive margin target is 15%, with 30% considered exceptional and 10% or less being a "drag" facility.

204.	When a negative adjustment occurs, LHC receives less revenue than had been anticipated at the beginning of an episode of care.  To avoid the decrease in profit, LHC managers directed clinicians to reduce negative adjustments by ensuring they complete the required amount of visits to avoid the adjustment without considering medical necessity.

205.	Conversely, LHC also tracked high numbers of therapy visits which maximized LHC costs but did not increase reimbursement. Another effect of the pervasive upcoding is that many patients are now slated to receive an inappropriately high number of therapy and nursing visits, and the high number of those visits is also unprofitable to LHC. In March 2019, LHC circulated a new report by John DiCapo – the "DiCapo Report" – which was aimed at reducing high numbers of therapy visits.  This report tracks the number of patients in each division who are receiving more nursing or therapy visits than is profitable, and is circulated to all DVPs, Regional VPs, Administrative VP, Executive Directors, and Clinical Directors.

206.	The DiCapo report was continually updated and circulated nationally prior to the implementation of CMS's new PDGM reimbursement system. Managers were directed to routinely review facilities which all patients with too many visits per episode on the DiCapo Report and were expected to use the report to drive the number of unprofitable visits down.

207.	LHC's scheme to manipulate visits along reimbursement cut-points is being continued under PDGM (implemented January 1, 2020).  As described *supra* ¶¶ 49-51, PDGM decreases the length of an episode of care from 60 to 30 days, and thereby restructures payments to correspond to OASIS assessments over 30-day periods.  In order to continue its manipulation of OASIS coding, LHC has adjusted the way it carries out the scheme to correspond to PDGM's new 30-day periods and patient-driven groupings. Specifically, LHC divided patients into six different "episodic groupings" based on the timing and number of their visits.  For each

-50-

grouping, LHC intends to manipulate the visits (either by moving them around and/or adding more) so that it could still bill for a 60-day time period. Group 1, for example, described a patient who had enough total visits to avoid LUPAs in both the first and second 30-day period, but the visits were front-loaded in the first 30-day period. LHC's "fix" would be to spread the visits out so that there are enough visits in both the first and second 30-day period to avoid LUPAs. Group 2 described a patient who did not have enough total visits to spread out and avoid LUPAs in both the first and second 30-day period, so LHC's "fix" would be to add visits to second 30-day period. Groups 3 through 6 similarly described other episodic scenarios and the actions that would allow LHC to still bill for a 60-day time period.

### D. LHC KNOWINGLY CAUSES FALSE CLAIMS TO BE SUBMITTED.

208. LHC knows that its conduct caused the submission of false claims for home health services to federal healthcare programs.

#### 1. LHC's Knowing Conduct

209. The fraud schemes identified herein are company-wide directives and practices. LHC also monitors the results of the fraud schemes and pressures its managers to maximize profit. The company incentivizes and rewards those who engage in the fraud and produce more money for LHC and punishes those employees that do not meet its growth and profitability targets.

210. LHC knew that its practices were unlawful and worked to conceal the fraud. For example, DVP Sylvester stated that she had to be careful about what she put in writing and instructed her team to inform her of any compliance issues via telephone. Sylvester reminded the team that "any email is discoverable unless you have sent it to one of our attorneys and indicated in the subject line and body of the email that it's 'PRIVILEGED AND

CONFIDENTIAL…" [P]lease call me instead." On another occasion, Sylvester stated that LHC "couldn't have [the Government] seeing that we are changing visits based on financial data."

211.    By way of another example, in October 2019, a number of managers, including DVP Sylvester, participated in a meeting in which they discussed the need to hold clinicians accountable for the number of visits LHC wanted them to provide. The managers noted that conversations with clinicians should be only over the phone with "[n]o emails going back and forth – these are not email conversation!"

