**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

| | |
|---|---|
| [UNDER SEAL],<br><br>                              Plaintiffs,<br><br>        v.<br><br>[UNDER SEAL],<br><br>                             Defendants. | Civil Action No.: 6:14-CV-94<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729** *et seq.*<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL
DO NOT ENTER ON PACER**

Robert L. Abell
Robert@RobertAbellLaw.com
120 North Upper Street
P.O. Box 983
Lexington, KY 40588-0983
Tel: (859)254-7076
Fax: (859) 281-6541

Colette G. Matzzie
cmatzzie@phillipsandcohen.com
Tim McCormack
tmcormack@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567
Fax: (202) 833-1815

Attorneys for [under seal]

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT AT KENTUCKY
SOUTHERN DIVISION AT LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ERICA BOWLING and MELISSA POYNTER,<br><br>Plaintiffs,<br><br>v.<br><br>LHC GROUP, INC. and LIFELINE HEALTH CARE OF PULASKI, LLC,<br><br>Defendants. | Civil Action No.: 6:14-CV-94<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.***<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Plaintiff-Relators Erica Bowling and Melissa Poynter, through their attorneys, on behalf of the United States of America (the "Government"), for their Complaint against Defendants LHC Group, Inc. and Lifeline Health Care of Pulaski, LLC (collectively, "Defendants"), allege, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.       This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.       This is also an action to seek recovery of lost pay and benefits, both past and future, compensatory and punitive damages, costs and attorneys' fees for unlawful discharge of Relator Bowling and Relator Poynter.  Relators were discharged because of their refusal to participate in Defendants' submission of false claims to the federal Medicare program, and because of their lawful actions and efforts to stop Defendants from

2

violating the False Claims Act.  Relators were also wrongfully discharged under the common law of Kentucky given that Defendants discharged Relators for refusal to falsify an essential medical record in violation of Kentucky Revised Statute § 314.091(1)(h).

3.       Defendants have engaged in a systematic scheme to defraud the United States by fraudulently billing Medicare and other Government health programs for home health services provided to patients who do not qualify for such services under the applicable rules.  Medicare will only pay for home health services if the patient is "homebound" and if the specific nursing or other therapy services are themselves medically necessary.  In violation of these rules, Defendants routinely submit false claims for home health services provided to patients who are not "homebound," and false claims for skilled nursing and other therapy services that are not medically necessary, and/or not even provided to the patient.

4.       To avoid detection of this fraudulent scheme, Defendants instruct staff to create false documentation of the eligibility, and need, for home health services for many patients who are beneficiaries of Medicare and other Government health programs.  For example, in Somerset, Kentucky, Lifeline branch manager Angie Perry specifically told nurses that the documentation in patient medical records had to indicate that the patients were homebound and needed skilled nursing care, regardless of whether either statement was true.

5.       Defendants also improperly list all co-morbidities, including irrelevant secondary diagnoses, on the patient's "Start of Care" assessment on Medicare's Outcome and Assessment Information Set ("OASIS") form and Medicare's "Plan of Care" (Form 485).  In so doing, Defendants falsely represent the patient's need for skilled nursing

3

services.  Inclusion of irrelevant co-morbidities as secondary diagnoses also artificially

inflates the patient's case-mix severity for the sole purpose of Defendants obtaining

additional reimbursement.

6.      Defendants also fraudulently obtain re-certification of patients for home

health services by relying on secondary diagnoses, often co-morbidities of long-standing, to

justify extended home health services when no need for skilled nursing services exists.   In

turn, once a patient is re-certified for a subsequent episode of care, Defendants will list, or

cause to be listed, the primary diagnosis from the first episode of care as a secondary

diagnosis even when there is no need for skilled nursing services for that patient.

7.      Defendants' fraudulent conduct is particularly egregious because only

three years ago, Defendants settled another FCA suit involving similar fraudulent conduct.

8.      In 2011, Defendants settled *United States ex rel. Master v. LHC Group*.

In that case, the United States alleged Lifeline had submitted false claims for patients who

did not qualify for home health services between January 1, 2006 and December 31, 2008.

As part of the 2011 *Master* settlement, Defendants executed a Corporate Integrity

Agreement ("CIA") in which it agreed, *inter alia*, to implement training and supervision

policies to ensure that claims submitted to Medicare and other Government health

programs are only for patients who qualify for home health services.

9.      Notwithstanding the promises and requirements in the CIA, Defendants

did not reform their substantive practices—instead, they merely initiated an aggressive

policy of "cleaning up" patient records to make it appear that they were compliant.  With

respect to their substantive patient admission and claims submission policies, Defendants

continued to admit and retain many patients who are not eligible for home health services

4

and submit claims for these patients to Medicare and other Government programs. Defendants' ongoing fraudulent conduct both pre-dates and post-dates the settlement of the *Master* case in 2011.

10.     If and when Defendants' staff object to these fraudulent practices, Defendants threaten retaliation, including termination of employment. Defendants use the high rates of unemployment regionally to remind staff that they must either comply with directives, including falsifying documentation, or face termination and unemployment.

11.     As a result, Defendants have submitted thousands of false and fraudulent claims to Medicare and other Government health programs for services not eligible for reimbursement under the rules of those programs. Each submission is a false or fraudulent claim in violation of the False Claims Act. Defendants have also created false and/or fraudulent documents to get claims paid by the Government, and to avoid repaying the Government for previously submitted false claims, all in violation of the FCA.

12.     The False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating fraud on the Government, needed modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

5

13.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §§ 3729(a)(1)(A)–(B), and (G).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

14.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

15.     *Qui tam* plaintiffs Erica Bowling and Melissa Poynter seek, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendants made, or caused to be made, while defrauding Medicare and other Government programs for home health care services.

## II.    PARTIES

16.     Plaintiff-Relator Erica Bowling is a Licensed Practical Nurse ("LPN") residing in Bronston, KY.  From June 2009 until August 2013, she was employed by Defendant Lifeline.  Defendant Lifeline fired her after she expressed concern that Lifeline

6

was defrauding Medicare.  Ms. Bowling attended Somerset Community College for her training as an LPN.  Prior to working for Lifeline, she worked as an LPN/Float Nurse for Lake Cumberland Medical Associates.

17.     Plaintiff-Relator Melissa Poynter is a Licensed Practical Nurse residing in Science Hill, Kentucky.  From April 2011 until November 2013, she was employed by Defendant Lifeline as an LPN.  Relator Poynter was constructively terminated by Defendant Lifeline after she expressed concern that Defendants were defrauding Medicare. Ms. Poynter attended Somerset Community College.  Before Lifeline, she worked for Amedisys as a Field Nurse, Somerwoods Nursing and Rehabilitation as a Floor Nurse, and LabCorp as a Phlebotomist.

18.     Relators are direct witnesses of Defendants' submission of false and fraudulent claims to Medicare for patients who are not homebound or do not require, and/or were not provided, skilled nursing services.

