| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* LEANN MARSHALL, and <br> LEANN MARSHALL, INDIVIDUALLY, <br><br>     *Plaintiffs/Relators*, <br><br> v. <br><br> UNIVERSITY OF TN MEDICAL CENTER HOME <br> CARE SERVICES, LLC, and LHC GROUP, INC., <br><br>     *Defendants*. | )<br>)<br>)<br>)<br>)<br>)    No. 3:17-CV-96<br>)<br>)    Judge Collier<br>)<br>)<br>)<br>)<br>) |

_____

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* <br> VIB PARTNERS, <br><br>     *Plaintiff/Relator*, <br><br> v. <br><br> LHC GROUP, INC., <br><br>     *Defendant*. | )<br>)<br>)<br>)<br>)<br>)    No. 3:19-CV-84<br>)<br>)    Judge Collier<br>)<br>)<br>)<br>) |

# M E M O R A N D U M

Before the Court is a motion by Defendants, University of TN Medical Center Home Care

Services, LLC ("UTMC"), and LHC Group, Inc. ("LHC"), to dismiss the claims of Relators,

LeAnn Marshall and VIB Partners, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules

of Civil Procedure. (Doc. 46 in Case No. 3:17-CV-96 ("*Marshall*".[1])) Relators have responded in

---

[1] Unless otherwise noted, subsequent citations refer to *Marshall*, Case No. 3:17-CV-96.

opposition to the motion to dismiss (Doc. 49), and Defendants have replied (Doc. 51). For the reasons set out below, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motion to dismiss (Doc. 46).

## I. <u>BACKGROUND</u>

The Court first summarizes the relevant law regarding the False Claims Act and Medicare and then turns to the facts of this case.

### A. The False Claims Act

The False Claims Act (the "FCA"), 31 U.S.C. §§ 3729, *et seq.*, imposes civil liability on persons and companies who defraud government programs.[2] For example, the FCA imposes civil liability for knowingly presenting or causing to be presented false or fraudulent claims to the United States Government for payment or approval. 31 U.S.C. § 3729(a)(1)(A). In addition, it is against the law for a person to knowingly make, use, or cause to be made or used, a false record or false statement that is material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA also imposes liability for knowingly employing a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government, commonly referred to as a "reverse" false claim. 31 U.S.C. § 3729(a)(1)(G). Those who violate the FCA are liable for civil penalties up to $10,000 and treble damages. 31 U.S.C. § 3729(a)(1).

To promote enforcement of the FCA, private individuals or organizations, called relators, can bring *qui tam* actions on behalf of the United States. 31 U.S.C. § 3730(b)(2). After the relator

---

[2] Tennessee has similar provisions under the Tennessee Medicaid False Claims Act. *See* Tenn. Code Ann. §§ 71-5-181, *et seq.*; Tenn. Code. §§ 4-18-101, *et seq.* Relator Marshall's original complaint asserted several claims under the Tennessee Medicaid False Claims Act (Doc. 2 ¶¶ 185–98), but these claims were not included in Relators' Consolidated Amended Complaint (*see* Doc. 40 ¶¶ 263–85). Accordingly, the State of Tennessee will be **DISMISSED** from this lawsuit, and the Clerk of the Court will be instructed to update the case caption accordingly.

files a complaint, the United States has the option of intervening and conducting the litigation itself. 31 U.S.C. § 3730(b)(4)(B). If the United States opts not to intervene, the relator may proceed individually. 31 U.S.C. § 3730(c)(3). Successful relators are awarded a portion of the award ranging from ten to thirty percent depending on the relator's role in the case and whether the government chose to intervene. 31 U.S.C. § 3730(d). To protect whistleblowers, the FCA also includes an anti-retaliation provision to protect individuals who make efforts in furtherance of an action under the statute or to stop a violation of the FCA. 31 U.S.C. § 3730(h).

  **B.**  **Medicare**

  The FCA applies to claims healthcare providers submit to Medicare, a government healthcare program for people over sixty-five years old. Medicare, as relevant here, includes three parts. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care, which includes home healthcare. 42 U.S.C. § 1395c–i-2. Medicare Part B authorizes the payment of federal funds for medical and other health services, including home healthcare and medical supplies. 42 U.S.C. § 1395(k), (i), (s). Medicare Part C authorizes the payment of federal funds to private "Medicare Advantage" organizations to manage the care of Medicare beneficiaries, including organizations that provide home healthcare services. 42 U.S.C. §§ 1395w-21, *et seq.*

  Medicare beneficiaries who are homebound can receive certain medically necessary services at home. *See* 42 U.S.C. §§ 1395(f)(a)(2)(C), 1395n(a)(2)(A). The patients of home health agencies are referred for home health services by their physicians who are required to certify that the respective patients are under their care, that the physicians have established and will periodically review sixty-day plans of care, that the patients are homebound, and that the patients

3

require one of the types of home health services that qualifies for Medicare. 42 C.F.R. § 484.205(a).

After receiving a patient referral, a home health agency is required to provide its own patient-specific, comprehensive assessment, called an Outcome and Assessment Information Set ("OASIS"). 42 C.F.R. § 484.55. During this initial assessment, the home health agency must determine the immediate care and support needs of the patient and, for Medicare patients, determine eligibility for home health benefits, which involves an assessment of their homebound status. *Id.* "The encoded OASIS data must accurately reflect the patient's status at the time of assessment." 42 C.F.R. § 484.20(b).

A sixty-day plan of care is called an "episode," and after each episode, a patient must be recertified to continue receiving funds from Medicare. To be recertified, the patient's physician must review and sign the patient's plan of care, making any necessary changes, and the home health agency must complete a new OASIS assessment and determine whether the patient is still eligible to receive home health services.

Home health agencies are not paid per service rendered; instead, Medicare pays them under a prospective payment system that provides a predetermined amount for the entire sixty-day episode. *See* 42 U.S.C. § 1395fff(a); 42 C.F.R. § 484.205(a). Adjustments are made to a standard national episode rate to account for the type of care the patient requires as well as the geographic location. *See* 42 U.S.C. § 1395fff(b)(4)(B), (C). These adjustments are made based on the OASIS forms, which are submitted to the government through a Medicare administrative contractor or fiscal intermediary for payment.