212.    When audits risked uncovering LHC's fraud scheme, LHC took action to shut down the audits/inquiries. For example, in November 2016, an LHC internal audit uncovered records that "had either 'minimal' or 'deficient' documentation to support" medical necessity, homebound status, or "M item answers" (i.e., OASIS assessment answers). LHC demoted an employee, Amber Hawkes, from a DON to a Clinical Director in response to this audit. After the November 2016 audit, however, the company did not conduct any further audits, as it was no longer under obligation to do so per its CIA.

213.    Finally, by at least March 2017, LHC was aware of improper overrides of OASIS data being conducted by managers at its facilities across the county. DVPs nationwide instructed Regional Operations Managers to pull override reports from HCHB; the reports showed tens of thousands of instances in which managers overrode OASIS data from the assessing clinician. The overrides fraudulently increased patients' case mix and, thus, falsely improved quality measures (and falsely supported homebound status). When a regional manager submitted the requested data to DVP Sylvester, she instructed the manager to be careful with communications about the data "because it looks like fraud." She further stated that there had been allegations of falsification of OASIS data stemming from the fact that LHC's star ratings in Medicare's Home

-52-

Health Compare were unrealistically high. Sylvester confirmed that LHC's home office was aware of the massive number of overrides in every region. She instructed that no further action or inquiry should be pursued regarding the overrides.

214. LHC performed training regarding the going-forward compliance policies to be applied to LHC's override practices. In a call on April 27, 2017, Gloria Keene, LHC's VP of Coding, Education, and Leadership Development, said that the way managers had been overriding clinicians' OASIS data had been "basically illegal."

215. Nevertheless, LHC did not correct years of past overrides, or to enforce a policy to prevent improper overrides from occurring. As such, this practice continues to the present despite LHC's knowledge of the systematic use of computer overrides to increase reimbursement and to meet corporately set guidelines and quotas.

216. At all times relevant to this complaint, LHC knew and had reason to know that it submitted claims for payment to federal insurance programs for home health care.

217. At all times relevant to this complaint, LHC knew or had reason to know that adherence to requirements set forth in relevant regulations, regulatory guidance, audits, and enforcement actions, was material to the Government's determination to pay claims for home health care services. For example, as early as 2014, LHC was also aware of whistleblower suits that illustrated the Government's absolute intent prosecute Medicare fraud, including any fraud that involved the alteration of records in order to obtain higher payments.

218. The Government refuses to pay claims that have been falsely-inflated through upcoding, are for beneficiaries who are not qualified for home health care, or are not reasonable or necessary.

219.    In addition, LHC specifically targeted Medicare beneficiaries. LHC's highest-level executives were keenly focused on revenue generation, and they specifically targeted the Medicare market in an effort to increase the company's profitability.  In 2016, for example, President/COO Stelly directed LHC to go after unearned Medicare revenue because it was a market with high potential.  Stelly described unearned Medicare revenue as "profits sitting on the table."

220.    Following Stelly's directive, LHC monitored how each patient's medical assessment affected LHC's fiscal bottom line.  LHC learned that by manipulating patient assessment metrics, it could maximize reimbursement from Medicare.  LHC also made an effort to keep confidential the communications about these manipulations.

221.    LHC's corporate policies and practices, as described in this complaint, naturally and foreseeably caused the falsification of OASIS data and documentation material to false claims, as well as the submission of false and falsely-inflated claims for home health care services.

222.    At all times relevant to this complaint, LHC has taken steps to hide the schemes detailed herein from the Government because it knew that its actions were material to the Government's payment decisions.

## 2.    LHC's Conduct Caused Claims to Federal Healthcare Programs.

223.    LHC's conduct caused false claims to be submitted to federal healthcare programs, including Medicare.

224.    Claims paid by federal healthcare programs, largely Medicare, was not just the foreseeable, but the intended, result of its schemes.

-54-

225.     LHC's corporate direction relating to the schemes alleged in here was a substantial factor in causing inflated claims to be routinely submitted and paid by federal healthcare programs, including Medicare, for federal beneficiaries at all of its facilities.