19.     Defendant LHC Group, Inc., is a publicly traded company (ticker symbol LHCG) with headquarters in Lafayette, Louisiana.  LHC provides home health services to patients through 232 individual home nursing agencies in the Southeast, Midwest, and Pacific Northwest.  The vast majority of LHC's patients receive federally funded health care, with approximately 80% of its revenue coming from Medicare.  LHC's self-stated goal is "to become the leading provider of post-acute services to Medicare beneficiaries in the United States."

20.     Defendant Lifeline Health Care of Pulaski, LLC is a limited-liability corporation in Somerset, Kentucky either wholly owned or majority controlled by LHC.  It is one of LHC's many home nursing agencies, staffed primarily by nurses who deliver

7

home health services to LHC's patients.  Ms. Angie Perry is the branch manager at Lifeline's Somerset office.  She supervises several team leaders in that office.

## III.   JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

22.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Even if there had been any such public disclosure, Relator Bowling and Relator Poynter are original sources of the allegations herein.  They each have substantial personal knowledge of the information that forms the basis of this complaint, and voluntarily disclosed that information to the Government before filing.

23.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and have transacted business in the Eastern District of Kentucky.

24.     Venue is proper in the Eastern District of Kentucky pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this district and/or maintain employees and offices in this district.

8

## IV.   APPLICABLE LAW

### A.   Medicare's Coverage of Home Health Services

### 1.   General Provisions

25.     Medicare is a federally funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS).

26.     The Medicare program has four parts, Part A, Part B, Part C and Part D, two of which—Parts A and B—cover the costs of home health care services.  42 U.S.C. §§ 1395f(a)(2)(A) (Part A); 1395n(a)(2)(A) (Part B).

27.     Part A of the Medicare program covers certain health services provided by hospitals, skilled nursing facilities and, at issue in this case, Certified Home Health Agencies, such as those owned and operated by LHC Group.

28.     Home health care under Medicare Part A has no limitations on length of stay (subject to re-certification of medical necessity), no co-pays, and no deductible.

29.     Reimbursement for Medicare claims under Medicare Part A is made by the United States through CMS which contracts with private insurance carriers known as fiscal intermediaries ("FIs") to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. 1395u.  In this capacity, the FIs act on behalf of CMS.

30.     The most basic requirement for reimbursement eligibility under Medicare is that the service provided must be reasonable and medically necessary"—*i.e.*, "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C.

9

§ 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary). Medical providers are not permitted to bill the Government for medically unnecessary services or procedures performed solely for the profit of the provider.

31.     Medicare also prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program," 42 U.S.C. § 1320a-7b(a)(1), and requires providers to disclose subsequently discovered errors or omissions in claims to the Government.  42 U.S.C. § 1320-a-7b(a)(3).

32.     CMS will not pay a claim presented by a provider for goods or services that were medically unnecessary, that were performed solely for the profit of the provider, and/or that violated another relevant law.

33.     Furthermore, CMS will not pay a claim seeking reimbursement for goods or services that were not actually provided.

**2.     Patient Eligibility for Home Health Services**

34.     Medicare will pay for home health services only if, *inter alia*, the following requirements are met:

(1)     the patient requires "skilled nursing care," speech-language pathology or physical or occupational therapy;

(2)     the patient is "confined to the home" ("homebound"); and

(3)      a plan of care has been established by and is periodically reviewed by a physician.

42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41; 409.42; *see also* 42 U.S.C. §§ 1395d (a) (3); 1395k (a) (2) (A).

10

35.      To qualify as "skilled nursing care," the service provided must "be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32.  Any service that an "average nonmedical person" can perform "without direct supervision of a licensed nurse . . . cannot be regarded as a skilled nursing service." 42 C.F.R. § 409.44(b)(1)(ii); *see also* CMS, *Medicare Benefit Policy Manual Chapter 7—Home Health Services* § 40.1.1 (2014).

36.      To qualify as "homebound" the patient must be "confined to home." Medicare regulations define confinement as follows:

> For purposes of the statute, an individual shall be considered "confined to the home" (homebound) if the following two criteria are met:
>
> 1. Criteria One:
>
> The patient must either:
>
> - Because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person in order to leave their place of residence
>
> OR
>
> - Have a condition such that leaving his or her home is medically contraindicated.
>
> If the patient meets one of the Criteria One conditions, then the patient must ALSO meet two additional requirements defined in Criteria Two below.
>
> 2. Criteria Two:
>
> - There must exist a normal inability to leave home;
>
> AND
>
> - Leaving home must require a considerable and taxing effort.

11

If the patient does in fact leave the home, the patient may nevertheless be considered homebound if the absences from the home are infrequent or for periods of relatively short duration, or are attributable to the need to receive health care treatment.

*Id.* at § 30.1.1 (2014); *see also* 42 U.S.C. §§ 1395f (a); 1395n (a).

37.     The Medicare regulations further explain:

Any absence of an individual from the home attributable to the need to receive health care treatment, including regular absences for the purpose of participating in therapeutic, psychosocial, or medical treatment in an adult day-care program that is licensed or certified by a State, or accredited to furnish adult day-care services in a State, shall not disqualify an individual from being considered to be confined to his home. Any other absence of an individual from the home shall not so disqualify an individual if the absence is of an infrequent or of relatively short duration. For purposes of the preceding sentence, any absence for the purpose of attending a religious service shall be deemed to be an absence of infrequent or short duration. It is expected that in most instances, absences from the home that occur will be for the purpose of receiving health care treatment. However, occasional absences from the home for nonmedical purposes, *e.g.*, an occasional trip to the barber, a walk around the block or a drive, attendance at a family reunion, funeral, graduation, or other infrequent or unique event would not necessitate a finding that the patient is not homebound if the absences are undertaken on an infrequent basis or are of relatively short duration and do not indicate that the patient has the capacity to obtain the health care provided outside rather than in the home.

CMS, *Medicare Benefit Policy Manual Chapter 7—Home Health Services* § 30.1.1 (2014)

38.     As an initial matter, before a patient may receive home health services, a physician must certify that the patient meets the medical criteria, including "homebound" status, and establish a plan of care. 42 U.S.C. §§ 1395f(a)(2); 1395n(a)(2).

39.     The physician must re-certify that the patient continues to meet the eligibility requirements, and re-certify a plan of care for the patient, at least once every sixty days for the home health agency ("HHA") to submit further claims to Medicare.

12

### 3.   Duty of Home Health Agency to Conduct Ongoing, Comprehensive Diagnostic Assessments

40.     The HHA may not merely rely on the physician's certification of eligibility as justification for providing home health services to the patient. The HHA has an independent, ongoing duty to determine that the patient qualifies for such services:

> Each patient must receive, and an HHA must provide, a patient-specific, comprehensive assessment that accurately reflects the patient's current health status and includes information that may be used to demonstrate the patient's progress toward achievement of desired outcomes. The comprehensive assessment must identify the patient's continuing need for home care and meet the patient's medical, nursing, rehabilitative, social, and discharge planning needs. For Medicare beneficiaries, the HHA must verify the patient's eligibility for the Medicare home health benefit including homebound status, both at the time of the initial assessment visit and at the time of the comprehensive assessment.