Medicare conditions payment on the physician's certification that the beneficiary is homebound and in need of skilled services. 42 C.F.R. § 409.41(b). Medicare also conditions

4

payment on the beneficiary actually being homebound and actually needing skilled services. 42 C.F.R. § 409.41(c). Additionally, Congress has statutorily prohibited the payment of any Medicare claim for services that are not medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A).

Certain additional adjustments are made to the reimbursement rate, including Low Utilization Payment Adjustment ("LUPA"), a Therapy Threshold, and case mix. The reimbursement rate is subject to a LUPA when the home health agency visits the patient four or fewer times during a sixty-day episode. 42 C.F.R. §§ 484.205(a)(1), 484.230. In such a situation, Medicare will calculate its payment using a per-visit amount. *Id.* A Therapy Threshold is the opposite of a LUPA—when a home health agency reaches a certain number of visits during a given sixty-day episode, Medicare will increase the reimbursement paid on the patient's behalf. A case mix accounts for the health condition and resource use of each beneficiary, based on OASIS assessments, and a home health service receives a higher rate of reimbursement when its Medicare patients are sicker.

Since July 2015, the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services, has published quality ratings for home health agencies. The ratings are derived from OASIS assessments and claims data. Specifically, the patient-care rating considers OASIS data regarding patients' improvement since start of care or recertification. A higher star rating is likely when more patients score as having improved based on their OASIS assessments, and a higher rating generally results in more referrals to and patient interest in certain home health agencies.

5

**C.     Defendants' Fraudulent Practices for Medicare Reimbursement[3]**

LHC provides home health and hospice services to patients, many of whom are beneficiaries of Medicare. As of December 2019, LHC operates 513 home health service locations, including 350 wholly owned subsidiaries, one of which is UTMC. Relator Marshall worked for Defendants as a Field Registered Nurse ("RN"), and later as a Team Leader, from June 10, 2010, to June 2, 2016. Relator VIB is a two-person partnership, and both partners worked as managers for LHC.

Defendants' revenue primarily comes from treatment of Medicare beneficiaries, and their policies focus on maximizing their reimbursements, rather than meeting their patients' needs. Defendants generally use two methods to defraud the government through Medicare reimbursements, both of which were designed to maximize their profits.

First, Defendants direct clinicians to falsify information by "upcoding" OASIS assessments. At times, a clinician's initial assessment will show a patient does not qualify for home health services, but LHC managers would instruct clinicians to change information in the OASIS assessment so that the patient seemingly qualifies. LHC managers would call clinicians several times a day to instruct the clinicians to accept these changes, even when the clinicians knew the altered information was inaccurate. Relator Marshall was asked to change practically every OASIS answer she submitted, a practice she reported to her Performance Improvement Coordinator. But clinicians had little to no discretion to reject the changes, and most complied with the instructions to avoid being singled out or reprimanded by their superiors. Between January 1, 2017, and March 23, 2017, in just one region, there were approximately 87,750 change

---

[3] This summary of the facts accepts all the factual allegations in Relators' Consolidated Complaint (Doc. 40) as true. *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

6

requests accepted by Defendants' clinicians, whereas only 245 change requests were denied. Even when change requests were denied, Defendants' managers can bypass and override those denials to make the fraudulent changes.

OASIS assessments also are upcoded to make patients appear less healthy upon admission or recertification, which makes them appear to have improved more upon discharge and results in increased reimbursements from Medicare. This alteration also improves Defendants' quality ratings with the Home Health Value Based Purchasing program, which is a program that adjusts Medicare reimbursements based on a health agency's performance. When Defendants maintain high quality ratings, in part, by falsify OASIS data, they are eligible to received increased payments.

LHC used to use paper records for OASIS assessments, which required clinicians to physically sign any assessment that was changed. However, in 2012, LHC began using certain software to upload and review OASIS assessments. This software makes it more efficient for clinicians to approve changes to the assessments, which also makes it easier to submit fraudulently upcoded OASIS assessments. Defendants also use another software program to further their fraudulent scheme, specifically, a software that reviews OASIS assessments to detect possible changes to increase reimbursement.

Second, Defendants manipulate the number of patient visits per episode to increase their profits. Clinicians are instructed to inflate patients' plans of care to project the highest number of visits possible, even if some visits are unnecessary. But after indicating these visits are needed in the records, Defendants reduce or eliminate them in actuality to improve their bottom line. Defendants monitor the number of patient visits provided by using software that determines the maximum number of visits a patient can receive to achieve maximum profitability, even when his

7

or her OASIS assessment calls for more. When clinicians follow these practices, Defendants make an even greater profit on each Medicare patient than they already receive from the upcoded OASIS assessments.

Defendants also manipulate visit numbers to avoid LUPA— Defendants instruct clinicians, including Relator Marshall, to create plans of care that consist of at least five nursing visits per episode, even when medically unnecessary, so that they are paid for an entire sixty-day episode, rather than a per-visit payment. Defendants also instruct clinicians to inflate the therapy visits for patients because their profitability increases when patients are identified as requiring more therapy.

### D.    Relator Marshall's Termination

Relator Marshall had personal knowledge of and experience with the above-described practices. She routinely expressed her concerns about these procedures to her supervisors, questioning these fraudulent practices at least once a week to her Branch Managers. In May 2016, Relator Marshall again objected to these practices and also refused to comply with Defendants' instructions to falsify OASIS assessments. Approximately one month later, on June 2, 2016, Relator Marshall was fired. Defendants indicated the termination was due to her performance, but Relator Marshall had received excellent reviews throughout her six years of employment. Unlike other employees who did not object to Defendants' practices, Relator Marshall was immediately fired, rather than given an opportunity to participate in a performance improvement plan.

### E.    The *Bowling* Action

On April 18, 2014, Erica Bowling and Melissa Poynter filed a *qui tam* action against LHC and Lifeline Health Care of Pulaski, LLC, one of LHC's subsidiaries, in the United States District Court for the Eastern District of Kentucky. (Doc. 47-5.) The relators amended their complaint on December 16, 2014, asserting several causes of action for violations of 31 U.S.C.