226.     As described *supra ¶¶* 24-25, Relators have personal knowledge that LHC's schemes were implemented in regard to the treatment and billing of Medicare patients, and resulted in large volumes of inflated claims paid by Medicare.  Relators personally observed the manipulation of OASIS data for Medicare patients, the primary purpose of which was to increase reimbursement from federal healthcare programs.

227.     Marshall personally observed LHC's fraudulent schemes, including that they involved the treatment and billing of Medicare patients. As a clinician, she personally treated Medicare patients and completed OASIS assessments for Medicare patients.  As a team leader, and at the instruction of LHC management, Marshall personally reviewed and made changes to Medicare patients' OASIS assessments.

228.     VIB's partners also personally observed LHC's fraudulent schemes, including documentation which confirmed that Medicare paid the resulting inflated claims.  Relator VIB's partners' job positions also included regular review of financial and audit data. VIB's partners regularly reviewed OASIS scoring for Medicare patients; reviewed census and discharge data for Medicare patients; reviewed external audits; reviewed bad debt reports relating to claims not paid; and aged claims reports. VIB's partners also reviewed LHC's "accepted change request" and "override" reports, which listed tens of thousands of managerial changes and unilateral alterations of OASIS assessments. In sum, reports regularly reviewed by VIB partners reflected whether claims submitted on behalf of Medicare patients are paid over time.

229. Relators' personal knowledge provides sufficient indicia of reliability of Defendants' practices for billing for federal healthcare patients both generally, and specifically, as to particular patients, over time. In addition, Relators' positions provided them with access to management-level communication and reports which confirmed that Defendants' practices did not just result in the billing of Medicare but caused the payment by Medicare of Defendants' false claims.

230. As a result of this personal knowledge, the following are representative examples of patients whose medical records LHC fraudulently upcoded and altered so that LHC could submit falsely-inflated claims that would be reimbursed by Medicare at higher rates. By information and belief, and based on the personal knowledge of Relators regarding LHC's practices for billing for such patients, LHC caused both a RAP and a final claim for payment to Medicare for the patients identified below.

231. Patient AA, date of birth xx/1931,[15] is a representative example of OASIS manipulation. On April 25, 2017, a clinician scored Patient AA as a "2" in M1810 (dressing upper body), a "2" in M1820 dressing lower body), a "5" in M1830 (bathing), a "1" in M1850 (transferring), and a "2" in M1860 (ambulation), resulting in a Functional-severity score of F2 and an HHRG score of C3F2S1. This score would have resulted in a payment of $2,195.63. However, after the clinician's assessment was run through the SHP software, per LHC's policy, it generated an alert identifying that, if M1850 (transferring) were scored at "2" or higher, rather than a "1," a "potential point gain" was available, resulting in reimbursement of $2,332.54, or $136.91 more than the original score. On April 27, one of LHC's managers changed the M1850

---

[15] Relators have substituted placeholders for patient names and redacted birth date information in order to protect the personal health information of third parties. Relators can provide the identities of the patients upon entry of an appropriate protective order.

-56-

score from a "1" to a "2," which the clinician accepted later that evening.  Upon information and belief, the change misrepresented the patient's condition solely to inflate reimbursement from CMS.

232.    Patient BB, date of birth xx/1925, is another representative example of OASIS manipulation.  On April 5, 2017, a clinician scored Patient BB as a "1" in M1830 (bathing).  However, the clinician's manager changed this score to "3" six days later, along with several other functional M-codes, in response to SHP alerts.  Later that day, the clinician accepted the manager's changed answers.  By changing the M1830 code from "1" to "3," the patient's Functional-severity score increased from F1 to F2, substantially increasing reimbursement.  The manager also changed M1810 (dressing upper body) from a "1" to a "2," M1820 (dressing lower body) from a "1" to a "2," M1845 (toilet transferring) from a "1" to a "2," M1830 (bathing) from a "1" to a "3," and M1860 (ambulation) from a "1" to a "3."  Upon information and belief, the manager made these changes to avoid undercutting homebound status and to increase quality ratings by making the patient's condition appear worse at the start of care, so that it would appear to have improved at discharge.