42 C.F.R. § 484.55.

41.     This initial assessment must be done by a Registered Nurse or a qualified therapist with 48 hours of the referral or the patient's return home from hospitalization or care at another facility, or within 48 hours of the physician-ordered start date. 42 C.F.R. § 484.55(a).

42.     HHAs are responsible for implementing the written plan of care.

43.     As part of this process, the home health agency must periodically conduct "patient-specific, comprehensive assessment[s]" that reflect the patient's current health status and includes information used to demonstrate the patient's progress toward achievement of desired outcomes. 42 C.F.R. § 484.55. Among the information that must be included in these assessments is the patient's medical and nursing needs and whether the patient meets homebound status. *Id.* The Comprehensive Assessment must be updated and revised as frequently as the patient's condition warrants but no less than every sixty days unless the patient is admitted to the hospital or discharged from home health services.

13

44.     An important tool that the HHA nurses must use as part of their initial and ongoing "comprehensive assessments" is the Outcome and Assessment Information Set ("OASIS") form.  42 C.F.R. § 484.55.  The twenty-four page OASIS form requires the RN to make qualitative assessments about the patient including, *inter alia*, the patient's living arrangements, need for supportive assistance, activities of daily living, medications, and equipment management.  Broadly speaking, with this form, the RN or qualified therapist documents the patient's capabilities (i.e., what activities they can do on their own, what activities they need help with, the significance of any impairment, etc.) and also sets forth the reasons for the patient's receipt of skilled nursing or therapy services.

45.     The OASIS includes a "primary diagnosis" which is "the condition most related to the current plan of care."  *See* "OASIS Diagnosis Reporting Case Examples," available at http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/HomeHealthPPS/Downloads/OASISDiagnosisReporting.pdf.

46.     The OASIS also may include "secondary diagnoses," which are "defined as all conditions that coexisted at the time the plan of care was established, or which developed subsequently, or affect the treatment or care of the patient."  *Id.*

47.     Although CMS advises that secondary diagnoses should include "any co-morbidity *affecting the patient's responsiveness to treatment and rehabilitative prognosis*," and  cautions that "Home Health Agencies should avoid listing diagnoses that are of mere historical interest without impact on patient progress or outcome."  *Id.* (emphasis added)

48.     The comprehensive assessment "must be updated and revised … as frequently as the patient's condition warrants due to a major decline or improvement in the patient's health status."  42 C.F.R. § 484.55(d).  The OASIS form itself must be

14

electronically reported to a State agency or CMS within 30 days of completion.  42 C.F.R.
§ 484.20(a).

**B.      Submission of Claims to Medicare**

49.      CMS contracts with regional home health intermediaries to assist in the
administration of home health claims processing and payment.  Home health agencies
submit claims to the intermediaries for payment from Medicare.

50.      Defendants submitted, or caused to be submitted, Medicare claims to an
Intermediary called Palmetto Government Benefits Administrators ("Palmetto").  During
the relevant time period, claims were submitted electronically through Palmetto.  In order
to submit claims electronically, Defendants entered into an Electronic Data Interchange
("EDI") Enrollment Agreement.

51.      As part of the EDI Enrollment Agreement, Defendants agreed to "submit
claims that are accurate, complete and truthful" and acknowledged that "all claims will be
made from Federal funds, that the submission of such a claim is a claim for payment under
the Medicare  program, and that anyone who misrepresents or falsifies or causes to be
misrepresented or falsified any record or other information relating to that claim that is
required pursuant to this agreement may, upon conviction, be subject to a fine and/or
imprisonment under applicable Federal law."

52.      Defendants also submitted claims to Medicare using Form CMS-1450
(UB-04), which contains the following certification:

> The submitter of this form understands that misrepresentation or falsification of
> essential information as required by this form, may serve as the basis for civil
> monetary penalties and assessments and may upon conviction include fines and/or
> imprisonment under federal and/or state law(s).

> Submission of this claim constitutes certification that the billing information as
> shown on the face hereof is true, accurate and complete.  That the submitter did
> not knowingly or recklessly disregard or misrepresent or conceal material facts.

## C.   Medicare's Payment for Home Health Services

53.      Medicare pays home health providers under the Prospective Payment System.  42 C.F.R. §§ 413.60, 413.64(f).  Under this system, Medicare pays an established rate for each sixty-day "episode" of care.  This "per-episode" payment is intended to cover all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services the patient needs during that sixty-day period.  The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics and service needs.

54.      The payment amount is based on a multi-factor analysis of the patient's health condition, clinical characteristics and service needs, and is known as the case-mix adjustment.  Each of these factors is weighed, on a grid of severity, and then the patient is assigned to one of one hundred fifty-three (153) case-mix groups, or Home Health Resource Groups ("HHRGs").  Medicare then pays an established rate for the patient based on the HHRG assigned.

55.      A substantial portion of the information used to assign the patient's HHRG comes from the scores recorded by the RN on the OASIS form during the periodic assessments.  *See* CMS, *Definition and Uses of Health Insurance Prospective Payment System Codes* at 3 (2010); *see also* CMS, *Medicare Claims Processing Manual Chapter 10—Home Health Agency Billing* § 10 (2013).

56.      Pursuant to 42 C.F.R. 484.55(b), the comprehensive OASIS assessment must be completed "in a timely manner, consistent with the patient's immediate needs, but no later than 5 calendar days after the start of care."  Requests for Anticipated Payment (RAPs) are submitted at the beginning of every 60-day episode and may only be submitted

16

to Medicare when: (1) the OASIS assessment is complete, locked or export ready; (2) a physician's verbal orders for home care have been received and documented; (3) a plan of care has been established and sent to the physician; and, 4) the first service visit under the plan of care has been delivered.

57.     Although Medicare pays a fixed rate for each episode of care, as a practical matter the payment is made in two steps: an initial payment at the beginning of the episode, and then a close-out payment at the end.  For initial episodes of care, Medicare pays 60% of the estimated payment for the sixty-day episode of care as soon as the Intermediary receives the HHA's initial claim.  The residual 40% payment is made at the close of the sixty-day episode, unless there is some applicable adjustment to the payment amount.  For subsequent episodes of care, the initial and residual payments are split evenly. CMS, *Medicare Claims Processing Manual Chapter 10—Home Health Agency Billing* § 10 (2013).

58.     The payment rate can also be reduced if the patient receives four or fewer visits from the home health agency during the sixty-day episode of care.  If an HHA visits a patient five or more times during a sixty-day period, it receives the full HHRG "episode payment" for the entire sixty days.  42 C.F.R. § 484.205.  But if an HHA visits a patient four or fewer times during a sixty-day period, Medicare makes a low-utilization payment adjustment ("LUPA"), and pays the HHA by the visit.  42 C.F.R. § 484.230.

59.     As a general matter, the LUPA per visit payments are substantially less than the amount an HHA receives per visit if it gets the full HHRG amount.  *See, e.g.*, 78 Fed. Reg. 72,256, 72,278–79 (Dec. 2, 2013).  Thus HHAs have a substantial financial incentive to ensure that the patient "qualifies" for—and receives—at least five visits.