8

§§ 3729(a)(1)(A), (B), and (G), violations of 31 U.S.C. § 3730(h) based on Bowling's and Poynter's retaliatory discharges, and statutory claims under Kentucky law, described further below. (Doc. 47-3 ¶¶ 183–206.) On August 8, 2017, the United States declined to intervene in the action. (*Id.*) On June 4, 2018, the case was voluntarily dismissed with prejudice pursuant to a stipulation of dismissal. (*Id.*)

## F.     Procedural History

On March 16, 2017, Relator Marshall filed a *qui tam* action against Defendants LHC and UTMC on behalf of the United States and the State of Tennessee. (Doc. 2.) On June 26, 2017, Relator VIB filed a *qui tam* action against Defendant LHC on behalf of the United States. (Doc. 1 in Case No. 3:19-CV-84 ("*VIB*").) On February 6, 2020, the United States and the State of Tennessee notified the Court that they would not intervene in *Marshall* (Doc. 29), and the United States notified the Court that it would not intervene in *VIB* (Doc. 43 in *VIB*).

On July 10, 2020, Relators filed an unopposed motion to consolidate their cases, which the Court granted on July 17, 2020. (Docs. 34, 39; Docs. 46, 51 in *VIB*.) On August 17, 2020, Relators filed a consolidated amended complaint against Defendants that asserted two counts: (1) violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G) against Defendant LHC; and (2) violations of 31 U.S.C. § 3730(h) against Defendants based on Relator Marshall's discharge. (Doc. 40 ¶¶ 263–85.)

Defendants now have filed a motion to dismiss Relators' claims based on Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 46.) Specifically, Defendants argue the Court lacks subject-matter jurisdiction, as the FCA's first-to-file rule bars Relators' FCA claims. (Doc. 47 at 15–21.) Alternatively, Defendants contend Relators have failed to state plausible claims in that they have failed to plead them with specificity as required by Rule 9(b).

(*Id.* at 21–28.) Further, Defendants assert Relator Marshall has failed to state a claim for retaliation. (*Id.* at 28–30.)

Relators have responded in opposition. (Doc. 49.) As to the first-to-file bar, Relators assert it is a non-jurisdictional rule and does not apply to their claims in any case. (*Id.* at 6–14.) Relators also assert Rule 9(b) does not apply to FCA claims and, even if it does, they have plausibly alleged violations of the FCA and for retaliatory discharge. (*Id.* at 20–31.)

Defendants' motion to dismiss (Doc. 46) is now ripe for review.

## II. <u>STANDARD OF REVIEW</u>

As an initial matter, the parties dispute whether Defendants' motion implicates Rule 12(b)(1) of the Federal Rules of Civil Procedure, which concerns challenges to the Court's jurisdiction. Defendants argue the FCA's first-to-file bar, 31 U.S.C. § 3730(b)(5), is jurisdictional (Doc. 47 at 15; Doc. 51 at 9 n.1), whereas Relators assert it is a non-jurisdictional provision (Doc. 49 at 11–12).

Although the Courts of Appeals are split on this issue,[4] the Court of Appeals for the Sixth Circuit has held the first-to-file bar is jurisdictional. *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005) (emphasis added) (explaining "Congress has placed a number of *jurisdictional* limitations on *qui tam* actions, . . . [such as] the first-to-file bar of 31 U.S.C.

---

[4] *Compare United States ex rel. Palmieri v. Alpharma, Inc.*, 647 F. App'x 166, 166–67 (4th Cir. 2016) (per curiam) (jurisdictional); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376–77 (5th Cir. 2009) (same); *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2001) (same); *United States ex rel. Grynberg v. Koch Gateway Pipline Co.*, 390 F.3d 1276, 1278 (10th Cir. 2004) (same), *with United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 120–21 (D.C. Cir. 2015) (non-jurisdictional); *United States ex rel. McGuire v. Millenium Lab'ys, Inc.*, 923 F.3d 240, 248–51 (1st Cir. 2019) (same); *United States ex rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 84 (2d Cir. 2017) (same); *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 231–233 (3d Cir. 2020) (same).

§ 3730(b)(5)"); *see also United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009), *abrogated on other grounds by United States Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021) (repeatedly referring to first-to-file bar as a "jurisdictional limitation" on *qui tam* actions). The Court therefore treats the first-to-file bar as a jurisdictional limitation, which means Defendant's motion relies not only on Rule 12(b)(6), but also on Rule 12(b)(1).

### A.     Rule 12(b)(1)

When a defendant moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). A motion to dismiss under 12(b)(1) may raise a facial attack or a factual attack. *Golden v. Gorno. Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack "questions merely the sufficiency of the pleading" in alleging subject-matter jurisdiction and thus the court takes the allegations raised in the complaint as true. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). In contrast, a factual attack challenges the factual existence of subject-matter jurisdiction, requiring the court to "weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Id.* The plaintiff bears the burden of proving jurisdiction is proper. *Cob Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir. 2004) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Here, Defendants raise a factual attack of subject-matter jurisdiction, so the Court may weigh conflicting evidence to determine whether jurisdiction exists.

### B.     Rule 12(b)(6)

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all of the factual allegations in the complaint as true and construe the complaint

11

in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 49 F.3d 710, 716 (6th Cir. 2005)).  The court is not, however, bound to accept bare assertions of legal conclusions as true.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In deciding a motion under Rule 12(b)(6), a court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* at 678.  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

If a party presents matters outside the pleadings in connection with a motion to dismiss, the court must either exclude those matters from consideration or treat the motion as one for summary judgment.  Fed. R. Civ. P.  12(d).  Documents attached to pleadings are considered part of the pleadings for all purposes.  Fed. R. Civ. P. 10(c).

12

## III.    DISCUSSION

The Court turns first to Defendants' jurisdictional argument for dismissal based on the first-to-file bar. The Court then will address Defendants' arguments for dismissal of any remaining claims based on Rule 12(b)(6).

### A.    First-to-File Bar (31 U.S.C. § 3730(b)(5))

The FCA provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). This provision "unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts." *Walburn*, 431 F.3d at 971 (quoting *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001)). The bar "furthers the policies animating the FCA by ensuring that the government has notice of the essential facts of an allegedly fraudulent scheme while, at the same time, preventing 'opportunistic plaintiffs from bringing parasitic lawsuits.'" *Poteet*, 552 F.3d at 516 (quoting *Walburn*, 431 F.3d at 970).