233.    Patient CC, date of birth xx/1927, is another representative example of OASIS manipulation.  On January 15, 2017, a clinician scored Patient CC as a "2" in M1242 (frequency of pain), but ten days later the clinician's manager changed the answer to a "3," which the clinician accepted.  The manager also upcoded several of the functional M-codes—M1830 (bathing), M1840 (toilet transferring), M1850 (transferring), and M1860 (ambulation)— increasing the Functional-severity score from F1 to F3.  For example, the manager changed the clinician's answer of "0" for M1860 (ambulation) to a "3."  The clinician, again, accepted each of the changes, which resulted in significant additional revenue from Medicare for Patient CC,

-57-

avoided a situation where homebound status could be challenged, and allowed the patient to show more improvement at discharge. Illustrating clinicians' routine and widespread practice of accepting managers' changed OASIS answers, this clinician had accepted over 2,000 changes, while declining just five, over the course of 2016.

234. Patient DD, date of birth xx/1933, is another representative example of OASIS manipulation. On February 14, 2017, a clinician scored Patient DD as a "2" in M1242 (frequency of pain), but two weeks later, the clinician's manager changed this answer to a "3," which the clinician accepted. This change increased the Clinical-severity points by three points, increasing the episode from a C1 to a C2, resulting in significant additional reimbursement.

235. Patient EE, date of birth xx/1935, is another representative example of OASIS manipulation. On September 14, 2016, a clinician classified Patient EE with a primary diagnosis of a unilateral inguinal hernia, with gangrene (a hernia near the groin involving tissue death), with a secondary diagnosis of a sacral (lower back) pressure ulcer, among others shown below. She also identified a surgical wound status with a score of "3—not healing." In other words, the clinician judged that wound care was the primary reason for home health care. The clinician determined that the patient would require 17 therapy visits, resulting in an HHRG score of C2. Ten days after the clinician's assessment, a coder from the coding department, who never met the patient, changed these codes to identify hypertension as the primary diagnosis and Parkinson's disease as the chief secondary diagnosis, which increased the HHRG Clinical-severity score to C3. She also added chronic obstructive pulmonary disease (COPD) and unspecified dementia as additional secondary diagnoses, after which the manager unilaterally changed the patient's M1400 (shortness of breath) score from a "0" to a "3," and changed many other M-codes to account for the unauthorized addition of the dementia diagnosis. The clinician

had not identified any of these diagnoses, even as comorbidities. The clinician did not accept any of these changes. All were accepted via override by the clinician's manager ten days after the assessment and, upon information and belief, without having visited the patient or consulted the clinician. The changes are mapped in the table below.

| Diagnosis | Original | Short description | | Changed | Short description |
|-----------|----------|------------------|---|---------|-------------------|
| **Primary** | K40.40 [16] | inguinal hernia | → | I10 | essential (primary) hypertension |
| **Other 1** | L89.152 | sacral pressure ulcer | → | G20 | Parkinson's disease |
| **Other 2** | Z87.448 | history of urinary disease | → | F03.90 | dementia without behavioral disturbance |
| **Other 3** | M62.81 | atherosclerotic heart disease | → | J44.9 | COPD |
| **Other 4** | R13.12 | dysphagia | → | M06.9 | rheumatoid arthritis |
| **Other 5** | R26.2 | difficulty walking | → | Z93.1 | gastrostomy status |

236. Patient FF, date of birth xx/1948, is another representative example of OASIS manipulation. On March 28, 2017, the clinician scored Patient FF as a "0" in M1860 (ambulation). Six days later, the clinician's manager changed the answer to a "2." The clinician disagreed with the changed, writing a few minutes later that it was "not accurate." Later that day, the manager overrode the clinician's disagreement, accepting the changed answer. This upcoding, which ignored the observation of the only individual whose observation counts under the regulations, resulted in an increase in the Functional-severity score from F1 to F2, substantially increasing reimbursement. It also avoided undercutting homebound status and inflated the patient's quality improvement score.