17

**D.     Home Health Care and Other Federal Health Care Programs**

60.     The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program, and federal workers' compensation programs.

61.     TRICARE/CHAMPUS, administered by the United States Department of Defense is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1104 *et seq.*; 32 C.F.R. § 199.4(a).

62.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781-1786; 38 C.F.R. § 17.270(a).

63.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.  5 U.S.C. §§ 8901 *et seq.*

64.      These federal health care programs all provide home health services on terms similar to Medicare.

**E.     The Federal Anti-Kickback Statute**

65.     The Medicare and Medicaid Fraud and Abuse Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  *Id.*

66.     Under the AKS, healthcare providers, such as HHAs, are prohibited from paying employees bonuses for recruiting or referring Medicare patients.  *See United States*

18

*v. Luis*, No. 12-23588, 2013 U.S. Dist. LEXIS 128177, at *20 (S.D. Fla. June 21, 2013) ("[The three employees] were paid for recruiting patients. Even if these patients ultimately received legitimate medical care, payments to these nurse/recruiters for referring patients to [defendant providers] violate the Anti-kickback statute.").

67.     Claims for reimbursement for services that result from kickbacks are, by definition, false under the FCA. 42 U.S.C. § 1320a-7b(g).

## V.     BACKGROUND

### A.     The *Master* Settlement and Corporate Integrity Agreement

68.     In September of 2011, Defendants settled *United States ex rel. Master v. LHC Group, Inc.*, No. 07-1117 (W.D. La.) for $65 million. The *Master* case included allegations that Defendants violated the FCA by billing Medicare for home health services delivered to patients who were not homebound.

69.     As part of the settlement, Lifeline executed a CIA with the Department of Health and Human Services. Under the CIA, Lifeline made a number of promises concerning its commitment to compliance with Medicare regulations on eligibility for home health services.

70.     Lifeline promised to train its line-level nurses and claims officers on Medicare regulations, including the homebound status, medical necessity, and truthful claim requirements. CIA § III.C. Lifeline agreed to offer this training within 120 days from signing the CIA—by the end of 2011. *Id.*

71.     Lifeline also promised to engage an accounting, auditing, or consulting firm to serve as an Independent Review Organization ("IRO"). CIA § III.C. The IRO was supposed to review claims submitted to Medicare to ensure that patients meet homebound

19

status and that claims are for medically necessary services rendered to the patient. *Id.* The IRO's claim review is limited to Lifeline's paperwork, meaning that the IRC checks the validity of Lifeline's Medicare claims against patient records maintained by Lifeline. *See* CIA App'x B.

72.    Finally, Lifeline promised to report actual or suspected noncompliance with Medicare regulations to CMS. The CIA obliges Lifeline to report any substantial overpayment, as well as any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program." CIA § III.I.

**B.    Defendants' Intake Process for Patient Admission**

73.    Defendants operate a Central Intake for all of their HHAs to process referrals that come in from doctors' offices or discharge planners from hospitals and surgery centers. Defendants' Patient Care Representatives also market Defendants' home health services in the community, looking for new patients through, *inter alia*, hospital visits or direct marketing to physician offices.

74.    Once Lifeline's Central Intake office receives a referral, the Intake Coordinator gets basic demographic information about the patient, a description of the services likely needed, a start-of-care date, payer source and any special instructions.

75.    Although, as set forth in greater detail above, an HHA has an independent duty to ensure that its patients qualify for home health care services, the Lifeline Intake Coordinators do not seek information from the referring physician or physician's office staff as to whether the patient is homebound, or otherwise qualifies for services. While employed by Lifeline, Relators suggested that Lifeline add this step to the

20

intake process, to screen out ineligible patients based on homebound status at the front end of the process. Lifeline management dismissed these suggestions as "stupid."

76.     Next, the Intake Coordinator notifies the local Lifeline Branch Manager of the referral and the likely service needs—for example, management of diabetes or wound care. The Intake Coordinator is also responsible for reviewing the patient's medical history and sending a list of the patient's co-morbidities for use by Registered Nurses and/or Therapists in assessment of the patient and completion of the OASIS form.

77.     The Branch Manager then refers the intake to a Team Leader within the Branch Office to schedule the patient for an initial assessment for admission and to provide information about likely service needs and start date.

78.     The Team Leader then assigns either a physical therapist or a Registered Nurse to visit the patient to perform the initial assessment and to complete the OASIS assessment form.

79.     If a physical therapist visits the patient and determines that the patient is not homebound and therefore not eligible for home health services, Lifeline does not accept this assessment. Instead, Lifeline's Branch Manager then assigns a Registered Nurse to visit the patient and to conduct a new assessment in hopes of finding a pretext to support the provision of (or at least the submission of claims for) home health services.

80.     Upon information and belief, based on Relators' experiences as nurses at Lifeline, Relators allege that Lifeline trains its Registered Nurses to include all of the patient's prior medical history, and co-morbidities, on the OASIS form to justify admissions and to boost the case-mix severity for the patient and increase reimbursement for Lifeline.

21

## VI.   DEFENDANT'S FRAUDULENT PRACTICES

81.      Defendants have for years engaged, and continue to engage, in a pervasive scheme to defraud Medicare and other federal health care programs by submitting false claims for home health services.  The scheme includes a variety of fraudulent conduct, including the following:

82.      Defendants routinely submit claims for home health services even though the patient does not qualify for such services because he or she is not homebound.

83.      Defendants routinely submit "upcoded" claims for more intensive and/or more frequent nursing or other therapeutic services than were medically necessary and or for services that the patient did not actually receive.

84.      Defendants knowingly submit false claims by adding inappropriate ssecondary diagnoses on OASIS forms (for example, diabetes and cardiac conditions) to artificially inflate patients' acuity to increase reimbursement.

85.      Defendants create false documents to conceal their fraudulent scheme and thus ensure that their false claims are paid, and to avoid having to repay Medicare and other federal health care programs for claims that Defendants later learn are false.

86.      Defendants submit claims for services that are false because the patients were referred to the Lifeline in violation of the Anti-Kickback statute.

### A.   Defendants Fraudulently Submit Home Health Claims for Non-Homebound Patients

87.      As discussed above, Medicare rules clearly provide that only homebound patients are eligible for home health services.

22

88.     Defendants should be acutely aware of this rule, given that they agreed in the 2011 *Master* settlement to end the practice of submitting claims to Medicare for non-homebound patients.

89.     Nonetheless, Lifeline has continued to submit home health claims for non-homebound patients.  In fact, it is Relators' understanding that Lifeline now solicits and bills for more non-homebound patients than it did before the *Master* settlement.

90.     As set forth above, when a patient is first referred to an HHA for services, the HHA has an independent duty to determine whether the patient is homebound and otherwise qualifies for services.  Notwithstanding this requirement, Lifeline makes no effort during its intake process to confer with the referring physician to determine whether the new patient is homebound.