To determine whether the first-to-file bar applies here, the Court must answer two questions: (1) was *Bowling* "pending" when *Marshall* or *VIB* was filed; and (2) if so, is *Marshall* or *VIB* a related case based on the facts underlying the *Bowling* complaint? *See United States ex rel. Moore v. Pennrose Props., LLC*, No. 3:11-cv-121, 2015 WL 1358034, at *10 (S.D. Ohio Mar. 24, 2015).[5]

---

[5] Defendants also argue *Marshall* bars *VIB* under the first-to-file bar. (Doc. 47 at 15–17.) However, Defendants also assert *Marshall* fails to satisfy Rule 9(b) (*id.* at 21–28), and a legally infirm complaint, including for failure to meet Rule 9(b), cannot preempt another action under the first-to-file bar. *See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516 (6th Cir. 2009), *abrogated on other grounds by U.S. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021) ("One important caveat to this first-to-file rule, however, is that, . . . to preclude later-filed *qui tam*

### 1. Is *Bowling* a "Pending" Action?

"Pending," as used in the first-to-file bar, takes on its ordinary dictionary definition of "remaining undecided; awaiting decision." *Kellogg Brown & Roots Servs. v. United States ex rel. Carter*, 575 U.S. 650, 662 (2015). Therefore, "an earlier suit bars a later suit while the earlier suit remains undecided." *Id.* But "the ultimate fate of an earlier-filed action does not determine whether it bars a later action under § 3730(b)(5)." *Walburn*, 431 F.3d at 972 n.5. Instead, the "pending" inquiry focuses on the status of the earlier-filed case "at the time the later action was filed." *Id.*

The Court therefore must determine whether *Bowling*, which was filed on April 18, 2014, and dismissed on June 5, 2018 (Doc. 47-5), was undecided, and therefore "pending," when *Marshall* and *VIB* were filed. But the parties dispute the date on which *Marshall* and *VIB* were filed, a dispute that is outcome-determinative to this question. Relators argue their case was filed on August 17, 2020, the date they filed their Consolidated Amended Complaint, which followed *Bowling*'s dismissal. (Doc. 49 at 18–19.) Defendants contend *Marshall* was filed on March 16, 2017, and *VIB* was filed on June 26, 2017, as those are the dates Relators filed their original *qui tam* actions, which occurred before *Bowling* was dismissed. (*See* Doc. 51 at 17–18.)

As previously stated, the first-to-file bar goes to the Court's subject-matter jurisdiction, *see Walburn*, 431 F.3d at 970, and "[t]he basis for jurisdiction must be apparent from the facts existing at the time the complaint is brought." *Poteet*, 552 F.3d at 510; *see Moore*, 2015 WL 1358034, at

---

actions, the allegedly first-filed *qui tam* complaint must not itself be jurisdictionally or otherwise barred."); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 (6th Cir. 2005) (declining to apply first-to-file bar when first-filed complaint failed to comply with Rule 9(b)). It is more efficient to first assess whether the first-to-file bar applies to both *Marshall* and *VIB* based on *Bowling*.

*14 (noting a plaintiff "cannot create federal court jurisdiction where none previously existed" by filing an amended complaint)  The Court therefore finds the relevant date to assess whether an earlier-filed case was "pending" is the date on which the *qui tam* action was first filed, not the date an amended or a consolidated complaint was filed.  *See Moore*, 2015 WL 1358034, at *13 (finding "[u]nder the FCA's first-to-file bar, the filing of an amended complaint does not create an exception to the time-of-filing rule"); *United States ex rel. Howard v. Lockheed Martin Corp.*, No. 1:99-CV-285, 2011 WL 4348104, at *3 (S.D. Ohio Sept. 16, 2011) (citing *United States ex rel. Nowak v. Medtronic, Inc.*, Nos. 1:08-cv-10368, 1:09-cv-11625, 2011 WL 3208007, at *19 n.4 (D. Mass. July 27, 2011)) (noting "the *Nowak* court found that the act of consolidating the two suits did not save Dodd's claim from dismissal pursuant to § 3730(b)(5)").

Thus, *Marshall* was filed on March 16, 2017, and *VIB* was filed on June 26, 2017, at which times *Bowling* had not been dismissed, which makes *Bowling* is a "pending" action for purposes of the first-to-file bar.

### 2. Is *Marshall* or *VIB* a Related Action to *Bowling*?

The next question is whether *Marshall* or *VIB* is a "related action based on the facts underlying" *Bowling*.  *See* 31 U.S.C. § 3730(b)(5).  To answer this question, "a court must compare the relator's complaint with the allegedly first-filed complaint."  *Poteet*, 552 F.3d at 516.  Before doing so, however, the Court must resolve another disputed issue—which complaints it should compare.

#### a. Operative Complaints

The parties have not briefed the issue of which complaints the Court should compare.  As to *Bowling*, the parties seem to agree that the operative complaint is the First Amended Complaint, filed on December 16, 2014.  *See, e.g.*, *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276,

1279 (10th Cir. 2004) (comparing amended complaint pending at time later action was filed). The Court agrees, as doing so aligns with the policy behind the first-to-file bar. The bar prohibits later suits based on facts already known to the government, *see Poteet*, 552 F.3d at 516, and when *Marshall* and *VIB* were filed, the First Amended Complaint in *Bowling* contained all of the allegations of fraud known to the government.

However, the parties disagree which complaints should be compared for *Marshall* and *VIB*, as Defendants cite to the original complaints (Doc. 47 at 17–21), while Relators cite to their Consolidated Amended Complaint (Doc. 49 at 16–18). This question is more difficult, and courts are split on the issue. In *Walburn*, the Court of Appeals for the Sixth Circuit analyzed the "First Amended Complaint as it was the last complaint to have been filed in the district court," but it did not engage in substantive analysis of the question, as the question may not have even been raised. 431 F.3d at 971 n.3. However, the Southern District of Ohio in *Moore* ten years later compared the original complaints, reasoning they were the operative pleadings to determine jurisdiction. 2015 WL 1358034, at *16 n.5. The Court finds it helpful to consider the approaches of other courts and the policies behind those approaches before answering this question itself.

The Court of Appeals for the Fifth Circuit has found that a relator's amended complaint should be evaluated for purposes of the related-action analysis, relying on the Supreme Court's decision in *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007). *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371 (5th Cir. 2009) ("*Branch Consultants I*"). In *Rockwell*, the Supreme Court evaluated another jurisdictional limitation to the FCA, the public-disclosure bar. 549 U.S. 457. Courts determine whether the public-disclosure bar applies by determining if a relator is an "original source," which requires review of "information on which the [relator's] allegations are based." *Id.* at 472. The Supreme Court held "the term 'allegations'

16

is not limited to the allegations of the original complaint," but instead "includes (at a minimum) the allegations in the original complaint *as amended*." *Id.* at 473. Based on *Rockwell*, the Fifth Circuit decided its "focus is on the allegations in [the relator's] first amended complaint because 'when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.'" *Branch Consultants I*, 560 F.3d at 375 n.5 (quoting *Rockwell*, 549 U.S. at 473–74).