237. Patient GG, date of birth xx/1936, is another representative example of OASIS manipulation. On February 12, 2017, the clinician scored Patient GG as a "1" in M1830

---

[16] All diagnosis codes used herein are ICD-10. Relator provides summary identifications; more complete information may be found in ICD-10 publications or at http://www.icd10data.com/.

-59-

(bathing), a "1" in M1850 (transferring), and a "1" in M1860 (ambulation). The clinician's manager upcoded these scores to a "2" for M1830 (bathing), a "2" for M1850 (transferring), and a "3" for M1860 (ambulation). This increased the Functional-severity points by six and three points, respectively, which in turn increased the Functional-severity score from F1 to F3, substantially increasing reimbursement.

238.    Patient HH, date of birth xx/1930, is another representative example of OASIS manipulation. On May 30, 2016, the clinician scored Patient HH as a "0" in M1860 (ambulation), which the clinician's manager changed to a "2" a few days later. The clinician declined to accept the changed answer, but by the end of the day, the manager had unilaterally overridden the clinician's answer to change it to a "2." Upon information and belief, this falsification was made to justify the patient's homebound status and inflate LHC's quality ratings.

239.    Patient II, date of birth xx/1937, is another representative example of OASIS manipulation. On September 28, 2016, the clinician assessed Patient II as being treated primarily for type 2 diabetes; major depressive disorder; and hypertension. He scored the severity of these conditions as "2." Two days later, a coder in the coding department changed his answers, making a muscle strain the primary diagnosis, osteoarthritis the second diagnosis, and moving diabetes to the third diagnosis position. The clinician accepted these changes. However, the coder also changed the severity of all three conditions to "3." The clinician rejected these changes, explaining that the "patient is medically stable." But the clinician's manager overrode these codes, upon information and belief, without consulting him or ever having met the patient. The manager also upcoded several of Patient II's M-codes, changing the clinician's score of "1" in M1810 (dressing upper body) to a "2," the score of "1" in M1820

-60-

(lower body dressing) to a "2," the score of "2" in M1830 (bathing) to a "3," and the score of "2" in M1860 (ambulation) to a "3." The clinician declined to accept each of these changes, but a few days later, the clinician's manager overrode the clinician's objections and changed the codes anyway. Upon information and belief, the manager did not consult the clinician and never met the patient.

240. LHC's manipulation of OASIS assessments resulted not just in increased reimbursement, but also in patients who did not require home health care.

241. Patient JJ is a representative example of a patient who did not require home health care. Patient JJ was to be started under Defendants' services because the patient was overweight and needed weight loss tips and recipes, which is not a billable skilled need, but Patient JJ was taken in for at least one certification period and Medicare was billed. When Patient JJ was discharged, the caregiver called and wanted to know where JJ's recipes were, because Patient JJ never received any from Defendants. The nurse never provided any services during the patient's episode of care that was billed to and paid by Medicare.

242. Patient KK is another representative example of a patient who did not require home health care. Patient WW kept calling the LHC's Sevierville office wanting someone to come and check the patient's blood pressure. Instead of explaining to this patient why this reason did not make the patient eligible for home health services, Defendants kept Patient KK on service for longer than Patient KK needed to be. Medicare was billed for these blood pressure checks even though it is not considered a skilled need, and Patient WW's medical records did not reflect a skilled need when it was submitted to Relator Marshall.