91.     Worse yet, Lifeline routinely disregards—or suppresses—information from nursing or other staff who inform it that a particular patient is not homebound.  Lifeline's affirmative efforts to suppress any such information, and to create false documentation to support its improper claims practices is described in greater detail in subsection VI.C, below.

92.     Throughout their employment with Lifeline, Relators were routinely assigned to pay home health visits to patients who were not homebound.  Through their own personal experiences and conversations with other Lifeline employees, Relators estimate that between 75 and 80% of Lifeline's patients were not homebound.  Any claims submitted to Medicare or other federal health care programs for home health services for these patients are false claims within the meaning of the FCA.

23

93.     Relators repeatedly voiced their concerns about the legality of billing for home health services for non-homebound patients to team leaders and the branch manager in their branch office. However, Lifeline would rarely discharge a non-homebound patient from the ongoing schedule of services.

94.     At most, Lifeline would, in some circumstances, consider discharging the patient after providing the fifth visit that qualified the episode for full HHRG reimbursement, rather than the lower LUPA per-visit amounts. *See* 42 C.F.R. §§ 484.205; 484.230. Lifeline management often instructed staff that "we've got to get to that fifth visit." Lifeline even insisted on "get[ting] to that fifth visit" for patients who, knowing themselves not to be homebound, actively refused Lifeline's home health services.

95.     As a result, Lifeline submitted claims for home health patients who were anything but homebound. Many of the patients Realtors visited still: (a) routinely drove; (b) left the home regularly for shopping and socializing; (c) performed farm labor or other physically taxing work; (d) served as primary caregiver for their spouses, children or grandchildren; and/or (e) went on extended vacations away from home. Some even regularly left home to go to the gym.

96.     Many were clearly not homebound, as evidenced by the fact that they often missed appointments because they were out of the house doing other things. In fact, several patients insisted on scheduling their home health visits early in the morning so that they would not be stuck at home all day waiting for the nurse.

97.     Other patients refused to accept the proffered home health services. Often patients specifically stated that they were not homebound.

24

98.     Relators have provided to the Government, as part of the statutory disclosure statement, a list of 135 examples of non-homebound patients for whom Lifeline submitted claims to Medicare.  The patients are identified in the disclosure materials as Patient 1, Patient 2, etc.  To protect the identity and confidential health information of those patients, Relators incorporate that list into this complaint by reference.  These are but examples of the hundreds, and likely thousands, of non-homebound patients for whom Lifeline submitted false claims.

99.     Some examples of the evidence demonstrating that these patients are not homebound includes the following:

100.    While receiving home health care, Patient 2 continued work on his farm, even continuing to use farm machinery.  He continued to drive a car, and cared for his wife.

101.    Patient 4 refused multiple nursing visits after she was referred to Lifeline for services.  Nonetheless, Lifeline continued to claim that it provided home health services to her.  She protested that she was not homebound, and left to go on a vacation to Tennessee. She was also the primary caregiver of a five-year-old grandchild.

102.    While receiving home health care, Patient 6  continued to drive his own car and work out at the gym.  He stated that he did not need home health services. Nonetheless, Lifeline continued to claim that it provided home health services to him.

103.    While receiving home health care, Patient 11 frequently left home to play bingo during the week.  He required no skilled nursing services, and used home health nurses primarily for supply delivery.

104.    While receiving home health care, Patient 15 continued to drive his own car on social visits, out to restaurants, and to other non-medical destinations.  He also did

25

his own yard work. He frequently called Lifeline to ask for a morning visit because he, reportedly, did not want to sit at home waiting for a home health nurse.

105.     Patient 17 routinely requested that a Lifeline nurse visit before 10 in the morning because the patient reportedly left for the day after that.

106.     While receiving home health care, Patient 30 continued to drive his own car. He went with his spouse on errands. He stated he did not require any home health services, but also noted that he enjoyed the company of the home health nurses.

107.     Patient 31 owned a local machine shop and continued to work there every day, returning home at lunch to receive home health services before going back to work.

108.     While receiving home health care, Patient 36 ran a dog-boarding business from her home. She frequently left home to buy supplies for the dogs.

109.     While receiving home health care, Patient 48 left home frequently with her spouse for non-medical reasons. She refused several home health visits, stating clearly that she was not homebound.

110.     While receiving home health care, Patient 55 continued to drive his own car. He often visited the local air field to fly model airplanes. He missed several appointments because he was not home when the nurses arrived.

111.     While receiving home health care, Patient 58 left home almost daily, and left town frequently. Patient 58 helped her daughter to move several times while receiving home health benefits.

112.     While receiving home health care, Patient 68 continued to drive his own car, work on a farm, ride horses, and care for his elderly mother-in-law.

26

113.    While receiving home health care, Patient 87 continued to drive his own car. He left home almost daily to socialize at a local grocery. Most mornings, he called Lifeline early so that he could schedule his outside errands around his home health appointments.

114.    While receiving home health care, Patient 91 continued to drive his own vehicle—including on "off-roading" trips. He also frequently left home for social visits.

115.    While receiving home health care, Patient 102 routinely left home for out-of-town trips. Patient 102 regularly called Lifeline to schedule appointments in a way that would avoid conflicts with out-of-the-home social visits.

116.    While receiving home health care, Patient 103 continued to drive his own car, and took frequent vacations to Tennessee. He swam regularly at the YMCA pool, and loaded and unloaded an assistive device from his vehicle without any help.

117.    While receiving home health care, Patient 112 continued to drive his own car and to walk without using assistive devices. He retrieved his boat from out of town and winterized it himself.

118.    While receiving home health care, Patient 124 left home frequently on shopping trips and social visits. She hosted large parties at her home. She was able to walk without using assistive devices. She requested evening visits because, she stated, she was usually gone from home during the day.

119.    Even if, and to the extent, that home health services were provided to these patients, it is illegal to bill Medicare for them because these patients were not homebound. Any claims Defendants have submitted for home health services provided, or

27

purportedly provided, to patients who are not homebound are false claims within the meaning of the FCA.

120.    The above are representative examples of Defendants' fraudulent conduct. Based on Relators' knowledge of Defendants' practices at the facilities where they worked, information from an employee at another Lifeline facility and Defendants' uniform corporate policies on admission and retention of patients, Relators allege, on information and belief, that Defendants have also submitted fraudulent claims for home health services for non-homebound patients at all facilities and locations where Defendants provide home health services nationwide.

**B.    Defendants Fraudulently Submit Upcoded Home Health Claims**

121.    In addition to the practice of billing for home health services provided to ineligible patients, Defendants have also routinely billed Medicare for skilled nursing and other therapeutic services that either were not medically necessary, or were not, in fact, provided (or both). Some of these patients may have once required and received such services, but no longer do. In other cases, though, the patients never required and/or received the services for which Defendants billed Medicare.

122.    Lifeline trains its registered nurses to falsify patients' needs for skilled nursing services and to include irrelevant secondary diagnoses on the OASIS evaluation tool while performing an initial, or comprehensive, assessment. These practices have the combined effect of falsely justifying the patients' needs for skilled nursing services and inflating the purported severity of the patients' medical conditions. In this way, Lifeline justifies the admission and/or retention of patients on home health services even where the

28

patients do not qualify, under Medicare guidelines, for skilled nursing services or other services.