However, other courts reason that jurisdictional principles mean the original complaint of a later-filed action is the operative complaint for the related-action analysis. In *Grynberg*, the Court of Appeals for the Tenth Circuit "judge[d] whether § 3730(b)(5) barred Grynberg's qui tam action by looking at the facts as they existed at the time the action was brought." *Grynberg*, 390 F.3d at 1279. It reasoned that the complaint initiating the *qui tam* action should be assessed because "[i]f [the relator's] suit was a 'related action' . . ., then it was barred from its *inception* by § 3730(b)(5)." *Id.*

The District Court for the Eastern District of Louisiana also has compared the first complaint of the later-filed action because "[t]he first-to-file bar . . . refer[s] specifically to jurisdictional facts that must exist when an 'action,' not a complaint, is filed." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 259 (E.D. La. 2011) ("*Branch Consultants II*").[6] To reach this conclusion, the court in *Branch Consultants II* distinguished *Rockwell*—"[a]n amended complaint may force a court to reevaluate its jurisdiction, as in *Rockwell*, but a court will not reach that question if it lacked jurisdiction from the beginning."

---

[6] The Eastern District of Louisiana is within the Fifth Circuit. Accordingly, the district court's decision in *Branch Consultants II* may conflict with the Fifth Circuit's earlier decision in *Branch Consultants I*.

*Id.* at 262; *id.* at 261–62 ("But *Rockwell* does not suggest that a plaintiff can establish jurisdiction by amendment when jurisdiction did not previously exist."). The Eastern District of Pennsylvania has reached a similar conclusion. *See United States ex rel. Cestra v. Cephalon, Inc.*, No. 14-01842, 2014 WL 5038393, at *3 (E.D. Pa. Oct. 9, 2014) ("The courts that have expressly considered this issue in the context of the first-to-file bar" examine "the complaints as they existed at the time [the relator] brought his later action.").

The Court finds it more appropriate to compare the original complaints in *Marshall* and *VIB*, rather than the Consolidated Amended Complaint. As an initial matter, neither *Rockwell* nor *Walburn* require a different approach. *Rockwell* addressed the FCA's public-disclosure bar, not the first-to-file bar. *See* 549 U.S. at 473. While both bars are jurisdictional limits under the FCA, they are distinct and use different language—*Rockwell* focused on the term "allegations," *id.*, whereas the first-to-file bar's statute refers to the "action." *See* 31 U.S.C. § 3730(b)(5). Likewise, *Walburn* does not mandate a different approach, as the issue was never directly addressed by the Court of Appeals, nor does it appear to have been raised by the parties. In fact, that an amended complaint had even been filed was addressed only in a footnote. *See Walburn*, 431 F.3d at 971 n.3.

This approach best serves the policy behind the first-to-file bar: to prohibit later actions based on facts of which the government is already aware. *See Poteet*, 552 F.3d at 516. By comparing the original complaints of the new actions, the Court tailors the related-action analysis to whether either complaint, when filed, brought new facts regarding Defendants' fraudulent scheme to the government's attention. Further, the Court has determined that comparing the original complaints aligns well with principles of subject-matter jurisdiction. "The Court's jurisdiction may expand or shrink as amendments are made to the complaint, but that jurisdiction must rest upon a solid foundation. That foundation is the Court's jurisdiction over the original

complaint." *Branch Consultants II*, 782 F. Supp. 2d at 264. Finally, this approach is more consistent with the "pending action" analysis above. *See supra* § III.A.1.

### b.    Analysis

To determine whether *Marshall* or *VIB* is a "related action based on the facts underlying" *Bowling*, *see* 31 U.S.C. § 3730(b)(5), the Court compares the appropriate complaints from each case. "[T]he relevant inquiry is whether the prior suit put the government on notice of the fraudulent scheme alleged here." *United States ex rel. Armes v. Garman*, No. 3:14-cv-172, 2016 WL 3562062, at *6 (E.D. Tenn. June 24, 2016), *aff'd on diff. grounds by* 719 F. App'x 459 (6th Cir. 2017) (citing *Poteet*, 552 F.3d at 517). "The later complaint 'need not rest on precisely the same facts as a previous claim to run afoul of this statutory bar.'" *Poteet*, 552 F.3d at 516 (quoting *LaCorte*, 149 F.3d at 232). "Rather, so long as a subsequent complaint raises the same or a related claim based in a significant measure on the core fact or general conduct relied upon in the first *qui tam* action, § 3730(b)(5)'s first-to-file bar applies.'" *Id.* (quoting *Grynberg*, 390 F.3d at 1279). Thus, "the earlier filed action bars the later action, even if the later complaint incorporates somewhat different details.'" *Id.* (quotation marks and alterations omitted) (quoting *Walburn*, 431 F.3d at 971). When several FCA claims are asserted, the Court conducts a "claim-by-claim analysis". *United States ex rel. Tillson v. Lockheed Martin Energy Sys.*, No. 5:00CV-39-M, 5:99CV-170-M, 2004 U.S. Dist. LEXIS 22246, at *19 (W.D. Ky. Sept. 29, 2004).

The Court will therefore identify the various essential facts of the fraud alleged by either or both Relators, comparing each set of facts to the allegations in *Bowling*.

First, Relators allege Defendants regularly falsify and upcode OASIS assessments to maximize reimbursement from Medicare and increase their profits. (Doc. 2 ¶¶ 87–119; Doc. 1 ¶¶ 110–221 in *VIB*.) Relator Marshall specifically alleges clinicians are instructed to fraudulently

19

categorize patients as homebound on OASIS assessments and ensure patients receive at least five in-home visits to avoid LUPA. (Doc. 2 ¶ 27, 92–03, 108.) Relator VIB also alleges the falsification of OASIS assessments resulted in greater profits through manipulation of patient visit numbers. (Doc. 1 ¶¶ 166–221 in *VIB*.) Specifically, Defendant LHC manipulates the number of patient visits by: inflating the number of visits in a patient's plan of care (*id.* ¶ 112); pressuring employees to ensure patients' plans called for at least five visits to avoid LUPA (*id.* ¶ 139); instructing employees to complete only profitable patient visits (*id.* ¶¶ 147–56); and providing patients with unnecessary therapy through clinical programs (*id.* ¶¶ 157–65). By way of example, Relator VIB alleges that Defendant LHC instructed employees to adjust patient visits to retain maximum profits when Humana, an insurance provider, changed its reimbursement model. (*Id.* ¶¶ 130–38.)