243. Patient LL is another representative example of a patient who did not require home health care. Patient LL was not homebound nor did Patient LL have medical necessity for

home health care.  The nurses were seeing Patient LL just to fill the patient's pill planner, which

Medicare does not consider a skilled need.  Also, when nurses arrived at Patient LL's house, they

were often told by a neighbor that Patient LL just got into a taxi to go to town, and many days

Patient LL would just ride the trolley around Pigeon Forge.  The nurses would document that

Patient LL was not homebound, but LHC continued to keep the patient on service.

### E.  LHC RETALIATED AGAINST MARSHALL FOR LAWFULLY RAISING CONCERNS ABOUT FRAUDULENT CONDUCT

244.    During her employment as a LHC Team Leader, Marshall worked at LHC/

UTMC HCS and oversaw the plans of care for the home health patients serviced by LHC's

Sevierville location.[17] In her Team Leader position, Marshall supervised the work of

approximately 15 staff partners who provided home health services.

245.    Throughout her tenure with LHC, Marshall's performance evaluations were

excellent.[18]

246.    At the start of her employment, when LHC instructed her to engage in the above-

described conduct, she initially complied.  But, over time, Marshall felt uncomfortable with the

practices because she was being asked to change the assessment of the clinicians actually

observing and providing services to patients.  Moreover, the changes were made based on

maximizing LHC's profits, not based on the medical needs of the patients.

247.    Marshall routinely expressed her concerns about, *inter alia*, qualifying and/or

recertifying patients who did not qualify for home health services, as well as altering assessing

clinicians' OASIS assessments.  At least once a week—during her weekly case conference (and

---

[17] The number of patients at this location ranged from approximately 80 to 110.

[18] Her only small blemish was one occasion when a Director of Nursing issued a blanket
disciplinary action to all management staff at Marshall's location.

-62-

on other occasions, too)—Marshall approached her Branch Managers, Libby Davis and Melanie Gibson, to question these practices. In addition to Davis and Gibson, Marshall also complained about these directives from LHC to her Performance Improvement Director, Sharon Coleman.

248.    Marshall's Branch Managers agreed with her concerns, but, because LHC employees feared losing their job, no corrective action was taken. LHC continued to direct its employees to engage in the fraudulent conduct.

249.    In fact, the standard response from her Branch Managers was that clinicians had to "score patients as needing more help at the start of care so we can show he/she improved at discharge." Her Branch Managers suggested that she (Marshall) teach clinicians how to answer the OASIS assessment in a way that ensured improvement at discharge. Otherwise, the Branch Managers feared that Coleman would "be all over us" and that "we can't afford to lose our jobs."

250.    On several occasions, Gibson reiterated her fear of losing her job. On several occasions, Gibson told Marshall (in form and substance), "We have to score low [on the OASIS] or we will lose our jobs."

251.    When Marshall talked to Coleman about OASIS scoring, Coleman's tone of voice communicated that Coleman did not want to be questioned. Coleman would say (in form and substance): "If we do not score the patients as needing more help, then Medicare will question why we are in there [providing home health services]." Or, "If Physical Therapy is going to see patient, then we better score patient low enough to justify PT being there." During a phone conversation with Coleman, Marshall told her she was having to change practically every Oasis question submitted, and Coleman responded that she knew.

252.    Marshall feared Coleman (as she had played an instrumental role in firing other LHC employees) and worried that Coleman would fire her if she did not comply with LHC's

instruction to engage in the fraudulent conduct. Marshall needed her job to support her family, so she complied with Coleman's direction.

253. In May 2016, Marshall again objected to Gibson about LHC's fraudulent practices. Marshall refused to comply with the company's directive that she recertify patients who did not qualify for additional home health services and override clinicians' OASIS assessments. Gibson said to her, "I don't blame you. It's wrong."

254. Marshall's efforts to stop this fraudulent conduct was to no avail.

255. Shortly thereafter, on June 2, 2016, Marshall was fired. The Separation Notice that LHC provided her stated she was terminated for "Involuntary – Performance."