123.    These practices allow Lifeline purportedly to justify admitting or retaining a patient for home health services that it could not otherwise admit or retain.

124.    Because Medicare's payment through the HHRG system is based largely on the documentation in the OASIS form, this upcoding of the OASIS scores also means that Medicare pays more for the "episode of care" than it properly should, even where some services are medically necessary and provided.

125.    Lifeline branch offices hold weekly staff meetings at which Lifeline managers coach nursing staff to fill out the OASIS forms in a way that allows for them to fraudulently re-certify patients who do not need skilled nursing services and maximizes reimbursement by inflating the severity of patients' medical needs.  Lifeline enforces these policies by ranking nurses on their success in keeping patients "qualified" (according to the doctored paperwork in their medical records) for home health services.  During staff meetings Lifeline managers criticize and demean RNs if their OASIS assessments are completed truthfully, which causes their retention rate to fall.  If that does not work to get the nurse to engage in upcoding and fraudulent documentation, Lifeline simply removes the nurse from his or her job and replaces them with another nurse.

126.    Lifeline also improperly obtains re-certifications of patients for payment of additional episodes of care by listing as a primary diagnosis, conditions that had been previously listed as secondary diagnoses, including many co-morbidities like COPD, diabetes, and hypertension for which the patient did not require skilled nursing services.

29

127.     Lifeline also devised a scheme to use so-called "clinical tracks" to boost the number of recommended nursing and therapy visits for a given patient based on their underlying medical condition.  For example, a patient with a history of cardiovascular disease would be prescribed a recommended number of nursing visits to address their cardiovascular issues even if the reason for their referral to home health did not concern the cardiovascular issues and there was no present need for skilled nursing services in the home related to their cardiovascular issues.

128.     Although the cclinical tracks program was created for the ostensible purpose of standardizing care provided to patients based on evidence-based medicine, it quickly developed into a convenient way to increase nursing and therapy visits to maximize reimbursement.

129.     To further boost census and reimbursement, Lifeline also created a "Call Back" program.  Through the "Call Back" program, Lifeline identifies patients who have been discharged from home health services and sends nurses to their homes to solicit information about the patient's current medical condition.  The purpose of these post-discharge patient visits is for Lifeline's nurses to identify medical conditions that could justify re-admitting a patient to home health even though there is no referral for home health services from a physician.  Through the "Call Back" program, Lifeline's nurses offer to contact the patient's primary care physician to solicit a referral for re-admission to home health.

130.     Relator Bowling was trained to participate in Lifeline's "Call Back" program.  Her training consisted of using persuasive sales tactics to convince discharged patients that they should be seeking a referral for home health services.  Lifeline trained

30

Relator Bowling and other nurses to "sell our services" to discharged patients even if those patients did not expect to be "sold" unnecessary home health services.

131.     As a result, Lifeline bills Medicare—sometimes for many years—for home health services for patients who require—and often are provided—no skilled nursing services.

132.     Although Lifeline sometimes provides skilled nursing or other therapeutic services to these patients, even though those services are not medically necessary, in many cases the skilled nursing or other services Lifeline purports to provide are simply not provided.  In many cases, the Lifeline nurses do little more than deliver supplies and provide other non-clinical services.

133.     In other cases, the Lifeline nurse may do nothing more than read out loud to a patient from a brochure prepared by Lifeline about common medical conditions including hypertension and diabetes.  Nurses are required to read the entirety of these brochures to the patients to "justify" the home health visit even if the patients' medical condition is of long standing and the patient has no need for education on their medical condition.

134.     In many cases the same patients who did not qualify for services because they were not homebound also failed to qualify because they did not actually require skilled nursing care.

135.     Relators have provided to the Government, as part of the statutory disclosure statement, a list of 48 examples of patients who did not require and/or were not provided the skilled nursing or other therapeutic services that Defendants claim to have provided.  The patients are identified in the disclosure materials as Patient 136, Patient 137,

31

etc. To protect the identity and confidential health information of those patients, Relators incorporate that list into this complaint by reference. These are but examples of the hundreds, and likely thousands, patients for whom Lifeline submitted fraudulently upcoded claims nationwide.

136.     Some examples of the evidence demonstrating that these patients did not require and/or were not provided the claimed nursing or other therapeutic services includes the following:

137.     Patient 136 no longer required education about her condition, so she used her Lifeline nurse to fill her weekly pill organizer.

138.     Patient 139 received Lifeline services for minor treatment of a superficial hand wound that did not require treatment by a skilled nurse.

139.     Patient 143's non-Lifeline caregiver refused to use the services of the Lifeline nurses. She insisted on providing care to patient 143 herself and used the Lifeline nurses exclusively for delivery of home health supplies. Sometimes when Lifeline nurses visited Patient 143's home, the caregiver would not even permit them to see Patient 143.

140.     Patient 144 did not require skilled nursing services. His care was managed by his wife who generally refused the services of the Lifeline nurses. When she did request the help of a Lifeline nurse it was exclusively to serve as an intermediary to discuss Patient 144's care with his physician.

141.     Patient 146 refused to receive education from the Lifeline nurses. Despite this, Lifeline continued to send skilled nurses to visit Patient 146. During these visits, Lifeline nurses performed no skilled nursing services.

32

142.     Patient 147 received visits from Lifeline nurses for years despite the fact
that they provided no skilled nursing services.  Patient 147 was ably cared for by non-
Lifeline caregivers who refused the services of the Lifeline nurses and instead called on
Patient 147's physician when issues arose that they were not equipped to handle.

143.     Patient 150 did not require skilled nursing services.  She was
knowledgeable about her condition and refused to receive education from the Lifeline
nurses.  Despite this, Lifeline continued to recertify her need for education.  During their
visits, Lifeline nurses performed no skilled nursing services.

144.     Patient 160's non-Lifeline caregiver refused to use the services of the
Lifeline nurses.  Instead, the caregiver insisted on providing care to Patient 160 herself and
used the Lifeline nurses exclusively for delivery of home health supplies.

145.     Patient 164 did not require skilled nursing services.  Her husband managed
her care and refused education about her conditions.  In fact, Patient 164 was discharged
from Lifeline's services several times.  But each time, her husband would demand a new
referral because he wanted the home health nurses to come so he could have someone to
talk to.

146.     Patient 167's most recent recertification was for "pain teaching," but
patient was completely independent with pain medication, and kept own log of medication
administrations.

147.     Patient 171's non-Lifeline caregiver refused to use the services of the
Lifeline nurses.  She insisted on providing care to Patient 171 herself and used the Lifeline
nurses exclusively for delivery of home health supplies. She often would not even permit
Lifeline nurses to assess the wounds she was treating.

33

148.    Patient 173 did not require skilled nursing services.  Immediately prior to his admission to Lifeline he was discharged from another home health agency in the area for lack of medical necessity.  There was no change in his condition to warrant his admission.  Patient 173 was well-educated regarding his conditions and independently managed his own care.