These essential facts of Defendants' fraud are the same as those underlying the allegations of fraud in *Bowling*. *Bowling* alleged LHC and Lifeline upcoded OASIS assessments to increase their scores and therefore increase Medicare's reimbursement. (Doc. 47-3 ¶¶ 83, 121–53.) *Bowling* also alleged that LHC and Lifeline scheduled at least five in-home visits to avoid LUPA. (*Id.* ¶¶ 94, 127.) Further, employees increased the recommended number of visits for patients. (*Id.* ¶ 127.) According to *Bowling*, they submitted bills for services that were not medically necessary or not provided (*id.* ¶ 121), and employees were trained to falsify patients' needs and include secondary diagnoses on the OASIS assessments to make patients appear sicker and therefore receive more reimbursement (*id.* ¶¶ 122, 126). The *Bowling* Defendants allegedly not only did so for initial assessments of patients, but also for the recertification of patients, which occurred every sixty days. (*Id.* ¶ 126.)

20

Relators' allegations do provide slightly more detail about Defendants' fraud. Unlike the *Bowling* complaint, Relator Marshall alleges Defendants also falsified OASIS forms by submitting them without a treating physician's approval (Doc. 2 ¶ 113), and Relator VIB provides a specific example of Defendants' fraud regarding Humana (*see* Doc. 1 ¶¶ 130–38 in *VIB*). However, the first-to-file bar applies "even if [Relators'] complaint[s] 'incorporate[] somewhat different details,'" *Walburn*, 431 F.3d at 971 (quoting *LaCorte*, 149 F.3d at 232–33), as their complaints are "simply a more detailed claim of improper" submissions for Medicare reimbursement through falsification and manipulation of OASIS assessments. *See Tillson*, 2004 U.S. Dist. LEXIS 22246, at *23.

Second, Relators allege Defendants violated the FCA by fraudulently certifying patients qualified for home healthcare under Medicare. (Doc. 2 ¶¶ 120–38; Doc. 1 ¶¶ 222–64 in *VIB*.) They both allege Defendants train employees to falsify patient information so that patients appear to qualify for home healthcare when they actually do not. (Doc. 2 ¶¶ 123, 127; Doc. 1 ¶ 223 in *VIB*.)

These allegations "raise[] the same or a related claim based in a significant measure on the core fact or general conduct relied upon in" the *Bowling* complaint. *See Poteet*, 552 F.3d at 516 (quoting *Grynberg*, 390 F.3d at 1279). *Bowling* alleged patients who were not homebound were regularly and fraudulently identified as homebound. (*See* Doc. 47-3 ¶¶ 82, 87–120, 154–70.) LHC and Lifeline instructed employees to disregard and suppress information that would suggest patients were not homebound (*id.* ¶ 91) and required them to change patient records when they reflected otherwise (*id.* ¶¶ 157, 163). From these allegations, the government had notice of a fraudulent scheme by which Defendants falsify OASIS assessments and other information as to

21

patients' homebound status, all in an effort to increase Medicare reimbursements and therefore increase profits.  *See Poteet*, 552 F.3d at 516.

Third, Relators both allege Defendants used software[7] to maximize profitability from patient visits.  (Doc. 2 ¶¶ 139–50; Doc. 1 ¶ 117 in *VIB*.)  "This software tool maximizes Defendants' profitability in furtherance of its fraudulent schemes, in part, because the number of home health visits provided to its patients is not specific to the patients' individualized needs." (Doc. 2 ¶ 140.)  *Bowling* did not allege any facts regarding this software.  (*See* Doc. 47-3.) However, the Court finds Defendants' use of the software furthered their ongoing scheme, as described above, rather than being a separate scheme itself.  Medicare already agreed to pay Defendants based on their fraudulent OASIS assessments, and the software simply allowed Defendants to capitalize even more on those overpayments.  As a result, Defendants' use of the software is just a "continuing part of the same fraud alleged throughout the [*Bowling*] complaint." *See Tillson*, 2004 U.S. Dist. LEXIS 22246, at *21.  These facts therefore do not provide details of a separate scheme and therefore did not give "the government . . . the chance to uncover additional fraud and to recover additional damages."  *See id.* at *20.[8]

---

[7] Relator Marshall refers to the software as Service Value Points (Doc. 2 ¶ 139), while Relator VIB refers to it as Score Value Points (Doc. 1 ¶ 117 in *VIB*).  Based on the alleged purpose and use of the software, as well as the similarity of the names, the Court assumes these allegations refer to the same software.

[8] Similarly, Relator Marshall also asserts Defendants regularly sent licensed practical nurses or social workers to patient visits, instead of RNs, and withheld medical supplies to cut costs and therefore increase their profits.  (Doc. 2 ¶¶ 147–50.)  But, like the software, these efforts to cut costs and maximize profits are part of the same fraudulent scheme, not a separate scheme, that was first alleged in *Bowling*.  *See United States. ex rel. Tillson v. Lockheed Martin Energy Sys.*, No. 5:00CV-39-M, 5:99CV-170-M, 2004 U.S. Dist. LEXIS 22246, at *21 (W.D. Ky. Sept. 29, 2004).

22

Fourth, Relator VIB separately alleges Defendant LHC's fraud is furthered through the Home Health Value Based Purchasing program. (Doc. 1 ¶¶ 265–74 in *VIB*.) The program increases payments to home health agencies whose patients have better outcomes based, in part, on OASIS assessments, and publishes quality ratings. (*Id.* ¶¶ 268, 271.) LHC therefore receives increased payments and higher ratings as a result of the manipulation of OASIS assessments. (*Id.* ¶¶ 271, 274.) Information regarding this program was not included in the *Bowling* complaint. (*See* Doc. 47-3.) The allegations of fraud regarding the program, however, are based primarily on Defendants' manipulation of OASIS assessments. These facts provide additional details about how Defendants benefitted from their fraudulent scheme, but it is not itself a separate fraudulent scheme to defraud the government. *See Tillson*, 2004 U.S. Dist. LEXIS 22246, at *20. Rather, it is a "continuing part of the same fraud alleged throughout the [*Bowling*] complaint." *See id.* at *21.