256. The meeting during which Marshall was told she was being fired was attended by Marshall's Director of Nursing, Joe Huff, and Gibson. Yolanda Brown, a corporate Human Resources representative, and Melissa Rittenberry, the Regional Director of Operations, also participated via telephone.

257. During the termination meeting, Rittenberry told Marshall that she was being terminated because she failed to ensure that a LPN saw a patient in a timely manner, despite the fact that she had properly advised the LHC team appropriately in the case conference. Brown then told Marshall that the termination was effective immediately and asked Marshall to relinquish her LHC keys and badge and exit the premises. After Marshall collected some of her personal effects, she was escorted out of the building by Huff.

258. The purported reason given for Marshall's termination was pretextual. The real reason for her dismissal was her objection to and refusal to comply with LHC's fraud.

259. Marshall's retaliatory firing was consistent with LHC's treatment of other employees who objected to the company's fraudulent conduct. For example, in approximately

-64-

March 2016, Jennifer Knox, a LPN who worked for LHC, and another nurse from LHC's Maryville office called the company's Corporate Integrity Line to report that the Maryville office was keeping patients on service when there was no medical necessity to justify the need for continued home health services. In response, corporate representatives called the Branch Manager at the Maryville office and, as Relator understood, Knox was subject to a retaliatory and hostile work environment that led to her constructive discharge.

260.    Several other LHC clinicians, including Sharon Braddy and Pam McWhorter, have also resigned under similar situations and because they feared that they would lose their nursing licenses if LHC's fraud was discovered.

261.    Marshall's firing was no consistent with LHC's treatment of other employees who had not objected but who were put on performance improvement plans.

262.    Defendants terminated Marshall because of her efforts to stop one or more violations of the False Claims Act, in violation of 31 U.S.C. §3730(h).

## VIII.   CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### AGAINST DEFENDANT LHC
### 31 U.S.C. § 3729(a)(1)(A)-(B), (G)

263.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

264.    The False Claims Act imposes liability upon, *inter alia,* those who (a) knowingly present or cause to be presented a false or fraudulent claim; (b) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and (c) knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal or

-65-

knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

265.    Defendant knowingly presents or causes to be presented false or fraudulent claims to Government healthcare programs for payment or approval; knowingly makes, uses, or causes to be made or used, false records or statements material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(a)(1)(A)-(B).

266.    Defendant knowingly and improperly conceals and avoids obligations to pay or transmit money to the Government within the meaning of 42 U.S.C. § 3179(a)(1)(G).

267.    Since at least 2011 to present, Defendant LHC has submitted false claims to the United States for the provision of therapy and nursing services provided by its facilities to home health patients insured by federal healthcare programs, including the Medicare program.

268.    More specifically, in order to inflate payments that it receives from federal healthcare payors, LHC implements a corporate-wide scheme in which it directs its facilities to systematically falsify the coding of patients' health conditions and the number of therapy and nursing visits provided to patients.

269.    To carry out the aforementioned scheme, LHC directs its clinicians and managers to falsify OASIS assessments to claim greater reimbursement than the patients' conditions warrant, without regard to the reasonableness and necessity of care. This scheme to falsify records occurs both through direction to clinicians to accept corporately-directed changes to their clinical assessments, and through after-the-fact computer overrides by LHC management.

270.    LHC also uses a proprietary software called Service Value Points ("SVP") to falsely skew the number of therapy and nursing visits, by prioritizing profitability over clinical

decision-making. As a result of these schemes, LHC routinely falsifies records to support the eligibility of patients for the billed home health services.

271. LHC also directs its clinicians and managers to make patients appear worse on admission and better on discharge, without regard to the patient's actual condition, in order to falsify quality improvement data used by Medicare to assign star-quality ratings to Defendant's agencies. By manipulating is star-quality rating scores, LHC fraudulently inflated revenue in states where Medicare's Home Health Value Based Purchasing pilot program operates.