149.    Patient 175 did not require skilled nursing services.  She was recertified several times for skin assessment but there was no breakdown to justify these services. Patient 175 did not want to be discharged because she was lonely and lived alone.

150.    Patient 177 did not require skilled nursing services.  Patient 177's non-Lifeline caregiver independently managed Patient 177, and neither the patient nor her caregiver required education.  The only service Lifeline nurses performed during their visits to Patient 177 was to check her vitals, something her non-Lifeline caregiver did regularly independently.

151.    Patient 179 was llegally blind, but took own vitals, kept a log of vitals, and called her doctor to deal with any problems that arose.  The home health nurses performed no skilled services.

152.    Every claim Defendants submitted for a higher-paying HHRG than was appropriate under Medicare rules by falsely representing the intensity of the patient's clinical needs, by claiming that the patients needed services that were, in fact, not medically necessary, and/or by providing medically unnecessary services to the patients, is a false claim within the meaning of the FCA.

153.    The above are representative examples of Defendants' fraudulent conduct. Based on Relators' knowledge of Defendants' practices at the facilities where they worked,

34

information from an employee at another Lifeline facility, and Defendants' uniform corporate policies on admission and retention of patients, Relators allege, on information and belief, that Defendants have also submitted fraudulent upcoded claims for home health services at all facilities and locations where Defendants provide home health services nationwide.

### C.   Defendants Falsified Documentation in Patient Medical Records to Facilitate and Conceal Their Fraud

154.   The 2011 CIA with the Government requires Lifeline to take various steps to ensure that the claims it submits to Medicare are properly supported by the patients' medical records and other Lifeline documentation.  Among these requirements is that Lifeline must subject its Medicare claims to a pre-submission independent review by an IRO.

155.   Although Lifeline devotes considerable energy to the appearance that it is complying with the CIA requirements and the Medicare rules requiring submission of truthful claims, their focus is misguided.  Rather than ensuring that all claims are medically necessary, properly provided, and otherwise meet Medicare's billing requirements, Lifeline primarily devotes its energy to making sure it has paperwork to support the claims it submits to Medicare, even if the claims are not eligible for reimbursement by Medicare and even though the supporting paperwork is false.

156.   For example, Lifeline requires an internal audit of patient records be performed at each branch office to ensure that each record clearly states that the patient is homebound.  On each Nursing note, the LPN is instructed to check every box under "Reason Homebound"—"Difficult/taxing effort to leave home," "Requires assistance to leave," "Absences are short and infrequent," and "Other"—whether or not they accurately

35

describe the patient.  Likewise, under "Other," LPNs must copy exactly the corresponding information from the patient's original plan of care, regardless of whether it applies to the patient.

157.　　If, during such a review, Lifeline personnel discover paperwork describing a patient as not homebound, or not in need of skilled nursing services, the Branch Managers require the responsible nurse to change the record, even if the original record was accurate.  Nurses who refused to do so face retaliation, including fewer assigned patients and correspondingly reduced compensation.

158.　　In one instance, Relator Bowling was forced to destroy records documenting a patient's non-homebound status by managers in her Branch Office.  In early 2012, Relator Bowling was scheduled to visit a Medicare patient, who had a long history of leaving the home before health appointments.  Relator Bowling had previously told Lifeline management, on multiple occasions, that this patient was not homebound.  Nonetheless, Lifeline continued to schedule the patient for one to two visits per week, and continued to bill Medicare for home health services.

159.　　En route to this visit, Relator Bowling called the patient to remind her of the appointment.  The patient replied that she was not, in fact, at home, but had walked to a fast food restaurant between a quarter- and half-mile from her home.  The patient, who left home daily for outings, asked whether Relator Bowling could visit her at the restaurant and Relator Bowling explained that Medicare regulations prohibited her from delivering home health services to a patient outside the patient's home, and from delivering home health services to patients who are not homebound.

36

160.     Relator Bowling did not visit the patient that day.  Instead, she filled out a Missed Visit Note and put it in the patient's file.  In that note, Relator gave an abbreviated transcription of her conversation with the patient and clearly indicated that the patient was not homebound.

161.     Lifeline Team Leader Regina Brooks, acting under Branch Manager Angie Perry's direction, instructed Relator Bowling to shred the note, and to write a new one stating simply that the patient was not home.  When Relator asked why she should destroy an accurate medical record, Relator was told simply that Angie Perry had ordered it.

162.     This experience was not unusual.  In both Relator Bowling's and Relator Poynter's experience, nurses who questioned Lifeline's policies were told to "stop asking questions" and to just "be thankful that there are enough patients for you to have a job."

163.     Team leaders routinely withhold patient itineraries—without which the nurses could not work and would not be paid—from nurses until they revised their previously-submitted paperwork to support homebound status or otherwise falsified medical record documentation to hide the fact that the patient did not qualify for Medicare home health service.

164.     It is Relators' understanding that these false documents were created in patient medical records both to ensure that claims Lifeline intended to later submit to Medicare would be paid, and to avoid having to repay Medicare for previously submitted claims that Lifeline later learned were improper.

165.     For example, Lifeline trained nursing staff to ensure that the multiple diagnoses initially provided by the Intake Coordinator at Central Intake and included in the

37

OASIS form and the Plan of Care were also documented in nursing notes.  In this way, Lifeline compelled its clinical staff to maintain consistency in all of the records in a patient's file and, in this way, hoped to conceal that the patient did not meet homebound status, did not require skilled nursing services and/or that a claim submitted for home health services was otherwise false.

166.    Based on Relator Bowling's and Relator Poynter's experience at Lifeline with the implementation of documentation policies by upper-level management, Relators allege, on information and belief, that Defendants were engaged in similar fraudulent conduct at all facilities and locations where Defendants provide home health services nationwide.

### D.    Defendants Submitted Claims for Kickback-Tainted Services

167.    Defendants also submit claims for home health care services that are false and fraudulent within the meaning of the FCA because the referrals for such services were procured in violation of the Anti-Kickback Statute.

168.    As described in greater detail above, the Anti-Kickback Statute prohibits providers from paying their employees extra amounts specifically to generate Medicare referrals.  In violation of these rules, Lifeline puts substantial pressure on its nurse-recruiters to generate referrals, and then pays them bonuses based on the number of referrals they generate.  These incentives are particularly insidious because the nurse-recruiters are also charged with documenting important information concerning the patients' eligibility for home health benefits (*e.g.*, homebound status, need for skilled nursing services).

38

169.     Lifeline forces staff members to solicit referrals from local providers with mandatory "Blitz Weeks." Although the name suggests a once-monthly or once-quarterly event, Blitz Week in fact occurs every week. As part of Blitz Week, all Lifeline employees must solicit prospective referral sources, such as nursing homes or primary care physicians, for new Medicare patients. For each Medicare referral, staff members get a chance to win prizes including mugs, cash, or gift cards for Wal-Mart or gas stations.

170.     Lifeline launched Blitz Weeks in 2012 as an effort to make up for the patients it had lost immediately after the *Master* settlement. Although Blitz Weeks initially allowed employees to volunteer, participation became mandatory in August 2013. Lifeline told employees who were uncomfortable with the practice that they could quit their jobs if they did not want to participate with recruiting referrals.