Finally, as to Relator Marshall's retaliation claim (Doc. 2 ¶¶ 194–98), it "is clearly distinct from any of the allegations found in the [*Bowling*] complaint," which means "the first-to-file rule does not bar" this claim. *See Tillson*, 2004 U.S. Dist. LEXIS 22246, at *30 (finding FCA retaliation claim was not barred by first-to-file bar).

The Court therefore finds that the first-to-file rule bars Relators' FCA claims except for Relator Marshall's retaliation claim. Relators put forth three additional arguments as to why their actions are not related to *Bowling*, none of which is persuasive.

First, Relators attempt to distinguish the complaints based on the defendants' identities. (Doc. 49 at 16–18.) The *Bowling* action brought claims against LHC and Lifeline (Doc. 47-3), while Relators' claims are against LHC and UTMC (Doc. 2; Doc. 1 in Case No. 1:19-CV-84). However, "the fact that the later action names different or additional defendants is not dispositive

23

as long as the two complaints identify the same general fraudulent scheme." *See Poteet*, 552 F.3d at 517. Despite the different defendants, the complaints identify the same fraudulent scheme.

Second, Relators argue the *Bowling* complaint did not allege a corporate-driven scheme and instead focused on one facility. (Doc. 49 at 16.) This argument is without merit because "even if the second complaint gives additional information that suggests a broader scope of fraud than the initial complaint, 'once the government knows the essential facts of the fraudulent scheme, it has enough information to discover related frauds.'" *United States ex rel. Doghramji v. Cmty. Health Sys.*, No. 3:11 C 442, 2020 WL 1640423, at *2 (M.D. Tenn. Apr. 1, 2020) (quoting *Poteet*, 552 F.3d at 517). The *Bowling* complaint provided the government with sufficient facts to discover related frauds, such as the ones alleged in *Marshall* and *VIB*.

Third, Relators argue *Bowling* cannot bar their action because they allege Defendants' use of new software to submit and approve OASIS assessments. (Doc. 49 at 17.) As discussed above, a different method is not necessarily a different scheme. *See Grynberg*, 390 F.3d at 1280 (stating a relator cannot "avoid § 3730(b)(5)'s first-to-file bar simply by alleging additional facts relating to *how* [the fraud was perpetrated], even though some of those specific allegations were not mentioned in the [first-filed] complaint)". Relator Marshall's allegations show why: "[t]he submission of falsely upcoded OASIS assessments was done throughout Relator's employment, regardless of whether the Defendants were utilizing paper records (pre-March, 2015) or electronic records (post-March 2015)." (Doc. 2 ¶ 99.) Thus, the use of new software that makes Defendants' fraud easier to complete does not prevent application of the first-to-file bar.

In sum, Relators' claims under 31 U.S.C. § 3729(a)(1)(A), (B), and (G) are barred by 31 U.S.C. § 3730(b)(5), as *Marshall* and *VIB* are related actions based on the facts underlying *Bowling*. Defendants' motion to dismiss (Doc. 46) will be **GRANTED IN PART**, and these FCA

24

claims will be **DISMISSED WITHOUT PREJUDICE**.[9]  As Relator VIB has no claims remaining, Relator VIB will be **DISMISSED** from this lawsuit.

The only remaining claim therefore is Relator Marshall's retaliation claim under the FCA.

### B.    Marshall's Retaliation Claim

"To protect whistleblowers exposing fraud on the government, . . . the FCA also contains an anti-retaliation provision." *Miller v. Abbott Lab'ys*, 648 F. App'x 555, 559 (6th Cir. 2016). "[T]o establish a claim for retaliatory discharge, a plaintiff must show: (1) [she] engaged in a protected activity; (2) [her] employer knew that [s]he engaged in the protected activity; and (3) [her] employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).  Failure to plead any one of these elements results in dismissal. *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017).  However, proving an FCA violation is not an element of such a claim. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015).

Defendants argue Relator Marshall's allegations fail to establish any element of her retaliation claim.  (Doc. 47 at 28–30.)  Each element is addressed in turn.

#### 1.    Protected Activity

Congress expanded the definition of "protected activity" in 2009. *See Miller*, 648 F. App'x at 560 (discussing statutory definition pre- and post-amendment).  Under the expanded definition, "to show [she] engaged in protected activity, a plaintiff must allege that [she] engaged in activities

---

[9] Defendants ask the Court to dismiss Relators' claims with prejudice.  (Doc. 47 at 7, 30.) The Court finds it inappropriate to do so, as the dismissal is on jurisdictional grounds and "dismissals for lack of jurisdiction should generally be made without prejudice." *See Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005); *see, e.g.*, *United States ex rel. Moore v. Pennrose Props., LLC*, No. 3:11-cv-121, 2015 WL 1358034, at *19 (S.D. Ohio Mar. 24, 2015).

25

that either: (1) were in furtherance of a *qui tam* action under § 3730 of the FCA; or (2) were in effort to stop one or more violations of the FCA." *Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015), *aff'd by* 676 F. App'x 421 (6th Cir. 2017).

Internal reports of suspected misconduct constitute protected activity. *See Miller*, 648 F. App'x at 560 ("The amended statutory language also explicitly confirms . . . that § 3730(h) protects internal reports of, or other efforts to stop, fraud on the government."); *Fakorede v. Mid-S. Heart Ctr., P.C.*, 182 F. Supp. 3d 841, 849 (W.D. Tenn. 2016), *aff'd by* 709 F. App'x 787 (6th Cir. 2017) ("Such protected activity includes reporting suspected misconduct to internal supervisors."). But "merely urging compliance with regulations," *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000), or "[g]eneralized complaints about wrongdoing," *Howard*, 14 F. Supp. 3d at 1023, are not enough. Rather, internal reports and complaints must "concern fraud or false claims against the Government." *Howard*, 14 F. Supp. 3d at 1023. Thus, "an employee must show some linkage between the activities they complain of and fraud on the government." *United States ex rel. Crockett v. Complete Fitness Rehab.*, 721 F. App'x 451, 461 (6th Cir. 2018).