272. Because the OASIS assessment and the star-quality ratings directly tie to the amount of payment that LHC and its facilities receive, as further described herein, LHC's conduct is material to the Government's decision to pay claims for services submitted to public healthcare programs, including Medicare.

273. Based on the relevant manuals, statutes, regulations, guidance, and the actions of the United States to prosecute similar frauds, Defendants knew or had reason to know the Government attached importance to adherence to these requirements in determining whether or not to reimburse a claim for home health services.

274. In addition, the requirements at issue go to the core or basic conditions for payment of the federal healthcare claims for home health services, and are essential to the ability of LHC's facilities to get claims paid by federal healthcare programs.

275. Defendant acts knowingly, as that term is used in the False Claims Act.

276. LHC's knowing, and ongoing, conduct has caused the submission of false and inflated claims to federal healthcare programs by its facilities nationwide, including in the submission of claims for interim RAP payments and final claims for episodes of inflated care for federal healthcare home health patients.

277. Further, despite knowing that it has received overpayments for thousands or hundreds of thousands of false claims, LHC has ignored its obligation to repay those funds to the Government and has concealed its obligation to repay those funds.

278. The United States has been damaged, and continues to be damaged, as a result of Defendant's conduct in violation of the False Claims Act in an amount to be determined at trial.

## COUNT II:
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT'S
## ANTI-RETALIATION PROVISION BY DEFENDANTS LHC AND UTMC HCS
## 31 U.S.C. § 3730(H)

279. The allegations of the forgoing paragraphs are incorporated as though fully set forth herein.

280. Under the False Claims Act, 31 U.S.C. § 3730(h), an employee who, because of her efforts to stop one or more violation of the False Claims Act, faces adverse employment action or discrimination, is entitled to relief.

281. Relator Marshall was directed by Defendants LHC Group, Inc. and UTMC HCS to engage in conduct in violation of the False Claims Act that included, *inter alia*, qualifying and/or recertifying patients who did not qualify for home health services, and altering and/or overriding clinicians' OASIS assessments.

282. Marshall objected to the aforementioned fraud, and spoke to her supervisors in an effort to stop one or more violations of the False Claims Act.

283. Defendant was on notice of Marshall's objections when she complained to her supervisors that the conduct was unlawful.

284. As a direct result of Marshall's efforts to stop one or more violations of the False Claims Act, Defendants LHC and UTMC HCS terminated Marshall's employment.

285.     As a direct and proximate result of the actions of Defendants, Marshall lost the benefits and privileges of employment.  She is entitled to all relief necessary to make her whole, including two times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators request:

A.     That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States and States have sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each action in violation of 31 U.S.C. § 3729;

B.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

C.     That Marshall be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(h) of the False Claims Act;

D.      That Relator be awarded all costs and expenses of this action, including attorneys' fees, costs, and expenses; and

E.     That the United States and Relators receive all relief, both in law and in equity, to which they may reasonably be entitled.

Respectfully submitted,

 *s/ Jennifer M. Verkamp*
Jennifer M. Verkamp (admitted *pro hac vice*)
Frederick M. Morgan, Jr. (admitted *pro hac vice*)
Sonya A. Rao (*pro hac vice* being submitted)
Ian M. Doig (*pro hac vice* being submitted)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
        rmorgan@morganverkamp.com
        sonya.rao@morganverkamp.com
        idoig@morganverkamp.com


David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
The Burkhalter Law Firm, P.C.
111 S. Central Street
Knoxville, TN 37902
Telephone: (865) 524-4974
Fax: (865) 524-0172
Email: david@burkhalterlaw.com
        alex@burkhalterlaw.com
        zach@burkhalterlaw.com

*Counsel for Relator*


## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing will be served via the Court's electronic filing system and served on all counsel of record on this 17th day of August, 2020.


 *s/ Jennifer M. Verkamp*
Jennifer M. Verkamp