### E.     Defendants Retaliated against Relators for Objecting to Fraudulent Conduct Causing False Claims to be submitted to Medicare

171.     During their employment, Relators expressed their opposition to billing Medicare for patients who did not meet homebound status and/or did not require skilled nursing services.

172.     Relators also expressed their opposition to directives to create paperwork falsely documenting patients' homebound status or need for skilled nursing services.

173.     Directives to Relators to participate in the submission of false claims for home health services to Medicare, and to create false documentation of the patients' statuses, were instructions to violate the federal False Claims Act.

174.     Relators' refusal to participate in submission of false claims for home health services to Medicare, and to create false documentation of patients' statuses, were refusals to violate a law in the course of employment.

39

175.    Relators' refusal to create false documentation of patient status was a refusal to falsify an essential record within the meaning of Kentucky Revised Statute § 314.091(1)(h).

176.    Relators' refusal to participate in submission of false claims for home health services to Medicare and to create false documentation of patient status were lawful acts done in an effort to prevent violation by Defendants of the federal False Claims Act.

177.    In August 2013, Relator Bowling's employment was terminated.

178.    In October 2013, Relator Poynter's employment was constructively terminated.

179.    Defendants' reasons for discharge of both Relators were and are pretextual.

180.    Substantial and motivating factors, but for which Relators' employment would not have been terminated by Defendants, were Relators' lawful acts done in furtherance of their efforts to stop or prevent violations of the federal False Claims Act, their refusal to violate the federal False Claims Act in the course of their employment, and their refusal to violate Kentucky Revised Statute § 314.091(1) (h) in the course of their employment.

181.    As a direct and proximate result of the unlawful terminations of their employment, both Relators have suffered loss of wages, past and future, and other injuries including embarrassment and humiliation, emotional distress and mental anguish.

182.    Relators' terminations were done in reckless disregard, and/or with gross negligence, toward and regarding Relators' rights.

40

## COUNT I
### False Claims Act
### 31 U.S.C. §§ 3729(a) (1) (A)–(B) and (G)

183.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

184.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

185.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

186.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

187.     By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

188.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

189.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

190.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## COUNT II
### Discharge of Relator Bowling
### In Violation of the Anti-Retaliation Provision
### Of the False Claims Act

41

**31. U.S.C. § 3730(h)**

191.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

192.     Relator Bowling's refusals to falsify the patients' records constituted a refusal to falsify a record material to a false or fraudulent claim within the meaning of Title 31, Chapter 37, Subchapter III of the United States Code, specifically 31 U.S.C. § 3729.

193.     Relator Bowling's refusals to falsify the patients' records were lawful acts in furtherance of her efforts to stop or prevent a violation by Defendants of the provisions of Title 31, Chapter 37, Subchapter III of the United States Code.

194.     Substantial and motivating factors, but for which Bowling's employment would not have been terminated by Defendants, were her refusals to falsify a record material to a false or fraudulent claim within the meaning of 31 U.S.C. § 3729, and her lawful acts in furtherance of her efforts to stop or prevent a violation by Defendants of the provisions of Title 31, Chapter 37, Subchapter III of the United States Code.

195.     Relator Bowling's termination was in violation of 31 U.S.C. 3730(h).

**COUNT III**
**Discharge of Relator Poynter**
**In Violation of the Anti-Retaliation Provision**
**Of the False Claims Act**
**31 U.S.C. § 3730(h)**

196.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

197.     Relator Poynter's refusals to falsify the patients' records constituted a refusal to falsify a record material to a false or fraudulent claim within the meaning of Title

42

31, Chapter 37, Subchapter III of the United States Code and most specifically 31 U.S.C. § 3729.

198.     Relator Poynter's refusals to falsify the patients' records were lawful acts in furtherance of her efforts to stop or prevent a violation by Defendants of the provisions of Title 31, Chapter 37, and Subchapter III of the United States Code.

199.     Substantial and motivating factors, but for which Relator Poynter's employment would not have been constructively terminated by Defendants, were her refusals to falsify a record material to a false or fraudulent claim within the meaning of 31 U.S.C. § 3729, and her lawful acts in furtherance of her efforts to stop or prevent a violation by Defendants of the provisions of Title 31, Chapter 37, Subchapter III of the United States Code.

200.     Relator Poynter's termination was in violation of 31 U.S.C. § 3730(h).

## COUNT IV
### Wrongful Discharge of Relator Bowling for
### Refusing to Falsify Essential Record in Violation of
### Ky. Rev. Stat. Ann. § 314.091) (1) (h)

201.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

202.     A substantial and motivating factor for the termination of Relator Bowling's employment was her refusal to violate Kentucky Revised Statute § 314.091(1)(h), which prohibits falsification by a nurse of an essential record in the course of her employment.

203.     Relator Bowling was wrongfully discharged under Kentucky law.

## COUNT V
### Wrongful Discharge of Relator Poynter for

43

### Refusing to Falsify Essential Record in Violation of
### Ky. Rev. Stat. Ann. § 314.091) (1) (h)

204.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 182 above as though fully set forth herein.

205.    A substantial and motivating factor for the constructive termination of Relator Poynter's employment was her refusal to violate Kentucky Revised Statute § 314.091(1) (h), which prohibits falsification by a nurse of an essential record in the course of her employment.

206.    Relator Poynter was wrongfully discharged under Kentucky law.

### PRAYER

WHEREFORE, Ms. Bowling and Ms. Poynter pray for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That Plaintiff-Relators Ms. Bowling and Ms. Poynter be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.    That Plaintiff-Relators Ms. Bowling and Ms. Poynter be awarded double their lost pay and benefits in accordance with 31 U.S.C. § 3730(h);

5.    That Plaintiff-Relators Ms. Bowling and Ms. Poynter be awarded compensatory damages for their injuries, past, present and future, arising from the wrongful discharge of their employment;

44

6.      That Plaintiff-Relators Ms. Bowling and Ms. Poynter be awarded punitive

damages from Defendants to punish them for their reckless disregard and/or gross negligence

toward the Relators and the Relators' duties under law, and to deter repetition of such

misconduct.

7.      That Plaintiff-Relators Ms. Bowling and Ms. Poynter be awarded all costs of this

action, including attorneys' fees and expenses; and

8.      That Plaintiff-Relators Ms. Bowling and Ms. Poynter recover such other relief as

the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Bowling and Ms.

Poynter hereby demand a trial by jury.

Dated: December _16_, 2014

By: _____

Robert L. Abell
Robert@RobertAbellLaw.com
120 North Upper Street
P.O. Box 983
Lexington, KY 40588-0983
Tel: (859) 254-7076
Fax: (859) 281-6541

By: _____

Colette G. Matzzie
cmatzzie@phillipsandcohen.com
Tim McCormack
tmccormack@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567
Fax: (202) 833-1815

45

Attorneys for Plaintiff-Relators
Erica Bowling and Melissa Poynter

46