Relator Marshall sufficiently alleges she engaged in protected activity because she alleges she reported and complained to supervisors of activities that, if true, would result in fraud on the government.[10] Specifically, Relator Marshall "objected to" and "refused to comply with the company's directive that she recertify patients who did not qualify for additional home health services and override clinicians' OASIS assessments." (Doc. 40 ¶ 253.) Similar allegations have

---

[10] Defendants assert Relator Marshall has failed to show she tried to stop a specific fraudulent claim. (Doc. 51 at 30–31.) However, "a plaintiff 'need not establish that the employer actually violated the FCA,' so long as she 'shows that her allegations of fraud grew out of a reasonable belief in such fraud.'" *United States ex rel. Crockett v. Complete Fitness Rehab.*, 721 F. App'x 451 (6th Cir. 2018) (quoting *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015)).

been found sufficient to allege protected activity by the Court of Appeals. *See Crockett*, 721 F. App'x 451. In *Crockett*, the plaintiff alleged "she was fired for identifying what she says was upcoding causing Medicare to pay more than patients' circumstances warranted." *Id.* at 460. The Court of Appeals found "there was a tight link between Crockett's complaints about improperly coding and treating Medicare patients, and the subsequent assumption that Medicare would pay on the basis of that improper coding and treatment." *Id.* at 461. The same is true here—Relator Marshall reasonably believed Medicare would reimburse Defendants based on the fraudulent OASIS assessments. Further, as in *Crockett*, Relator Marshall "linked her objections about those practices to a purported fraud on the government through her allegation that the only reason why [Defendants] persisted in these practices was to increase revenue," *id.* at 460. (*See* Doc. 40 ¶¶ 3, 84, 111, 140.)

Thus, Relator Marshall sufficiently alleges that she engaged in protected activity.

## 2. Employer Notice

Next, Relator Marshall must allege Defendants were aware of her protected activity. *See Yuhasz*, 341 F.3d at 566. Allegations that an employee has reported or complained to supervisors about possible fraud on the government are sufficient to meet this element. *See, e.g.*, *McFeeters v. Nw. Hosp., LLC*, No. 3-13-0467, 2015 WL 328212, at *6 (M.D. Tenn. Jan. 23, 2015) (finding notice element met when the plaintiff "allege[d] that she not only reported Defendants' practices to Medicare, but she also notified the hospital CEO, Assistant CEO, and two of her supervisors in writing that she had reported their misconduct to Medicare").

To her Performance Improvement Coordinator, Relator Marshall reported that "she was having to change practically every Oasis question submitted, and [the Coordinator] responded that she knew" (Doc. 40 ¶ 251; *see also id.* ¶ 104) and "complained about these directives from LHC"

27

(*id.* ¶ 247). "At least once a week—during her weekly case conference (and on other occasions, too)—Marshall approached her Branch Managers, Libby Davis and Melanie Gibson, to question these practices." (*Id.* ¶ 247.) Specifically, in May 2016, Relator Marshall "again objected to Gibson about LHC's fraudulent practices" and "refused to comply with the company's directive that she recertify patients who did not qualify for additional home health services and override clinicians' OASIS assessments." (*Id.* ¶ 253.) Gibson responded "I don't blame you. It's wrong." (*Id.*) Taking these allegations as true, Relator Marshall plausibly alleges that Defendants were aware of her protected activity based on her reports and complaints to her Performance Improvement Coordinator and Branch Managers.

### 3. Causation

The final element of an FCA retaliation claim is causation. *See McFeeters*, 2015 WL 328212, at *6. "[T]o prove that the action was taken 'because of' the protected activity, the employee must show that the retaliation was motivated, at least in part, by the employee's engaging in protected activity." *Howard*, 14 F. Supp. 3d at 1021.

Relator Marshall's allegations regarding causation are sufficient to survive Defendants' motion to dismiss. Relator Marshall was fired on June 2, 2016. (Doc. 40 ¶ 18.) Throughout her six years with Defendants, she received excellent performance evaluations. (*Id.* ¶ 245.) However, Defendants fired her without prior warning, which was not "consistent with LHC's treatment of other employees who had not objected but who were put on performance improvement plans" (*Id.* ¶ 261). Her termination occurred approximately one month after she complained and refused to participate in Defendants' fraud. (*Id.* ¶¶ 253, 255.)

Taken as true, the Court finds these allegations sufficient to allege Relator Marshall's termination was motivated, at least in part, by her complaints of and refusal to participate in alleged

28

Medicare fraud.  "Temporal proximity between the protected activity and the retaliatory conduct can be sufficient to permit an inference of causation in limited circumstances."  *Howard*, 14 F. Supp. 3d at 1021.  The Court of Appeals has stated:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  The one-month gap here suggests Relator Marshall's termination was somewhat motivated by her protected activity.  This temporal proximity, on its own and in conjunction with positive performance reviews and termination without warning, are sufficient evidence of causation at this stage.  *See, e.g.*, *McFeeters*, 2015 WL 328212, at *6 (alleging "that, following her complaints, [the plaintiff] received her first ever negative performance review, was harassed and intimidated by superiors and co-workers, was placed on suspension, and was fired"); *United States ex rel. White v. Gentiva Health Servs.*, No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223, at *17 (E.D. Tenn. June 25, 2014) (finding the plaintiff "sufficiently alleged that her push for an audit was the reason for her termination-that the criticism and allegations of poor performance were nothing more than a pretext for Gentiva's retaliatory actions").

Thus, Relator Marshall has plausibly stated a claim under 31 U.S.C. § 3730(h) for retaliatory discharge.  Defendants' motion to dismiss (Doc. 46) will be **DENIED IN PART** as to this claim.

IV.     **CONCLUSION**

The Court will **ORDER** as follows:

1.      The State of Tennessee will be **DISMISSED** from this lawsuit, and the Clerk of the Court will be instructed to update the case caption accordingly;

2.      Defendant's motion to dismiss (Doc. 46) will be **GRANTED IN PART**, as Relators' claims for violations of 31 U.S.C. §§ 31 U.S.C. § 3729(a)(1)(A), (B), and (G) are barred by 31 U.S.C. § 3730(b)(5);

3.      Relator VIB will be **DISMISSED** from this lawsuit because it has no claims remaining; and

4.      Defendant's motion to dismiss (Doc. 46) will be **DENIED IN PART** as to Relator Marshall's retaliation claim under 31 U.S.C. § 3730(h).

**AN APPROPRIATE ORDER WILL ENTER.**


                                        **/s/**_____
                                        **CURTIS L. COLLIER**
                                        **UNITED STATES DISTRICT JUDGE**

30